**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
Palm Beach County Division

ROGELIO LUIS NORES,                                          Case No.

                            Plaintiff,

v.

GEOFF PAYNE,

                            Defendant
_____

## COMPLAINT FOR DEFAMATION AND DECLARATORY RELIEF

Plaintiff Rogelio Luis Nores, an individual ("Plaintiff") brings this action against Geoff Payne, an individual ("Defendant Geoff") and alleges as follows:

### INTRODUCTION

Plaintiff brings this defamation claim and declaratory judgement action against Defendant Geoff arising from the May – September 2024 activities in Wellington, Florida (Palm Beach County) of Defendant Geoff and other persons.  Liam Payne (deceased October 16, 2024) was a member of the globally famous One Direction music group and subsequently a globally famous solo entertainment artist. Liam was an incredible individual. Liam and Plaintiff were mutual dear friends.  Predicated on and arising from Defendant Geoff's and other peoples' 2024 activities in Palm Beach County, Defendant Geoff published Two Sworn Declarations which are false and constitute defamation of Plaintiff. Defendant Geoff's defamation of Plaintiff has had a Palm Beach County defamatory adverse impact/injury on Plaintiff and Plaintiff's reputation of mega proportions with extensive damages[1] all which were done negligently, with intent, recklessly and/or malice ill will by Defendant Geoff the results of which were all known to and foreseeable by Defendant Geoff.

_____

[1] Plaintiff will donate net financial proceeds of the judicial proceedings for the benefit of Liam Payne's son – Bear Payne

## JURISDICTION/VENUE

1.       (a) This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a United States citizen resident in Miami, Florida.  Defendant Geoff is a United Kingdom citizen resident in England.

2.       This Court has personal jurisdiction over Defendant Geoff under the U.S. Constitution, the Florida Constitution and pursuant to Florida Statute § 48.193(1)(a)(2) and his substantial physical presence in Palm Beach County, Florida from which Plaintiff's claims arise.

3.       Defendant Geoff has submitted himself to the Court's jurisdiction by his acts and substantial physical presence in Palm Beach County, Florida and the publication of the false Relevant Content information and statements in Defendant Geoff's Two Sworn Declarations [See Paragraphs 71, 72, 73, and 74 of this Complaint], which were published in Palm Beach County, Florida and accessible in Palm Beach County Florida, from which Plaintiff's claims arise. (Exhibit G and as alleged herein). As alleged herein, Defendant Geoff's Palm Beach activities include, among others:

(a)       (i) May – July 2024 – a 10+ week physical presence in Palm Beach County, Florida, and interactions in Palm Beach County with Liam Payne (deceased son of Defendant Geoff) ("Liam"), Katelyn (Kate) Cassidy (Liam girlfriend), Bledar Vata (Liam  bodyguard) and Plaintiff,  (ii) interactions with and/or failure to interact with Liam's professional doctors, psychiatrists, therapists, addiction experts, and other medical specialists in and from Palm Beach County, and (iii) interactions with other persons in Palm Beach County who interacted with Defendant Geoff, Liam, Kate Cassidy (girlfriend) and Bledar Vata (bodyguard); and (iv) knowledge created, learned, and retained[2] during the 10+ week stay in

---

[2] This also includes (1) the statements and contents in Defendant Geoff's Two Sworn Declarations that were not based on personal knowledge and (2) the material omissions from Defendant Geoff's Two Sworn Declarations.

Palm Beach County which are the predicate/foundation for the false Relevant Contents information and statements [see paragraphs 71, 72 and 73 of this Complaint] of Defendant Geoff's October 22, 2024 1st Sworn Declaration (Exhibit J) and October 25, 2024 2nd Sworn Declaration (Exhibit K) (collectively "Defendant Geoff's Two Sworn Declarations" or "Two Sworn Declarations"[3]) (collectively referred to "Defendant Geoff's Palm Beach Presence Activities").

(b)     Defendant Geoff's wrongful activities, tortious activities and unlawful, defamation publication predicated on Defendant Geoff's Palm Beach Presence Activities and Defendant Geoff's publication of the false Relevant Contents information and statements [see paragraphs 71, 72 and 73 of this Complaint] of Defendant Geoff's Two Sworn Declarations (Exhibits J and K) which were published in Palm Beach County/Florida and accessed by persons in the Palm Beach County/Florida, caused injury and damages to Plaintiff in Palm Beach County/Florida (Exhibit G and as alleged herein); and

(c)      Defendant Geoff's Palm Beach Presence Activities, conduct, publication, access, and defamation and injury of Plaintiff in Palm Beach County, Florida are the proximate cause of Plaintiff's injury and damages incurred by Plaintiff in Palm Beach County.  Defendant Geoff's Palm Beach Presence Activities and Defendants Geoff's publication of Defendant Geoff's Two Sworn Declarations [see paragraphs 71, 72 and 73 of this Complaint] (Exhibits J and K), which were published in Palm Beach County/Florida and were accessible from Palm Beach County/ Florida, give rise to Plaintiff's cause of action against Defendant Geoff in Palm Beach County, Florida. See Exhibits E, F, and G.

---

[3]  The Two Sworn Declarations of Defendant Geoff are internally inconsistent and self incriminating for Defendant Geoff.

(d)     At the time of Defendant's publication and re-publication of the false Relevant Contents information and statements [see Paragraphs 71, 72 and 73 of this Complaint, Defendant Geoff knew or should have known that the described parts of the Two Sworn Declarations were false, misleading, omitted material information which made them false and/or misleading, and/or were not made on personal knowledge. Defendant Geoff's Two Sworn Declarations caused a tortious act in Palm Beach County/Florida and constitutes publication in Palm Beach County, and defamation against Plaintiff, causing injury and damages to Plaintiff and Plaintiff's reputation in Palm Beach County/Florida and elsewhere.

4.     Venue is proper in Palm Beach County, Florida, pursuant to 28 U.S.C. 1391. The cause of action arises from and accrued in Palm Beach County, Florida:

(a)     May – July 2024 10+ week physical presence constituting Defendant Geoff's Palm Beach Presence Activities are the predicate for and give rise to Plaintiff's claims alleged herein;

(b)     Defendant Geoff's wrongful activities, tortious activities and unlawful, defamation publication predicated on Defendant Geoff's Palm Beach Presence Activities and Defendant Geoff's publication of the false Relevant Contents information and statements [see Paragraphs 71, 72 and 73 of this Complaint] of the Two Sworn Declarations were published in Palm Beach County/Florida and accessible by persons in Palm Beach County/Florida (Exhibit G and as alleged herein); and

(c)     Defendant Geoff's injury and damages imposed on and incurred by Plaintiff in Palm Beach County arising from Defendant Geoff's Palm Beach Presence Activities and Defendant Geoff's publication of Defendant Geoff's Two Sworn Declarations and Relevant Content information and statements [see paragraphs

71, 72 and 73 of this Complaint] which were published in and which were accessible from Palm Beach County/Florida (Exhibit G and as alleged herein), give rise to Plaintiff's cause of action against Defendant Geoff in Palm Beach County, Florida.

    (d)    Defendant's publication and re-publication of the false Relevant Contents information and statements [see Paragraphs 71, 72 and 73 of this Complaint] was done negligently, intentionally, recklessly, and/or with malice ill will and Defendant Geoff knew or should have known the described parts of the Two Sworn Declarations were false, misleading, not made on personal knowledge, and/or omitted material information which made them false and misleading. Defendant Geoff's Two Sworn Declarations caused a tortious act in Palm Beach County, Florida and  constitutes defamation against Plaintiff, causing injury and damages to Plaintiff  in Palm Beach County, Florida and elsewhere.

    5.    Defendant Geoff's Palm Beach Physical Presence Activities and Defendant Geoff's interaction with Plaintiff in Palm Beach County formed the predicate for the false Relevant Contents information and statements [see Paragraphs 71, 72 and 73  of this Complaint] contained in Defendant Geoff's Two Sworn Declarations and Defendant Geoff's publication of the defamatory information and statements and foreseeable re-publication in Palm Beach County, Florida and caused injury and damages to Plaintiff and Plaintiff's reputation in Palm Beach County, Florida.

    6.    Plaintiff has suffered substantial defamation and reputational injury and damages in Florida, including Palm Beach County, Miami Dade County, and elsewhere from the false defamatory Relevant Contents information and statements [see paragraphs 71, 72 and 73  of this Complaint] of Defendant Geoff's Two Sworn Declarations (Exhibits J and K) the information and statements of which were published in Palm Beach County, Florida and accessible by persons in Palm Beach County, Florida (Exhibit G and as alleged herein).

7.        In June - July  2024, Liam made the decision to move to Palm Beach County, commenced moving his business and operating structure to Palm Beach County, opened a bank account in Palm Beach County, Florida, and signed, in July 2024, a one year lease [See Exhibit H] on a residence in Wellington, Florida (Palm Beach County). Liam lived in Palm Beach County from mid-May – late July and September 2024 related to the matters in this Complaint which form the predicate for and are the basis for the Relevant Contents information and statements [see paragraphs 71, 72, and 73 of this Complaint] in the Two Sworn Declarations.

8.        The Southern District of Florida (West Palm Beach Division) is a convenient forum for Plaintiff, Defendant Geoff, documents, physical inspection of premises, and all relevant witnesses (including all medical persons[4] related to and who treated Liam, local persons who interacted with Defendant Geoff, Liam, Kate Cassidy (girlfriend), Bledar Vata (bodyguard) and others – all in Palm Beach County, Florida.

9.        By Defendant Geoff's Palm Beach Presence Activities in Palm Beach County, Defendant Geoff has submitted himself to the jurisdiction of the Courts in Palm Beach County, Florida.

10.        By Defendant Geoff's publication and foreseeable republication of the false Relevant Contents information and statements contained in Defendant Geoff's Two Sworn Declarations (Exhibits J and K) in Palm Beach County, Defendant Geoff has submitted himself to the jurisdiction of the Courts in the Palm Beach County, Florida.

---

[4] A crux of one of the most fallacious Defendant Geoff false statements is on Page 2, line 27-36 (Spanish version) and page 2 , line 10-18 (English version) of his 2nd Sworn Declaration where he falsely and without any personal knowledge or independent corroboration states that Plaintiff and Liam visited in September 2024 "another psychiatrist" in Palm Beach County. This statement is complete fiction. This is a defamation per se statement by Defendant Geoff. Defendant Geoff's published and republished defamatory statements constitute defamation per se. See Paragraphs 71, 72, and 73 of this Complaint. Defendant Geoff omitted the August 23-26, 2024 emails [see Exhibit I] with Plaintiff in which Plaintiff categorically stated he would not provide any care support for Liam other than Plaintiff's continuing dear friendship. See Paragraph 73 of this Complaint.

**PARTIES**

Plaintiff

11.     Plaintiff was born in the United States and is a United States citizen and is resident of Miami-Dade County, Florida.   Plaintiff is an international energy and industrial business person based in the United States.

12.     Since 2020, Plaintiff was a dear friend of Liam and Liam was a dear friend of Plaintiff.  As dear friends, each of Liam and Plaintiff provided the other with dear friendship, dear friend companionship and dear friend support in business and personal life. Neither Liam nor Plaintiff was the caretaker of the other. Neither Liam nor Plaintiff had any custody or control over the other. Neither Liam nor Plaintiff had a duty of care with the other. Neither Liam nor Plaintiff paid the other money.

13.     Between mid-May – September 2024, at relevant times, Plaintiff was present in Palm Beach County with Defendant Geoff, Liam, Kate Cassidy (girlfriend) and Bledar Vata (bodyguard).

Defendant

14.     Defendant Geoff Payne ("Defendant Geoff") is a United Kingdom citizen and resident of England.

15.     Between mid-May – mid-July 2024 – 10+ weeks, Defendant Geoff engaged in Defendant Geoff's Palm Beach Presence Activities in Palm Beach County with Liam, Kate Cassidy (girlfriend),  Bledar Vata (bodyguard) and Plaintiff.

16.     Defendant Geoff participated in the preparation of, signed, and did publish and re-publish the false Relevant Content information and statements [see Paragraphs  71, 72 and 73  of this Complaint] of (1) the October 22, 2024 1st Defendant Geoff Sworn Declaration (Exhibit J) and (2) the October 25, 2024 2nd Defendant Geoff Sworn Declaration (Exhibit K) which are predicated

on Defendant Geoff's Palm Beach Presence Activities, Liam's activities in Palm Beach County, Kate Cassidy's (girlfriend) actions, Bledar Vata (bodyguard) actions and all related persons' activities in Palm Beach County, including Plaintiff's. Defendant Geoff negligently, knowingly, intentionally, with reckless disregard and/or malice for the accuracy and truth, published defamatory statements of Plaintiff defamed and damaged Plaintiff in Palm Beach County, Florida, and created defamation damages for Plaintiff in Palm Beach County, Florida.

17.     Defendant Geoff's false Relevant Contents information and statements [see Paragraphs 71, 72 and 73 of this Complaint] in Defendant Geoff's Two Sworn Declarations were published  and re-published in Palm Beach County/Florida and were accessible by persons in Palm Beach County, Florida.  With the signing of Defendant Geoff's Two Sworn Declarations, Defendant Geoff published and re-published the false Relevant Content information and statements [see Paragraphs 71, 72 and 73 of this Complaint] of Defendant Geoff's Two Sworn Declarations and did reasonably foresee the continuous publication and republication of the false Relevant Content information and statements in Palm Beach County. Defendant Geoff knew or should have known that his actions would defame, injure, and damage Plaintiff and Plaintiff's reputation in Palm Beach County, Florida, Nationally and Globally.

18.     Exhibit F contains a sampling of media articles with defamatory information, statements and content published and re-published which were predicated on and taken from Defendant Geoff's Two Sworn Declarations establishing that Defendant Geoff's [false] defamatory statements  against Plaintiff  arose during and are anchored: (i) in Defendant Geoff's Palm Beach Presence Activities in May 2024, (ii) in Liam's May – September 2024 activities in Palm Beach/Florida, (iii) in Kate Cassidy's (girlfriend) May – September 2024 activities in Palm Beach County/Florida, (iv) in Bledar Vata (bodyguard) May – September 2024 activities in Palm Beach County/Florida, (v) in Plaintiff's May – September 2024 activities in Palm Beach County/Florida, (vi) Liam's medical professionals May – September activities in and from Palm Beach

County/Florida, and (vii) all other relevant persons they interacted with in Palm Beach County:

    (a)    <u>TMZ- November 26, 2024</u> – "According to the docs, Liam's dad was interviewed by authorities and said in <u>May 2024</u>[5], Roger volunteered to take over Liam's care and arrange to put him in rehab"

    (b)    <u>New York Post – November 26, 2024</u> - Authorities interviewed Liam Payne's father, who said that Nores volunteered to take over as Liam Payne's caretaker <u>in May</u> [6]and arrange for him to go to rehab, as the documents state.

    (c)    Each of Defendant Geoff's alleged activities about Plaintiff allegedly occurred in or arose from Palm Beach County, Florida during Defendant Geoff's Palm Beach Physical Presence Activities and other activities between Plaintiff and Defendant Geoff, Kate Cassidy (girlfriend), Bledar Vata (bodyguard), all arising from Palm Beach County, Florida.

    (d)    The false Relevant Content information and/or statements [see Paragraphs 71, 72 and 73 of this Complaint] from the Two Sworn Declarations (Exhibits J and K) were published and re-published in Palm Beach County, Florida and accessible from Palm Beach County, Florida.

## **OVERVIEW**

19.    Liam Payne ("Liam") was an incredible artist and, more importantly, and incredible individual.  Liam was Defendant Geoff's son.  Since 2020, Liam and Plaintiff were mutual dear friends.

---

[5]  In May – July 2024, Defendant Geoff, Liam, Kate Cassidy (girlfriend), Bledar Vata (bodyguard) and Plaintiff lived in Palm Beach County, Florida.
[6]  In May – July 2024, Defendant Geoff, Liam, Kate Cassidy (girlfriend), Bledar Vata ( bodyguard) lived in Palm Beach County, Florida. In September 2024 Liam, Kate Cassidy (girlfriend) and Bledar Vata (bodyguard)  lived in Palm Beach County, Florida at Liam's residence.

20.     Liam was an internationally acclaimed music artist of significant global fame and success.  Liam was a member of the globally famous One Direction music group.  Liam and or the music group reportedly sold more than 60 million albums as part of the global phenomena One Direction and reportedly sold more than 2 million albums as a single artist.

21.     It was widely reported and publacally acknowledged by Liam (1) that he developed a long term addiction to recreational drugs and alcohol, (2) was in and out of, over a long term period, addiction treatment programs some of which he finished and some of which he did not complete, and (3) that he alternatively followed and did not follow medical advice of his evolving medical team [consisting of addiction therapist, psychiatrists and other doctors, other professional addiction specialists, and treatment centers] from year to year[7].

22.     In 2020, Plaintiff and Liam became friends and were, as dear friends, supportive of each other.  That mutual dear friendship between Plaintiff and Liam continued to the date of Liam's tragic death – October 16, 2024.

23.     Since 2020, Plaintiff was a dear friend of Liam and Liam was a dear friend of Plaintiff.  As dear friends, Liam and Plaintiff each provided the other with dear friendship, dear friend companionship and dear friend support in personal life and in business life.

24.     Plaintiff had a dear mutual friendship with Liam and as a dear friend sought to be supportive of Liam. Plaintiff was never a caretaker of Liam in any respect and never had a legal duty of care to Liam. Plaintiff never had custody and/or control over Liam in any respect. Liam was an independent adult person who made all his own decisions.

25.     Between mid-May – late July 2024, Defendant Geoff and Liam decided to seek privacy together in Wellington, Florida and moved to Wellington, Florida for 10+ weeks.[8]

---

[7] See Pages 20-21 of Defendant Geoff's 1st Sworn Declaration (Exhibit J) in which Defendant Geoff states that in April – May 2024 before coming to Palm Beach County, Liam was under hospital care for addiction issues.

[8] In June - July 2024, Liam decided to become a resident of Florida and signed a one year lease on his residence in Wellington, Florida. See Exhibit H.

Defendant Geoff and Liam were accompanied by Kate Cassidy (girlfriend), and Bledar Vita (bodyguard).  Plaintiff joined Liam and Defendant Geoff in Wellington, Florida during this 10+ week time-period.  In September 2024, Kate Cassidy (girlfriend) returned to and lived together with Liam in Wellington, Florida at Liam's residence as did Bledar Vata.

26.      In late July – August 2024, Defendant Geoff and Liam traveled to England and Liam subsequently traveled to Europe. Plaintiff did not travel with Defendant Geoff and/or Liam to England.

27.      In June – July  2024, Liam:

   (a)    decided to move to and reside in Wellington, Florida;

   (b)    signed (July 2024) a one year lease and rented a house, as his residence, in Wellington, Florida – See Exhibit H;

   (c)    opened a bank account in Palm Beach County;

   (d)    had video calls with his professional support staff/advisors to structure and to organize (i) the transfer of Liam's business structure and operations to Palm Beach County and (ii) his new residency in Wellington, Florida. Exhibit L.

28.      In September 2024, Liam, Kate Cassidy (girlfriend) and Bledar Vata (bodyguard) returned to Wellington, Florida.  They lived in Liam's house in Wellington, Florida with Liam.

29.      Liam suffered a tragic death in Buenos Aires, Argentina on October 16, 2024 after reportedly being forcibly removed from his hotel lobby [Hotel #3] by hotel personnel and locked in his hotel room by hotel personnel. Plaintiff was not at Hotel #3 when this tragic incident occurred.

30.      Plaintiff did not stay or live at Liam's Wellington residence.  Plaintiff never stayed or lived with Liam in Hotel #1, Hotel #2 (rental), and/or Hotel #3, located in Buenos Aries, Argentina.

31.      In October 2024, Defendant Geoff participated in the preparation of, signed, and published the Exhibit J 1st Defendant Geoff Sworn Statement and the Exhibit K 2nd Defendant Geoff Sworn Statement, both of which contain the false Relevant Contents information and statements which Defendant Geoff knew or should have known were inaccurate and false, and done negligently, with intent, reckless, and/or with malice [see Paragraphs 71, 72 and 73 of this Complaint].

32.      The Florida and global media coverage of the publication and re-publication of the Defendant Geoff Two Sworn Declarations contents, information, and statements (including the false Relevant Contents of each) has been widely reported on all forms of media publishing including the internet, published in Palm Beach County, Florida and accessible by Palm Beach County, Florida residents.  See Exhibits E, F, and G.

33.      Plaintiff has been damaged in Palm Beach County, Florida by the false Relevant Contents information and statements [see Paragraphs 71, 72 and 73 of this Complaint] in the Defendant Geoff Two Sworn Declarations. The false Relevant Contents information and statements [see Paragraphs 71, 72 and 73 of this Complaint] of Defendant Geoff Two Sworn Declarations are the proximate cause of Plaintiff's damages.  Defendant Geoff published and re-published the Defendant Geoff Two Sworn Declaration, was negligent, acted with intent, acted with reckless disregard for the accuracy and truth of his statements, acted with malice ill will with intent to damage Plaintiff, and Defendant Geoff could reasonably foresee that his published and republished information  and statements [see Paragraphs 71, 72 and 73 of this Complaint] would be published  in Palm Beach County, Florida, nationally, and globally and republished and would cause injury and damage to Plaintiff on a daily basis.

34.      On January 8, 2025, Plaintiff sent Defendant Geoff the Exhibit D demand and defamation retraction letter ("Plaintiff's Demand Letter"). As of the filing of this Complaint, Defendant Geoff has not retracted or corrected the false Relevant Contents information and

statements of the Defendant Geoff Two Sworn Declarations [see Paragraphs 71, 72, and 73 of this Complaint].   On January 10, 2025, counsel for Defendant Geoff responded and declined to retract. See Exhibit N. On January 13, 2025, Plaintiff sought any information that Defendant Geoff has to establish the contents of the January 8, 2025 letter (Exhibit D) and contents of this Complaint are not accurate and requested the result of any due diligence review done by Defendant Geoff and/or his counsel that determines the veracity of Defendant Geoff's Two Sworn Declarations and independent corroboration. See Exhibit O. As of the filing of this Complaint, Plaintiff has not received a response.

35.    Exhibits A, B, and C contain three demonstrative charts: Exhibit A identifying persons involved and relationships; Exhibit B providing  a summary timeline for the Palm Beach County [which are the predicate of Plaintiff's defamatory claims] and other activities; and Exhibit C providing a summary of certain  defamatory false statements, omissions and statements made with no personal knowledge by Defendant Geoff.

**FACTS**

**Liam Payne Overview**

36.    Liam was an internationally acclaimed artist of significant global fame and success.  Liam was a member of the globally famous One Direction music group and subsequently an acclaimed individual artist.  At age 31, Liam met a tragic death on October 16, 2024.

37.    The tragic death of Liam has had significant global media coverage, significant United States media coverage, and significant Florida & Palm Beach County[9] media coverage, including Liam's tragic death, the Relevant Contents information and statements of Defendant Geoff's Two Sworn Declarations [see Paragraphs 71, 72, and 73  of this Complaint], Plaintiff, and

---

[9] On January 17, 2025 an event is being held in West Palm Beach to honor Liam: "Welcome to One Direction Night - All For Liam! Join us on January 17th at The Banvan Live in West Palm Beach for a night filled with all your favorite One Direction hits in honor of Liam Payne. Get ready to dance and sing along to all the iconic songs that made One Direction a global sensation. Lets come together to show our love and support for Liam! See you there!"

related matters all of which were published in Palm Beach County/Florida and accessible by persons in Palm Beach County/Florida.

    (a)    Exhibit E shows that the name Liam Payne was (i) the 5th most searched name on Google in 2024 and (ii) the 1st name search of any person passing in 2024.

    (b)    Exhibit E shows that Plaintiff 's name search was extraordinarily low except December 27+/-, 2024 and January 7+/-, 2025.

    (c)    Exhibit F contains a summary sampling of relevant media coverage tied to the false Relevant Content information and statements [see Paragraphs 71, 72 and 73 of this Complaint] of Defendant Geoff's Two Sworn Declarations arising from Defendant Geoff's Palm Beach Presence Activities which, when published, Defendant Geoff knew or should have known were false and were published with malice ill will, which caused damage to Plaintiff and Plaintiff's reputation.

38.    Liam was in Wellington, Florida (Palm Beach County) between mid-May – late September 2024, except in late July/August when he departed to UK and Europe.

39.    On July 30, 2024, Liam and Alan McEvoy (UK accountant to Liam) and others had a call to discuss Liam's decision to move his residence to Wellington, Florida, move his business structure and operations to Palm Beach County, Florida and for Liam to be a resident of Palm Beach County Florida. See Exhibit L.

40.    Dated July 2024, Liam signed a one-year lease of a residence in Wellington, Florida. See Exhibit H.  In September 2024, Kate Cassidy (girlfriend) and Bledar Vata (bodyguard) lived with Liam at the Wellington address. During May – September 2024 (except August), there were many local persons, including Liam's medical advisors who interacted with each of Liam, Kate Cassidy (girlfriend), and Bledar Vata (bodyguard) in Wellington, Florida and Palm Beach County.

41.        In September 2024, Liam opened a bank account at a bank in Palm Beach County, Florida.

42.        During the mid-May – late September 2024 time period, Plaintiff spent more than 10+ weeks with Defendant Geoff, Liam, Kate Cassidy (girlfriend), Bledar Vata ( bodyguard) and others living in Wellington Florida (Palm Beach County) resulting in Liam deciding to move his residency and his business operations and structure to Palm Beach County.

**Plaintiff and Liam Payne Mutual Friend Relationship**

43.        On or about 2020, Plaintiff and Liam met and became dear friends.

44.        Plaintiff and Liam, as dear friends, supported each other as dear friends.

45.        Plaintiff was never the caretaker of Liam. Plaintiff did not have custody and/or control over Liam in any respect. Plaintiff was not the caretaker of Liam at any time, including between May – October 2024. Plaintiff was not the caretaker of Liam on October 16, 2024. At all times, Liam made his own independent decisions.

46.        Liam was not the caretaker of Plaintiff. Liam did not have a duty of care to Plaintiff. Liam did not have custody and/or control over Plaintiff in any respect.

47.        Plaintiff was never paid by Liam for anything. Plaintiff was not employed by or an independent contractor of Liam. Plaintiff did not have custody or control of Liam's finances.

48.        Plaintiff never provided Liam with recreational drugs or any restricted medicines. Plaintiff never had custody or control over any recreational drugs of or any restricted medicines of Liam.

**Defendant Geoff and Kate Cassidy (girlfriend) Care Status with Liam**

49.        In Defendant Geoff's Two Sworn Declarations (Exhibits J and K), Defendant Geoff self-declared himself to be the caretaker of Liam.[10]   Defendant Geoff had the capacity,

---

[10] In Pages 20-21 of the Exhibit J 1st Defendant Geoff Sworn Declaration, Defendant Geoff so states and on page 22 Defendant Geoff stated he supervised Liam drinking alcohol.

opportunity, and superior knowledge of Liam's personal activities to assist and to meet Liam's needs.

50.      During the September – October 2024, time period, Kate Cassidy (girlfriend) lived with Liam in Wellington, Florida and lived with Liam in Argentina [at Hotel #1, and Hotel #2 [rental] until she wanted to go home from Argentina and departed. Kate Cassidy (girlfriend) had the capacity, opportunity, and superior knowledge of Liam's personal activities to assist and to meet Liam's needs. On information and belief, in October 2024, Defendant Geoff took no action to provide medical care to Liam and/or to make certain that Liam was not alone.

**Defendant Geoff Payne and Liam Payne in South Florida Mid-May –  Late July 2024**

51.      As further detailed in Paragraphs 36 - 42 and established by Exhibit H, from mid-May 2024 to late July 2024, Liam lived in Palm Beach County Florida with Defendant Geoff and Kate Cassidy (girlfriend) and Bledar Vata (bodyguard) for the purpose of looking after Liam. Defendant Geoff, Liam, and others were in South Florida together for approximately 10+ weeks.

**Liam Payne With Defendant Geoff in England  – July – August 2024**

52.      On or about late July 2024, Defendant Geoff and Liam departed South Florida for England and were together in England during July - August 2024.

53.      During the time Liam was in England with Defendant Geoff, and as caretaker of Liam, continued to look after Liam. [11]

**Liam Payne in South Florida – September 2024**

54.      On or about early September 2024, Liam returned to Florida staying at his residence in Wellington, Florida with Kate Cassidy (girlfriend) and Bledar Vata (bodyguard). Plaintiff did not stay at Liam's Wellington residence.

55.      Liam directed, at all relevant times, the payment of a monthly allowance and

---

[11] In Pages 20-21 Exhibit J 1st Defendant Geoff Sworn Declaration, Defendant Geoff so states and on page 22 Defendant Geoff stated he supervised Liam drinking alcohol

financial expenses to Kate Cassidy (girlfriend).

56.     In September 2024, Kate Cassidy (girlfriend) lived with and stayed with Liam at Liam's Wellington Florida residence.

57.     Liam directed the payment of monthly compensation to Bledar Vata (bodyguard) in May – September 2024.

58.     During the May – September 2024 time period (except late July – August), Bledar Vata lived with Liam. In mid- September 2024, Mr. Vata was terminated by Liam. Defendant Geoff did not cause a new bodyguard for Liam to be hired in Palm Beach County.

59.     Mid-May – October 2024, Liam regularly used his laptop to orally communicate with persons, including his family, and carried his laptop with him as many people do a mobile phone. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-360-4177.

**Liam Payne in Buenos Aires, Argentina – Late September - October 16, 2024**

60.     On or about late September 2024, Liam traveled to Buenos Aires, Argentina.

61.     Plaintiff[12] never provided Liam with any recreational drugs and never controlled any prescribed medicines taken by Liam.

62.     In September 2024, Kate Cassidy (girlfriend) traveled from South Florida to Buenos Aries, Argentina with Liam.  Kate Cassidy (girlfriend) lived with and stayed with Liam at his two hotels: (1) Hotel #1 where she and Liam shared a hotel room; and  (2) Hotel #2 (rental) where she and Liam shared a room.

63.     Kate Cassidy (girlfriend) had  superior knowledge of Liam's  activities during this October 2024 time period.

64.     In October 2024 in Buenos Aires, Kate Cassidy (girlfriend) had day to day live-in relationship at Hotel #1 and Hotel #2 (rental) with Liam. She had the capacity, opportunity,

---

[12]  Plaintiff has never used/consumed recreational drugs and does not drink alcohol.

and superior knowledge to know Liam's activities and needs.

65.     Kate Cassidy (girlfriend) on or about October 12, 2024 left Liam and departed for the United States. Prior to her departure and after her departure, it is unknown how she used her capacity, opportunity and superior knowledge of Liam's personal activities to assist and to meet Liam's needs.

66.     Defendant Geoff did not travel to Argentina[13] to be with Liam in October 2024 so Defendant Geoff could continue his self declared caretaker role of Liam with Liam and for Liam not to be left alone. It is unknown how, in October 2024, Defendant Geoff used his capacity, opportunity and superior knowledge of Liam (1) to monitor and stabilize Liam's addiction and prescribed medicine issues, (2) to monitor and prevent any use of recreational drug matters by Liam, (3) to cause appropriate medical and treatment care to be provided to Liam, and (4) to make certain Liam was not alone. With his superior knowledge, self declared caretaker status, and familial relationship with Liam, it is unknown what Defendant Geoff did to assist Liam and make certain that Liam was not alone.

67.     On October 16, 2024, Liam suffered a tragic death in Buenos, Aires Argentina.

**Defendant Geoff Payne's Published Two Sworn Declarations [October 22 & 25, 2024] Containing Published Defamatory Statements Injuring Plaintiff**

68.     Defendant Geoff participated in the preparation of, signed and published the Defendant Geoff Two Sworn Declarations. Exhibits J and K . When Defendant Geoff signed the Defendant Geoff Two Sworn Declarations, Defendant knew and/or should have known that the Relevant Contents information and statements [see paragraphs 71, 72, and 73 of this Complaint] were false, contained material omissions, and many parts were not based on personal knowledge so Defendant Geoff could not swear to the truthfulness of the information and statements, yet

---

[13]   __ See also Paragraph 71 where in September 2024 Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington, Florida to take care of Liam. Despite being Liam's self declared caretaker, Defendant Geoff did not come to Florida to take care of Liam.

Defendant Geoff did not disclose this information. .

69.     Defendant Geoff negligently, knowingly, with intent, recklessly, and/or with malice omitted from the Defendant Geoff Two Sworn Declarations material information which Defendant Geoff knew or should have known made the Geoff Payne Two Sworn Declaration statements materially misleading and false.

70.     Defendant Geoff (i) negligently, knowingly, with intent, reckless, and/or with malice published the false Relevant Contents information and statements [see paragraphs 71, 72, and 73 of this Compliant] in the Defendant Geoff Two Sworn Declarations and (i) knew that such statements were not based on personal knowledge so Defendant Geoff could not swear to the truthfulness of the information and statements, and (ii) omitted material facts which made Defendant Geoff's statements false and misleading, causing damage to Plaintiff and Plaintiff's reputation. Defendant Geoff did damage Plaintiff and Plaintiff's reputation in Palm Beach County, Florida, nationally, and globally—the damages from which continue on a daily basis.

71.     The false Relevant Contents information and statements of the 1st Defendant Geoff Sworn Declaration[14] include:

(a)     Page 2, line 15-19 Spanish/Page 16, line 14-18 English: "For that reason my phone contact with Liam was not direct, it was always through third parties, particularly, in his last stay in Argentina it was through his girlfriend Kate Cassidy (+447███████) and Roger Nores (+1305███████) who were in his care due to his addictions."

i.     Fact: Plaintiff never agreed to be the caretaker of Liam and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support.

---

[14] The Two Sworn Declarations of Defendant Geoff are internally inconsistent and incriminating for Defendant Geoff.

Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-███████.

ii.  Fact:  In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

iii.  Fact:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florida and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam.[15]

(b)  Page 7, line 16-19 Spanish/page 21, line 11-13 English: "I, Liam, and the bodyguard heard Roger tell him that he knew that his health was not good, and that since he had known him for a long time, he offered to help him in exchange for nothing."

i.  Fact: Plaintiff never agreed to be the caretaker of Liam.  Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period.

---

[15] At the same time (as noted on page 23 of Defendant Geoff's 1st Sworn Declaration (Exhibit J) Defendant swore that in September 2024 he was "very concerned about" Liam's health status.

Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-▮▮▮▮▮.

    ii.   <u>Fact</u>:   In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

    iii.   <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florida and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam.

    iv.   <u>No Personal Knowledge</u>. Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and as a result, Defendant Geoff could not attest to the truthfulness of the sworn statements as to others, which are false

(c)    Page 7, line 19-25 Spanish/page 21, line 13-19 English: "He offered to leave London and do a good recovery treatment in Miami. At that moment Roger was entirely available to Liam and in his care, he offered to take care of him and his recovery. This call was at night, the next day the three of us flew to Miami because we considered that this absolute change of environment was going to be favorable for Liam."

    i.   <u>Fact</u>: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone

or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-███████.

    ii. <u>Fact</u>:  In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

    iii. <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florida and take care of Liam. Defendant Geoff declined to come to Wellington.

(d)    Page 7, line 27-31 Spanish/page 21, line 21-25 English: "We stayed there [Palm Beach County, Florida] for 10 weeks with Liam, the four of us. During that time we formed a team with Roger and the bodyguard for Liam's recovery, always monitored by psychologists and psychiatrists, all of Roger's contacts so I don't have their details now."

    i. <u>Fact</u>: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support.   Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop.  In October 2024 and at the time of his tragic death, Liam's

mobile phone number was 561-███████.

    ii.   <u>Fact</u>: In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

    iii.   <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florid and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam

    iv.   <u>Fact</u>: Defendant Geoff was a self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

(e)    Page 8, line 20-25 Spanish/page 22 , line 12-16 English: "I had the feeling that it [Palm Beach County] was a safe place for him, that he was in good company (the bodyguard is my trusted person and Roger at that time and voluntarily offered to take charge and take responsibility for Liam) and I thought it was good that he stayed until he started his work in Manchester."

    i.   <u>Fact</u> : Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-███████.

      ii.  <u>Fact</u>:  In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

     iii.  <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florid and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam

     iv.  <u>Fact</u>:  Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

(f)    Page 10, line 3-9 Spanish/page 23, line 27-32 English: "… to provide the filiation and contact details of the health professionals who were in charge of Liam's subsequent treatment in the USA and those who later assisted him here in Argentina as part of the procedure to renew his US visa, he replied: "No, that data must be in Roger who managed the whole matter"

      i.  <u>Fact</u>: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop.  In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-███████.

     ii.  <u>Fact</u>:  In August 23-26, 2024 emails (see Exhibit I) to and from

Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

iii.   Fact:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florid and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam

iv.   Fact: Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

v.   No Personal Knowledge. Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and as a result, Defendant Geoff could not attest to the truthfulness of the sworn statements, which are false.

(g)   Page 11, line 29-35 Spanish/page 25, line 16-22 English: "What I want to make clear is that Roger had full responsibility for Liam's care during this last period when at least I was not there, because that is how he assumed it when he called him by his own means to help him in his treatment. In fact, it was Roger himself who decided to accompany Liam on his last stay in Buenos Aires as part of all this care he needed. Care of which Roger was well aware"

i.   Fact: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar

Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-████████.

ii. <u>Fact</u>:  In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

iii. <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florid and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam

iv. <u>Fact</u>:  Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

v. <u>No Personal Knowledge.</u>  Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and as a result, Defendant Geoff could not attest to the truthfulness of the sworn statements, which are false.

(h)   Page 11, line 35 and page 12, line 1-9 Spanish/page 25, line 22-29 English: "Liam's trust and care group at first were the bodyguard and I, in addition to Liam's girlfriend, then Roger joined and when I had to go back to my house and the bodyguard too, Roger and Liam's girlfriend continued. He was together with Liam precisely to take care of him for no other reason, in fact he regularly reported his state of health to me. Liam couldn't be left alone and Roger knew

it and when the care group format broke when Liam's girlfriend left, Roger booked Liam a room for himself and that's how what happened happened."

i.  Fact: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-████████.

ii. Fact:  In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

iii. Fact:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florida and take care of Liam. Defendant Geoff declined to come to Wellington take care of Liam

iv. Fact: Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

v.  No Personal Knowledge. Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and as a result, Defendant Geoff could not attest to the truthfulness of the sworn

statements, which are false.

(i)     Page 12, line 9-17 Spanish/page 25, line 30-35 English: "Because Roger knew that the objective of the group was to keep Liam busy, he could not be left alone in the vulnerable situation in which he was, it was even the recommendation that one of the doctors in the UK had given me (I don't remember his details) and that was the basis of Liam's recovery which was always remembered in the care group that included Roger. Liam could not be alone and Roger was the one who had taken responsibility for that care, at least during his stay here in Argentina."

  i.   <u>Fact</u>: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-███████.

  ii.  <u>Fact</u>:  In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

  iii. <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florid and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam

iv. <u>Fact</u>: Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was by Defendant Geoff's personal choice.

v. <u>No Personal Knowledge.</u>  Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and as a result, Defendant Geoff could not attest to the truthfulness of the sworn statements, which are false.

(j)     Page 12, line 26-29 Spanish/page 26, line 11-14 English: "When I wasn't with Liam, and he stayed with Roger who was responsible for his care, he was the one who reported his condition to me and sometimes his bodyguard when he was an artist."

i. <u>Fact</u>: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) Liam direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-████████.

ii. <u>Fact</u>:   In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

      iii.  <u>Fact</u>:  In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington Florida and take care of Liam. Defendant Geoff declined to come to take care of Liam

      iv.  <u>Fact</u>: Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

      v.  <u>No Personal Knowledge</u>. Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and as a result, Defendant Geoff could not attest to the truthfulness of the sworn statements, which are false.

72.      The false Relevant Contents information and statements of the 2nd Defendant Geoff Sworn Declaration[16] includes:

      (a)      Page 2, line 27-36 Spanish/page 2 , line 10-18 English: "It should be noted that Mr. Bledar Vata ▮▮▮▮▮@gmail.com) turns out to be the one who was Liam's bodyguard in Londres (Great Britain) and in Florida (USA) from August 2023 to September 17, 2024, providing his cell phone: +44▮▮▮▮▮▮. That Mr. Vata was fired from his job as a bodyguard by Liam, because when the psychiatrist Dr. Rohaidy resigned from her position, Liam went to see another psychiatrist with Rogelio Nores, and both hid from him the problems with alcohol and drugs that Liam had in order for him to prescribe psychiatric medication and avoid giving him the care recommendations that Dr. Rohaidy had given him; that because of this situation, Vata decided to go to see the new

---

[16] The Two Sworn Declarations of Defendant Geoff are internally inconsistent and incriminating for Defendant Geoff.

psychiatrist alone and exposed the real problems that Liam had, in view of this fact Rogelio Nores spoke with Liam and manipulated him to fire him, which Liam did on September 17, 2024."

i. <u>Fact</u>: Plaintiff never agreed to be and was never the caretaker of Liam. Plaintiff did not have a legal duty to Liam. Liam and Plaintiff were dear friends and provided each other friend support. Defendant Geoff's primary contact with Liam was (1) direct by Liam's mobile phone or Liam's laptop, (2) via Kate Cassidy (girlfriend) and (3) via Bledar Vata (bodyguard) both of which lived with Liam in the relevant time period. Defendant Geoff's family communicated with Liam via Liam's laptop. In October 2024 and at the time of his tragic death, Liam's mobile phone number was 561-██████.

ii. <u>Fact</u>: In August 23-26, 2024 emails (see Exhibit I) to and from Defendant Geoff, Plaintiff stated clearly that Plaintiff was not Liam's caretaker and declined to be.

iii. <u>Fact</u>: In September 2024, Defendant Geoff called Plaintiff and Plaintiff requested that Defendant Geoff come to Wellington, Florid and take care of Liam. Defendant Geoff declined to come to Wellington to take care of Liam

iv. <u>Fact</u>: Defendant Geoff was the self declared caretaker of Liam. Defendant Geoff had all medical details available to him and if he did not retain the medical details it was Defendant Geoff's choice.

v. <u>Fact</u>: Liam and Plaintiff never visited "another psychiatrist" together. To Plaintiff's knowledge Liam never visited "another psychiatrist." Defendant Geoff's sworn statement is 100% fiction and when

Defendant Geoff made the statement Defendant Geoff knew it was 100% fiction and knew he had no independent corroborative basis to make such a sworn statement.

vi.  <u>Fact</u>: Liam and Plaintiff never visited "another psychiatrist" together. Since there was no "another psychiatrist", Liam and Plaintiff could never have hid any information from the non-existent medical person. Defendant Geoff's sworn statement is 100% fiction and when Defendant Geoff made the statement Defendant Geoff knew it was 100% fiction and knew he had no independent corroborative basis to make such a sworn statement

vii.  <u>Fact</u>: There was no "new psychiatrist", "another psychiatrist" or "other psychiatrist". Since there was no "new psychiatrist", "another psychiatrist" or "other psychiatrist, it was factually impossible for [as sworn under oath by Defendant Geoff] "Vata decided to go to see the new psychiatrist alone and exposed the real problems that Liam had…". Defendant Geoff's sworn statement is 100% fiction and when Defendant Geoff made the statement Defendant Geoff knew it was 100% fiction and knew he had no independent corroborative basis to make such a sworn statement.

viii.  <u>No Personal Knowledge</u>. Defendant Goff had no personal knowledge of any of the relevant facts and the false statements stated, and any statement made by Defendant Geoff was based on hearsay and/ his own creative fiction and malice with ill will to harm Plaintiff, and as a result, Defendant Geoff could not attest to the truthfulness of the sworn statements, which are false.

73.     Defendant Geoff negligently, with intent, recklessly, and/or with malice omitted material facts in the Two Sworn Declarations which made Defendant Geoff's Two Sworn Declarations' statements materially misleading and false. The omissions include but are not limited to:

(a)     August 23 – 26, 2024 emails between Plaintiff and Defendant Geoff (Exhibit I):

      i.     On August 23, 2024, Plaintiff sent an email to Defendant Geoff summarizing some matters regarding Liam, including that (1) Plaintiff could not further as a friend devote the same time to support Liam, (2) Geoff needed to take action regarding Liam's condition, and (3) Plaintiff would continue to be Liam's friend.

     ii.     On August 26, 2024, Defendant Geoff responded "Also thank you for your call yesterday Roger. I have taken what you had to say on board."

(b)     In September 2024, Defendant Geoff called Plaintiff in Palm Beach County and Plaintiff, from Palm Beach County, urged Defendant Geoff, as father and self declared caretaker of Liam, to come to Wellington Florida and take care of Liam.   To Plaintiff's knowledge, Defendant Geoff never came to Wellington, Florida to take care of Liam.

(c)     In September 2024 and although requested to do so by Plaintiff, Defendant Geoff did not travel to Wellington to take care of Liam as Liam's self declared caretaker.[17]

(d)     In October 2024, Defendant Geoff did not travel to Argentina to take care of Liam as Liam's self declared caretaker or to provide medical assistance and to

---

[17] At the same time (as noted on page 23 of Defendant Geoff's 1st Sworn Declaration (Exhibit J) Defendant swore that in September 2024 he was "very concerned about" Liam's health status.

make sure Liam was not left alone.

(e)     In September 2024 in Florida - Defendant Geoff claimed trust in Bledar Vata (bodyguard) to be a paid caretaker of Liam. When Liam fired Bledar Vata (bodyguard) in September 2024, Defendant Geoff as self declared caretaker of Liam never provided for a temporary or new bodyguard caretaker for Liam in September or in October 2024.

(f)     In September – October 2024, Defendant Geoff never had any person accompany Liam to Palm Beach County Florida or to Argentina to take care of Liam. In September – October 2024, Defendant Geoff was the self declared caretaker of Liam and had a unique capacity, opportunity and superior knowledge to provide but did not provide or arrange, in Wellington ,Florida in September 2024 and/or in Buenos Aires, Argentina in October 2024 and plan or action (1) to monitor and stabilize matters for Liam, (2) to cause appropriate medical and treatment care services to be provided to Liam or (3) to ensure that Liam not to be left alone. With his superior knowledge, it is unknown what Defendant Geoff did to assist Liam and make certain Liam was not left alone.

(g)     In September – October 2024, Kate Cassidy (girlfriend) lived with Liam in Wellington, Florida and in Hotel #1 and  Hotel#2 (rental) in Buenos Aires, Argentina and had a unique capacity, opportunity and superior knowledge of Liam's activities and needs.  Between September – October 2024, she was living with Liam and with her unique capacity, opportunity and superior knowledge, it is unknown what she did to assist Liam and make certain he was not alone.

(h)     Defendant Geoff swore to the truth of the false Relevant Content information and statements [see paragraphs 7, 72, and 73 of this Complaint] when he knew

the published information and statements were false, omitted material information, and swore to statements with no personal knowledge and did so with malice ill will and intent to injure and to damage Plaintiff and Plaintiff's reputation.

(i)     Defendant Geoff knew he had no personal knowledge of the certain referenced Relevant Content matters.

(j)     Defendant Geoff swore to the truth of the false Relevant Content information and statements when Defendant Geoff knew he had omitted material information that made parts of the Two Sworn Statements misleading and/or false.

74.     Defendant Geoff's false Relevant Contents of the Two Sworn Declarations were and are the proximate cause of the Plaintiff's injury and damages including damage to Plaintiff's reputation.  Defendant Geoff knew or should have known and could reasonably foresee that the false Relevant Contents of the Two Sworn Declarations would be and were the proximate cause of Plaintiff's injury and damages in Palm Beach County, Florida, United States, and globally in all respects.

**Liam Independent Person**

75.     Liam was an independent person, an adult who had control over all his personal, financial, and professional decisions and made those decisions independently.  To the knowledge of the Plaintiff and on information and belief, Liam was not under any legal imposed and monitored care program, guardianship or conservatorship or the like.  Over the years and as publicly reported, Liam was in and out of addiction facilities sometimes departing the facilities prior to conclusion of the addiction program, and sometimes abandoning or even refusing medical

care.[18]

76.       At all relevant times and regardless of persons around Liam, Liam made all decisions to undertake or to reject professional medical assistance and treatment.

**Defendant Geoff's Response to Plaintiff's Notice Demand Letter To Retract**

77.       January 8, 2025, Plaintiff sent the defamation retraction demand Letter ("Defamation Retraction Letter – Defendant Geoff") to Defendant Geoff. See Exhibit D.

78.       On January 10, 2025, English counsel for Defendant Geoff responded to the Defamation Retraction Letter – Defendant Geoff and declined to retract any matter. See Exhibit N.

79.       On January 13, 2025, Plaintiff requested (i) that Defendant Geoff's counsel provide any evidence and independent corroboration that (a) the contents of the January 8, 2025 letter (Exhibit D) were not accurate and (b) provide a copy of any due diligence report and independent corroboration if done and if not done undertake due diligence of the contents of the Defendant Geoff's Two Sworn Declarations  to determine if  accurate and truthful in all respects and to provide copies of these documents to Plaintiff. See Exhibit O. As of the filing date of this Complaint, Plaintiff has not received, from English counsel or any other person, a response and has not been provided (1) any information that Plaintiff's January 8, 2025 letter is inaccurate in any respect and (2) any information that English counsel or any other person has ever done any due diligence to ascertain the accuracy, truthfulness, and/or falsity of Defendant Geoff's  Two Sworn Declarations.

**Other Matters**

80.       Plaintiff reserves the right to add additional party defendants if discovery and/or additional information provides identification of persons as appropriate defendants.

---

[18]  On pages 20-25 Defendant Geoff's 1st Sworn Declaration (Exhibit J) Defendant Geoff describes this.

81.     Pursuant to the requirements of Section 768.72, Fla. Stat., Plaintiffs may seek discovery reasonably calculated to lead to admissible evidence on the issue of Defendants' liability and ability to pay for punitive damages relating to the misconduct alleged herein.

82.     If discovery establishes grounds for seeking to amend the Complaint to seek an award of punitive damages[19] and attorney fees as provided in Fla. Stat. 768.72, Plaintiff intends to seek to amend the Complaint and seek punitive damages against Defendant Geoff.

83.     All matters, if any, including any condition precedents to the filing of this Complaint have been completed, and/or occurred.

## COUNT I – DEFAMATION

84.     Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1- 83, as though fully set forth herein.

85.     Defendant Geoff's false Relevant Contents information and statements of the Defendant Geoff  Two Sworn Declaration were false when made and when Defendant Geoff signed and published the false statements he knew or should have known that the statements were false, were made negligently, with intent, made the statements with reckless disregard as to the truth and accuracy of the statements and/or made with malice with intent to and which did injure and damage Plaintiff and Plaintiff's reputation.

86.     Defendant Geoff's false Relevant Contents information and statements of the Defendant Geoff Two Sworn Declarations were  false when made and when Defendant Geoff made the false statements he knew or should have known that he had no personal knowledge of the statements [See Paragraphs 71, 72, and 73 of this Complaint] and despite knowing he had no

---

[19] Section 768.72 F.S. provides that a defendant may be held liable for punitive damages if the defendant was guilty of (1) intentional misconduct [means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage] or (2) gross negligence[means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct].

personal knowledge, Defendant Geoff made the false statements and/or made the statements negligently, with intent, recklessly and/or with malice injuring and damaging Plaintiff and Plaintiff's reputation.

87.     Defendant Geoff's false Relevant Contents information and statements of the Defendant Geoff Two Sworn Declarations are false and when Defendant Geoff made the false statements he knew or should have known that he had had omitted material information [see Paragraphs 71, 72, and 73 of this Complaint], Despite knowing he had omitted information which made the statements false, inaccurate and/or not correct, Defendant Geoff negligently, with intent, recklessly, and/or with malice published the Two Sworn Declaration and caused the re-publishing of the Two Sworn Declarations damaging Plaintiff and Plaintiff's reputation.

88.     Defendant Geoff made the false Relevant Contents information and statements in the Two Sworn Declarations with malice, ill will and intent to harm and to damage Plaintiff and Plaintiff's reputation.

89.     Defendant's false Relevant Contents information and statements — made with a lack of personal knowledge — are the proximate cause of Plaintiff's injury and damages, including the damage to Plaintiff's reputation.

90.     Plaintiff has suffered distress, harm, injury, and damages to his business, reputation, standing in the business community, in Palm Beach County, in Florida and generally due to the Palm Beach County, Florida, United States, and Global publication, re-publication and/or reporting arising from Defendant Geoff's Palm Beach Activities and Defendant Geoff's publication and republication of his false Two Sworn Declarations. This injury and these damages continue on a daily basis and accrue on a daily basis. Defendant Geoff is liable for such damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a final judgment in favor of Plaintiff and against Defendant Geoff finding and/or ordering: (1) that the Relevant Contents information and statements of the Defendant Two Geoff Sworn Statements are false; (2)

Defendant Geoff knew or should have known the Relevant Contents information were false when made, were negligently made, were made with intent, were made with reckless disregard as to accuracy and truth, were made with material omissions which made the statements false and/or misleading, and/or made with malice ill will with intent to injure and to damage Plaintiff and Plaintiff's reputation when Defendant Geoff signed the Defendant Geoff Two Sworn Declarations and when Defendant Geoff published the false Relevant Contents information of the Two Sworn Declaration and when Defendant Geoff refused to retract and to correct the Two Sworn Declarations; (3) Defendant Geoff's false Relevant contents of the published Defendant Geoff Two Sworn Declarations were the proximate cause of injury and damages suffered by Plaintiff and were foreseeable by Defendant Geoff; (4) Defendant Geoff made the false Relevant Contents in the Two Sworn Declarations with malice, ill will and intent to injure and to harm Plaintiff's reputation and to harm Plaintiff; (5) Plaintiff was not a caretaker of Liam and had no legal duty of care to Liam generally and in particular arising from Defendant Geoff's Palm Beach Presence Activities; and (6) that Plaintiff is entitled to an award of compensatory and special damages, at law or equity, pre-judgment and post-judgment interest, attorneys fees, and costs, in excess of the Court's jurisdiction as established in the evidentiary process by Plaintiff and determined by the Court and/or jury[20] which continue to accrue on a daily basis until Defendant Geoff provides an appropriate and satisfactory correction to the false Relevant Contents information and statements of Defendant Geoff Two Sworn Declarations and/or entry of the Court's appropriate order or final judgment, and (7) any such other relief as may be just and appropriate in this matter.

## COUNT II – DECLARATORY JUDGEMENT

91.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs 1-83 as though fully set forth herein.

---

[20] Plaintiff will donate the financial proceeds of these judicial proceedings [less the cost of Plaintiff's total legal proceedings] for the benefit of Liam Payne's son – Bear Payne.

92.     Plaintiff believes the Relevant Contents information and statements of the Two Defendant Geoff Sworn Declarations are false. Defendant Geoff has sworn to the truth of the Relevant Contents of the Defendant Geoff Two Sworn Statements. Defendant Geoff has refused to retract the Relevant Contents of the Defendant Geoff Two Sworn Statements. See Exhibit N.

93.     Plaintiff believes the Defendant Geoff Two Sworn declarations contain material omissions, which make Defendant Geoff's Two Sworn Declarations misleading and false, yet Defendant Geoff nevertheless published the statements negligently, with intent, recklessly, and/or with malice with disregard to the truth or accuracy of the statements.  Defendant Geoff has refused to retract the Relevant Contents of the Defendant Geoff Two Sworn Statements. See Exhibit N.

94.     Plaintiff believes parts of the Defendant Geoff Two Sworn declarations contain sworn statements not based on the personal knowledge of Defendant Geoff which make Defendant Geoff's Two Sworn Declarations misleading and false. Defendant Geoff has refused to retract the Relevant Contents of the Defendant Geoff Two Sworn Statements. See Exhibit N.

95.     Plaintiff believes that the Defendant Geoff Two Sworn declarations contain material omissions known to Defendant Geoff when made and that omissions make Defendant Geoff's Two Sworn Declarations misleading and false.  Defendant Geoff has refused to retract the Relevant Contents of the Defendant Geoff Two Sworn Statements. See Exhibit N.

96.     Plaintiff is in doubt as to his rights and obligations against Defendant Geoff as stated herein and seeks a declaration as to rights and obligations relating to Defendant Geoff.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a final judgment in favor of Plaintiffs and against Defendant finding, declaring, and/or ordering: (1) ;  the Relevant Contents information and statement of the Defendant Geoff Two Sworn Declarations are false, not accurate and constitute defamation of Plaintiff;  (2) that Defendant Geoff has defamed Plaintiff, and (3) such other relief as may be just and appropriate in this matter.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right.

## <u>RESERVATION OF RIGHTS</u>

Plaintiff reserves, upon evolution and/or completion of investigation and discovery, to assert such additional claims, make additional damages claims, and join such additional defendants as may be just and equitable under the circumstances, with or without leave of Court as provided by governing law.

Dated:  January 15, 2025

Respectfully submitted,

*/s/Nicholas Collazo*_____
Nicholas Collazo (Fla Bar 1027028)
James D. Whisenand (Fla Bar 166000)
Whisenand & Turner, P.A.
240 Crandon Blvd., Suite 250
Key Biscayne, Florida 33149
Tel: (305) 375-8484
Fax: (305) 374-2919
Attorneys for Plaintiffs

**Exhibits to Complaint**

Exhibit A – Demonstrative Chart – Identification of Certain Relevant Parties & Relationships

Exhibit B – Demonstrative Chart – Liam Payne, Defendant Geoff Payne, Kate Cassidy, Bledar Vata, Plaintiff May – October 2024 Activities & Time Line

Exhibit C – Demonstrative Chart – Defendant Geoff False, Material Omissions, No Personal Knowledge Relevant Contents in Defendant Geoff Two Sworn Declarations [October 22 and 25, 2024].

Exhibit D – January 8, 2025 Plaintiff letter to Defendant Geoff seeking retraction and correction of the false Relevant Contents of the  Defendant Geoff Two Sworn Declarations with transmittal e-mail, Note and Evidence Preservation letter

Exhibit E – Certain Google Search 2024 Liam Payne and Rogelio (Roger) Nores results.

Exhibit F – Sampling of Media Articles - Publication of Defendant Geoff False Relevant Content Information and Statements from Defendant Geoff Two Sworn Declarations [Exhibits J and K]

Exhibit G- Confirmation of the Publication of Relevant Contents to Defendant Geoff Two Sworn Declaration being available in Palm Beach County Florida and confirming the accessibility to the content from Palm Beach County Florida.

Exhibit H – Liam's July 2024 one year lease of residence in Wellington Florida shared with Kate Cassidy (prior girlfriend) and Bledar Vata (prior bodyguard) in September 2024. [redacted].

Exhibit I – August 23 - 26, 2024 emails between Plaintiff and Defendant Geoff – Plaintiff confirm not responsible for Liam and Defendant Geoff acknowledgement. [redacted].

Exhibit J - Defendant Geoff Payne 1st Sworn Declaration – October 22, 2024 [contains English translation Defendant Geoff signed] [redacted]

Exhibit K – Defendant Geoff Payne 2nd Sworn Declaration – October 25, 2024 [contains certified English translation] [redacted]

Exhibit L – Screenshot of video call of July 30, 2024 between Liam and certain advisors about (1) Liam moving to Florida and (2) Liam moving his business operations and structure to Palm Beach County, Florida.

Exhibit M – Photo of Liam Payne and Niall Horan meeting together in Buenos Aires, Argentina in October 2024.

Exhibit N – January 10, 2025 email from English Counsel Bray & Krais acting as counsel for Defendant Geoff expressing a non-response response to the Plaintiff's Exhibit D retraction request letter to Defendant Geoff.

Exhibit O – January 13, 2025 email from Plaintiff's counsel to Defendant Geoff's counsel requesting that Defendant Geoff's counsel provide any evidence and independent corroboration that (1) the contents of the January 8, 2025 letter was not accurate and (2) the contents of the Defendant Geoff's Two Sworn Declarations were accurate and truthful in all respects.

# **<u>EXHIBIT</u> A**

**Exhibit A – Demonstrative Chart –
Identification of Certain Relevant Persons & Relationships**

**Liam Payne**
1. Global entertainment celebrity.
2. Member of One Dimension music group.
3. Providing financial payments to Geoff Payne, Paul Higgins, Bledar Vata and Kate Cassidy.
4. Historical addiction issues & in and out of treatment centers – made decisions to not complete treatment.
5. Made his own independent decisions.
6. Dear mutual friend Rogelio Nores.
7. Kate Cassidy girlfriend May – October 2024.
8. May – July & September 2024 in Wellington Florida.
9. June – July 2024 decided to move to Palm Beach County, Florida and rented house.

**Rogelio (Roger) Nores**
1. USA Citizen & Miami Resident.
2. Mutual dear friend of Liam since 2020.
3. Never a caretaker of Liam.
4. Never received money from Liam.
5. August 23-26, 2024 email – Geoff Payne – declines to take care of Liam – friend support.
6. September 2024 Geoff Payne called Roger and Roger requested Geoff Payne come to Wellington & take care of Liam.
7. Roger requested but Geoff Payne did not come to Wellington to take care of Liam.
8. Roger has never used a recreational drug and does not drink alcohol.
9. Roger never provided recreational drugs or restricted medicine to Liam.

**Geoff Payne**
1. Father of Liam & self declared Liam caretaker.
2. 10+ weeks in Wellington, Florida with Liam, Kate Cassidy, Bledar Vata, Rogelio Nores.
3. Roger Nores requested he come to Wellington Florida in September 2024 – he declined to go.
4. Did not go to Argentina with Liam October 2024.

**Bledar Vata**
1. Body guard of Liam 2023 - September 2024.
2. Lived with Liam for 10+ weeks May – July. 2024 and in September 2024 in Wellington, Florida.
3. Fired by Liam in Wellington, Florida in mid September 2024.

**Katelyn (Kate) Cassidy**
1. Girlfriend of Liam from May - October 2024.
2. Stayed with Liam in Wellington, Florida September 2024.
3. Traveled with Liam to Argentina & stayed in same room with Liam at Hotel #1 & Hotel #2.
4. Departed Argentina on or about October 12, 2024 – left Liam alone.
5. Never sought medical assistance for Liam in Argentina prior to her departure to go home.
6. Liam paid her an allowance & expenses.

RN/F/RNF4013 EX Demo Cht involved persons

# **EXHIBIT** B

**<u>Exhibit B – Demonstrative Chart -  Wellington, Florida Timeline - Liam Payne, Geoff Payne, Kate Cassidy & Rogelio Nores</u>**

| 2020 | Mid-May – Late July, 2024 10+ weeks Wellington, Florida | Late July 2024 – Early September 2024 Liam Payne in UK & Europe | Early September – October 16, 2024 Liam  Payne in  Florida & Argentina |
|---|---|---|---|
| • Roger Nores and Liam Payne meet and become mutual dear friends. | • Liam Payne and Geoff Payne stayed in Wellington Florida with Kate Cassidy (Liam girl friend), Bledar Vata (body guard).<br>• Roger was between Wellington, Florida and Miami, Florida (where Roger lives).<br>• Geoff Payne was self declared caretaker of Liam with Kate Cassidy and Bledar Vata living with Liam.<br>• Roger assisted as friend.<br>• Other than a mutual dear friend, Roger had no arrangement with Liam or any part of Liam's organization, and was never paid a penny.<br>• June – July 2024 Liam decides to become a resident of Wellington, Florida and move business structure to Palm Beach County. | • Liam traveled with Geoff Payne to England.<br>• Geoff Payne was self declared caretaker of Liam.<br>• Roger did not go to England or accompany Liam. | • Liam returns to Wellington, Florida and decides to reside in Florida. Opens bank account at JP Morgan Palm Beach.<br>• Liam rents house in Wellington – annual lease<br>• Kate Cassidy (girl friend) and Bledar Vita live with Liam in Wellington house.<br>• September 18, 2024 Geoff called Roger and Roger requested Geoff to come to Wellington to take care of Liam and Geoff did not come to Wellington.<br>• Late September - Liam & Kate Cassidy depart for Argentina.<br>• Kate Cassidy lives with Liam in Hotel #1 & Hotel #2 (rental) & for Rural Weekend in Argentina.<br>• In Argentina, Liam takes & clears drug test for approved USA Visa renewal.<br>• Geoff Payne does not come to Argentina to assist Liam.<br>• October 16, 2024 – Liam tragic death. |

**August 23-26 , 2024 Emails Roger Nores- Geoff Payne – Alan McEvoy & September 18, 2024 Call  Rogelio Nores – Geoff Payne**

**-August 23, 2024 Roger Nores email to Geoff Payne/Alan McEvoy/Liam  –** (1) Roger helped Liam as a friend; (2) Roger has stopped helping Liam and is disconnected from helping Liam; (3) Geoff & Alan responsibility.

**-August 26, 2024 Geoff Payne email to Roger Nores –** Geoff Payne acknowledges email and thanks Roger for August 25, 2024 call to Geoff Payne – "I have taken what you had to say on board."

**-September 2024 Roger Nores call to Geoff Payne  -**  As a friend of Liam, Roger requested Geoff Payne come to Wellington Florida and take care of Liam; Geoff Payne never came to Florida.

RN/F/RNF4013 Ex Demo Cht time line

# **EXHIBIT** C

**Exhibit C – Demonstrative Chart - Geoff Payne Two Sworn Declarations – False Statements  + Omissions + No Personal Knowledge**

**Geoff Payne 1st Sworn Declaration October 22, 2024**   |   **Geoff Payne 2nd Sworn Declaration October 25, 2024**

| Geoff Payne 1st Sworn Declaration October 22, 2024 | Geoff Payne 2nd Sworn Declaration October 25, 2024 |
|---|---|
| Geoff Payne defamed Rogelio Nores with False Statements & Material Omissions & No Personal Knowledge:<br><br>**Certain False Statements:**<br>1. Communications contact with Liam.<br>2. Roger was the caretaker of Liam with full responsibility and agreed to be.<br>3. Geoff did not have information of the medical specialist that treated Liam.<br><br>**Certain Omissions**:<br>1. Liam had a mobile phone plus Liam routinely called people via his laptop.<br>2. Geoff had the capability to have direct phone contact with Liam & did so.<br>3. When requested in September 2024 to come to Wellington, Florida to take care of Liam - Defendant Geoff did not come to Florida.<br>4. August 23-26, 2024 Geoff – Roger emails – Roger decline to take care of Liam<br>5. Geoff did not arrange medical specialists in Argentina to take care of Liam and did not arrange to make sure Liam not alone.<br>6. Kate Cassidy lived with Liam in Argentina in the same hotel room as Liam (Hotel #1 & Hotel #2(rental) & Hotel #3 and she did not & Geoff never requested that Kate Cassidy arrange medical specialists in Argentina to take care of Liam and did not arrange to make sure Liam not alone.<br><br>**No Personal Knowledge:**<br>1. No Personal knowledge of many False Statements in 1st & 2nd Sworn Declaration.<br>2. All hearsay with no independent corroboration. | Geoff Payne defamed Rogelio Nores with False Statements & Material Omissions & No Personal Knowledge:<br><br>**Certain False Statements:**<br>1. Liam had "another psychiatrist" in Florida after Dr. Rohaidy (September 16)<br>2. Liam and Rogelio Nores visited and hid Liam's condition information from new "another psychiatrist" in Florida.<br>3. Bledar Vata (bodyguard) went to see & disclosed information to "another psychiatrist" in Florida of Liam<br>4. Rogelio Nores "manipulated" Liam to fire bodyguard in September 2024.<br><br>**Certain Omissions**:<br>1. When requested in September 2024 to come to Wellington, Florida to take care of Liam - Defendant Geoff declined to come to Florida.<br>2. Defendant Geoff made a decision not to come to Argentina to take care of Liam despite being the self declared caretaker of Liam.<br><br>**No Personal Knowledge:**<br>1. No Personal knowledge of above Certain False Statements in 2nd Sworn Declaration.<br>2. All rank hearsay with no independent corroboration. |

# __EXHIBIT D__

January 8, 2025 Plaintiff letter to Defendant Geoff
seeking retraction and correction of the false Relevant
Contents of the Two Defendant Geoff Sworn Declarations
with transmittal e-mail, Note and Evidence Preservation
letter

**WHISENAND & TURNER**
**Professional Association**
**Attorneys at Law**
**Suite 250**
**240 Crandon Blvd.**
**Key Biscayne, Florida 33149**

TEL: 305-375-8484                                    FAX: 305-374-2919

January 8, 2025

via email: ██████████████████
Geoff Payne

      Re: Request to Retract False Defamatory Statements in Relevant Contents – Rogelio
Nores (a/k/a Roger Nores)

Dear Mr. Payne:

      We represent Rogelio Nores ("Mr. Nores") with respect to his defamation claim against
you arising from your conduct in Florida, your false statements about Mr. Nores made by you (1)
in your published October 22, 2024 sworn declaration ("1st Geoff Payne Sworn Declaration") and
your published October 25, 2024 sworn declaration ("2nd Geoff Payne Sworn Declaration"), and
the false defamatory Relevant Contents [as described below] (collectively "Two Geoff Payne
Sworn Declarations") and (2) such defamatory false Relevant Contents information and statements
are contained on the internet that were published in Florida and accessible from Florida.

      You knew or should have known that the false Relevant Contents information and
statements of the (1) 1st Geoff Payne Sworn Declaration, and (2) the 2nd Geoff Payne Sworn
Declaration were not true and accurate when made or you made the false Relevant Contents
information statements negligently, with reckless disregard for the truth or falsity of the
statements, and with malice. Thee false Relevant Contents contained material omissions known
or should have been known to you that knowingly made your Two Geoff Payne Sworn
Statements materially misleading, and important parts were sworn by you when you had no
personal knowledge of the Relevant Contents.  Your false Relevant Contents information
regarding Mr. Nores and the publication of the your false Relevant Contents information were
and are continuing to be the proximate cause of Mr. Nores' damages for which Mr. Nores seeks
compensatory damages, punitive damages, other damages and relief from you.

      Mr. Nores requests that on or before January 13, 2025,  that you (1) retract the false
Relevant Contents and publish an acceptable factually correct correction that contains no material
omissions in the same manner that you made the original false Relevant Content statements in all
respects, (2) issue an acceptable written clarification of the false Relevant Contents information
and publish the written clarification information in the same manner you made the false Relevant
Contents in all respects, and (3) forthwith pay mutually agreed damages to Mr. Nores.

**Relevant Contents 1ˢᵗ Geoff Payne Sworn Declaration**

Appendix A to this Letter contains an October 22, 2024 sworn declaration provided by you that is in Spanish and English (in your original document it is stated the translation was done via Google translate) which bears your signature. Mr. Nores believes that, among possibly other statements, the below sworn statement by you in the 1ˢᵗ Geoff Payne Sworn Statement are false and that you knew the statements were false when made or you made the statements negligently, with reckless disregard for the truth of the statements, with malice. The false Relevant Contents contained material omissions known or should have been known to you that knowingly made your 1ˢᵗ Geoff Payne Sworn Statements materially misleading and you failed to disclose that parts of such statements were not made on your personal knowledge:

1. Page 2, line15-19 Spanish/page 16/line 14-18English: "For that reason my phone contact with Liam was not direct, it was always through third parties, particularly, in his last stay in Argentina it was through his girlfriend Katlyne Cassidy (+447███████) and Roger Nores (+1305███████) who were in his care due to his addictions."
2. Page 7, line 16-19 Spanish/page 21 /line11-13 English: "I, Liam, and the bodyguard heard Roger tell him that he knew that his health was not good, and that since he had known him for a long time, he offered to help him in exchange for nothing."
3. Page 7, line19-25 Spanish/page 21 /line 13-19 English: "He offered to leave London and do a good recovery treatment in Miami. At that moment Roger was entirely available to Liam and in his care, he offered to take care of him and his recovery. This call was at night, the next day the three of us flew to Miami because we considered that this absolute change of environment was going to be favorable for Liam."
4. Page 7, line 27-31 Spanish/page 21 /line 21-25 English: "We stayed there for 10 weeks with Liam, the four of us. During that time we formed a team with Roger and the bodyguard for Liam's recovery, always monitored by psychologists and psychiatrists, all of Roger's contacts so I don't have their details now."
5. Page 8, line 20-25 Spanish/page 22 /line12-16English: "I had the feeling that it was a safe place for him, that he was in good company (the bodyguard is my trusted person and Roger at that time and voluntarily offered to take charge and take responsibility for Liam) and I thought it was good that he stayed until he started his work in Manchester."
6. Page 10, line 3-9 Spanish/page 23 /line 27-32  English: "Asked by the Prosecutor to provide the filiation and contact details of the health professionals who were in charge of Liam's subsequent treatment in the USA and those who later assisted him here in Argentina as part of the procedure to renew his US visa, he replied: "No, that data must be in Roger who managed the whole matter""
7. Page 11, line 29-35 Spanish/page 25 /line16-22 English: "What I want to make clear is that Roger had full responsibility for Liam's care during this last period when at least I was not there, because that is how he assumed it when he called him by his own means to help him in his treatment. In fact, it was Roger himself who decided to accompany Liam on his last stay in Buenos Aires as part of all this care he needed. Care of which Roger was well aware."
8. Page 11-12, line 35-44 Spanish/page 25 /line 22-29 English: "Liam's trust and care group at first were the bodyguard and I, in addition to Liam's girlfriend, then Roger joined and when I had to go back to my house and the bodyguard too, Roger and Liam's girlfriend continued. He was together with Liam precisely to take care of him for no other reason, in fact he regularly reported his state of health to me. Liam couldn't be left alone and Roger knew it and when the care group format broke when Liam's girlfriend left, Roger booked Liam a room for himself and that's how what happened happened."

9. Page 12, line 44-52 Spanish/page 25-26 , line 30-37 English: "Because Roger knew that the objective of the group was to keep Liam busy, he could not be left alone in the vulnerable situation in which he was, it was even the recommendation that one of the doctors in the UK had given me (I don't remember his details) and that was the basis of Liam's recovery which was always remembered in the care group that included Roger. Liam could not be alone and Roger was the one who had taken responsibility for that care, at least during his stay here in Argentina."

10. Page 12, lines 61-64 Spanish/page 26/line 46-49 English: "When I wasn't with Liam, and he stayed with Roger who was responsible for his care, he was the one who reported his condition to me and sometimes his bodyguard when he was an artist."

Among other material matters which makes your 1st Geoff Payne Sworn Statement materially misleading, you negligently, knowingly, and/or with reckless disregard and/or with malice, and/or negligently omitted from your 1st Geoff Payne Statement:

1. Your role in support of Liam commencing on or before your 10+ week stay in Wellington, Florida and continuing thereafter and intentional or negligent refusal to perform your duties as is support of Liam in September and October 2024;
2. Your refusal to travel to Wellington, Florida – despite a request to do so – in September 2024 for you to take care of Liam;
3. You have no personal knowledge of many parts of the 1st Geoff Payne Sworn Statement and your statement is based on multiple removed hearsay and guesstimates by you;
4. You knowingly failed to disclose and to state in the 1st Geoff Payne Sworn Statement that parts of your 1st Geoff Payne Sworn Statement were not based on personal knowledge and were based on hearsay and guesstimates which you had no reasonable basis to believe were true despite your representation of the sworn statements as true.
5. Despite this knowledge that you maintained and/or failed to disclose, you permitted the Relevant Contents information and/or statements of your 1st Geoff Payne Sworn Statement to be published and to be made available in Florida and to be accessible from Florida and failed to take any action to prevent the publication of the 1st Geoff Payne Sworn Statement in Florida and to be accessible from Florida.

You have provided (1) no corroborative proof of the above Relevant Contents of your 1st Geoff Payne Sworn Declaration, (2) no independent corroboration of the above Relevant Contents of your 1st Geoff Payne Sworn Declaration and (3) no corroborative proof or independent corroboration of your capability to have personal knowledge of the fact events of the Relevant Contents of your 1st  Geoff Payne Sworn Declaration since you were not personally present in an important part of the Relevant Contents of your 1st Geoff Payne Sworn Declaration.

**Relevant Contents 2nd Geoff Payne Sworn Declaration**

Appendix B to this Letter contains an October 25, 2024 sworn declaration provided by you that is in Spanish (the English version is translated in Google translate as you did your 1st Geoff Payne Sworn Statement) which bears your signature.  Mr. Nores believes that, among possibly other statements, the below sworn statement by you in the 2nd  Geoff Payne Sworn Statement are false and that you knew the statements were false when made or you made the statements negligently, with reckless disregard for the truth of the statements, or with malice.  The false Relevant Contents contained material omissions known or should have been known to you that knowingly made your 2nd Geoff Payne Sworn Statements materially misleading, and you failed to disclose that parts of such statements were not made on your personal knowledge:

1. Page 2, line 27-36 Spanish/page 2, line 10-18 English: "It should be noted that Mr. Bledi Vata ▇▇▇▇▇@gmail.com) turns out to be the one who was Liam's bodyguard in Londres (Great Britain) and in Florida (USA) from August 2023 to September 17, 2024, providing his cell phone: +447▇▇▇▇▇. That Mr. Vata was fired from his job as a bodyguard by Liam, because when the psychiatrist Dr. Rohaidy resigned from her position, Liam went to see another psychiatrist with Rogelio Nores, and both hid from him the problems with alcohol and drugs that Liam had in order for him to prescribe psychiatric medication and avoid giving him the care recommendations that Dr. Rohaidy had given him; that because of this situation, Vata decided to go to see the new psychiatrist alone and exposed the real problems that Liam had, in view of this fact Rogelio Nores spoke with Liam and manipulated him to fire him, which Liam did on September 17, 2024."

Among other material matters which makes your 1st Geoff Payne Sworn Statement materially misleading, you negligently, knowingly, and/or with reckless disregard, and/or with malice, and/or negligently omitted from your 1st Geoff Payne Statement:

1. Your role in support of Liam commencing on before your 10+ week stay in Wellington, Florida and continuing thereafter and intentional or negligent refusal to perform your duties in support of Liam in September and October 2024;
2. Your refusal to travel to Wellington, Florida – despite a request to do so – in September 2024 for you to take care of Liam;
3. You have no personal knowledge of many parts of the 2nd Geoff Payne Sworn Statement and your statement is based on multiple removed hearsay and guesstimates by you;
4. You knowingly failed to disclose and to state in the 1st Geoff Payne Sworn Statement that parts of your 2nd Geoff Payne Sworn Statement were not based on personal knowledge and were based on hearsay and guesstimates which you had no reasonable basis to believe were true despite your representation of the sworn statements as true.
5. Despite this knowledge that you maintained and/or failed to disclose, you permitted the Relevant Contents information and/or statements of your 2nd Geoff Payne Sworn Statement to be published and to be made available in Florid and to be accessible from Florida and failed to take any action to prevent the publication of the 2nd Geoff Payne Sworn Statement in Florida and to be accessible from Florida.

You have provided (1) no corroborative proof of the above Relevant Contents of your 2nd Geoff Payne Sworn Declaration, (2) no independent corroboration of the above Relevant Contents of your 2nd Geoff Payne Sworn Declaration, and (3) no corroborative proof or independent corroboration of your capability to have personal knowledge of the fact events of the Relevant Contents of your 2nd Geoff Payne Sworn Declaration since you were not personally present in an important part of the Relevant Contents of your 2nd Geoff Payne Sworn Declaration.

**Damages to Mr. Nores arising from the Two Geoff Payne Sworn Statements**

Among other damages and irreparable harm, Mr. Nores believes that the false Relevant Content information and/or statements in the Two Geoff Payne Sworn Statements has caused him and continues to cause him irreparable damage and monetary damages[1] in excess of

---

[1] Mr. Nores will donate the net financial proceeds paid for the benefit of Liam's son – Bear Payne.

US$10,000,000 and estimated daily damages in excess of US$100,000/day.

**Request to Retract and to Clarify Relevant Contents information and/or statements (without material omissions) of the Two Geoff Payne Sworn Declarations**

You are requested (1) to retract these false Relevant Content information and statements in the Two Geoff Payne Sworn Statements immediately and publish your acceptable retraction (without material omissions) in the same manner that you made the original false Relevant Contents information and/or statements in the Two Geoff Payne Sworn Statements in all respects, and (2) to publish an acceptable written clarification of the false Relevant Contents information and/or statements (without material omissions), on or before January 13, 2025.

Sincerely,

*James D. Whisenand*

James D. Whisenand

# <u>**EXHIBIT E**</u>

2024 Google Search of Liam Payne and Rogelio Nores

**Exhibit E – Google Search 2024 -  Liam Payne – Rogelio (Roger) Nores**

Here are the top Google searches of the year

# Shortlist of top searches

## Top 5 searches of the year globally:

1. Copa América
2. UEFA European Championship
3. ICC Men's T20 World Cup
4. India vs England
5. Liam Payne



**Passings**

1 Liam Payne

2 Toby Keith

3 O.J. Simpson

4 Shannen Doherty

5 Akira Toriyama

**Searches**

1 Copa América

2 UEFA European Championship

3 ICC Men's T20 World Cup

4 India vs England

5 Liam Payne

1

**Rogelio (Roger) Nores**

[Trending Now - Google Trends](#)



# **<u>EXHIBIT F</u>**

Sampling of Media Article – Publication of Defendant Geoff False Relevant Content Information and Statements from Defendant Geoff Two Sworn Declarations [Exhibits J and K]

| Exhibit F<br>Sampling of  Media Articles – Defendant Geoff False Relevant Contents Information & Statement From Defendant Geoff Two Sworn Statements<br>Liam Payne – Rogelio Nores | | | | |
|---|---|---|---|---|
| **ARTICLE #** | **Date of Publication** | **Website of publication** | **Name of publication – Article title** | **Publication** |
| | | | | |
| **ARTICLE 1** | October 22, 2024 | **Us Weekly**<br><br>Liam Payne's Dad Willing to Help in Investigation of His Son's Death \| Us Weekly | **Liam Payne's Dad Is Willing to Help in Investigation of His Son's Death** | "The Argentine Prosecutor's Office confirmed to *Us Weekly* that Geoff has spoken to the case's prosecutor, **Dr. Andres Esteban Madrea**, about "his desire to investigate and to know what happened" with his son, Liam. Geoff also expressed that he will share with authorities what he knows about his son's life that could potentially aid the investigation." |
| **ARTICLE 2** | October 22, 2024 | Newsweek<br><br>New Details Emerge As Liam Payne's Dad Helps With Son's Death Investigation | **New Details Emerge As Liam Payne's Dad Helps With Son's Death Investigation** | "Liam Payne's father, Geoff Payne, is offering to help Argentine authorities in their investigation into the former One Direction member's tragic death.<br><br>For his part, the musician's father expressed his desire for an investigation and knowledge of what happened and expressed to the prosecutor his willingness to testify about everything he knows about his son's life, which can help the investigation," a release, translated from Spanish, from the National Criminal and Correctional Prosecutor's Office No. 14 states." |

| | | | | |
|---|---|---|---|---|
| **ARTICLE 3** | October 23, 2024 | People Magazine<br><br>Instagram<br><br>People Magazine \| Liam Payne's father, Geoff Payne, is cooperating with the Argentine authorities in their investigation into Liam's unexpected death, a... \| Instagram | Liam Payne's father, Geoff Payne, is cooperating with the Argentine authorities in their investigation into Liam's unexpected death, |  |
| **ARTICLE 4** | November 7, 2024 | www.sun-sentinel.com<br>https://www.sun-sentinel.com/2024/11/07/liam-payne-death-3-charged-argentina/ | | |
| **ARTICLE 5** | November 8, 2024 | Amigo de Liam Payne imputado por su muerte habló: "jamás lo abandoné". | Amigo de Liam Payne imputado por su muerte habló: "jamás lo abandoné". ¿Quién es? | "El jueves 7 de noviembre la Fiscalía Nacional Argentina dio a conocer que había tres personas imputadas por la muerte de **Liam Payne**. Una de ellas es su amigo y quien, según algunos testimonios se presentaba como mánager del artista y al parecer, también habría ocultado a la familia que el exintegrante de **One Direction** recayó en sus problemas de adicción.<br>La Fiscalía explicó: "El primero de los acusados quien acompañaba de manera cotidiana al artista durante su estadía en la ciudad de Buenos Aires, a quien se lo imputa por los delitos de abandono de persona seguido de muerte y que prevé una pena de 5 a 15 años de prisión, en calidad de autor, en |

| | | | | concurso ideal con suministro y facilitación de estupefacientes", indicó el fiscal Andrés Madrea."<br>_Translation:_<br>_"On Thursday, November 7, the Argentine National Prosecutor's Office announced that there were three people charged with the death of Liam Payne. One of them is his friend and who, according to some testimonies, presented himself as the artist's manager and apparently, he also hid from the family that the former member of One Direction relapsed into his addiction problems._<br><br>_The Prosecutor's Office explained: "The first of the accused, who accompanied the artist on a daily basis during his stay in the city of Buenos Aires, who is charged with the crimes of abandonment of a person followed by death and who is punishable by 5 to 15 years in prison, as the author, in ideal competition with supply and facilitation of narcotics," said prosecutor Andrés Madrea."_ |
|---|---|---|---|---|
| **ARTICLE 6** | November 26, 2024 | https://www.newsbreak.com/news/3691626376219-liam-payne-pal-accused-of-abandonment-texting-with-singer-about-drugs-prostitutes-before-fatal-fall | **Liam Payne pal, accused of 'abandonment,' texting with singer about drugs, prostitutes before fatal fall** | "Authorities interviewed Payne's father, who said that Nores volunteered to take over as Payne's caretaker in May and arrange for him to go to rehab, the documents state".<br><br>"Payne's dad said it was important that Payne always stayed busy and was never alone in his recovery". |

| ARTICLE 7 | November 26, 2024 | www.tmz.com<br><br>Liam Payne Prosecutors Say Why They Accused His Friend of Abandonment | "Liam Payne Prosecutors Lay Out Why They Accused His Friend of Abandonment" | "According to the docs, Liam's dad was interviewed by authorities and said in May 2024, Roger volunteered to take over Liam's care and arrange to put him in rehab. The docs say Liam's father said it was critical that Liam always stayed busy and was never alone." |
|---|---|---|---|---|
| ARTICLE 8 | November 26, 2024 | nypost.com<br><br>Liam Payne pal, accused of 'abandonment,' texting with singer about drugs, prostitutes before fatal fall | "Liam Payne pal, accused of 'abandonment,' texting with singer about drugs, prostitutes before fatal fall" | "Authorities interviewed Payne's father, who said that Nores volunteered to takeover as Payne's caretaker in May and arrange for him to go to rehab, the documents state.<br><br>Payne's dad said it was important that Payne always stayed busy and was never alone in his recovery." |
| ARTICLE 9 | November 26, 2024. | www.posta.com.mx<br><br>Caso Liam Payne: ¿quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante? - POSTA Nuevo León | "Caso Liam Payne: ¿quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante?" | "El testimonio del padre de **Liam** reveló que el cantante estaba siendo tratado por una psiquiatra en **Estados Unidos,** quien advirtió sobre los riesgos de mezclar alcohol, drogas y sertralina. A pesar de estas advertencias, **Payne** habría continuado consumiendo bajo la influencia de Nores, quien incluso le habría facilitado dinero para comprar drogas."<br><br>*Translation:*<br>*"Liam's father's testimony revealed that the singer was being treated by a psychiatrist in the United States, who warned about the risks of mixing alcohol, drugs and sertraline.* |

| | | | | |
|---|---|---|---|---|
| | | | | *Despite these warnings, Payne allegedly continued to consume under the influence of Nores, who allegedly even provided him with money to buy drugs"* |
| **ARTICLE 10** | November 27, 2024 | www.tvynovelas.com<br><br>Revelan por qué acusaron al amigo de Liam Payne de abandono de persona | "Revelan por que acusaron al amigo de Liam Payne de abandon de persona" | "Si bien la fuerte acusacion en su contra podria no ser aceptada por un juez, fue la declaracion del paap de Liam Payne lo que cambio la perspectiva.<br>Y es que, segun informes de "TMZ", Geoff Payne revelo que Rogelio se habia ofrecido a hacerse cargo de cuidar a Liam y Tambien de organizar su ingreso en una rehabilitacion. El papa pidio a su amigo que no lo dejara solo, pues dera importante que estuviera siempre acompanado por su delicada situacion."<br>*Translation:*<br>*While the strong accusation against him might not be accepted by a judge, it was the statement from Liam Payne's father that changed the perspective.*<br>*According to reports from "TMZ", Geoff Payne revealed that Rogelio had offered to take care of Liam and also organize his admission into a rehabilitation center. The father asked his friend not to leave him alone, as it was important that he was always accompanied due to his delicate situation.* |
| **ARTICLE 11** | November 27, 2024 | Daily Record<br><br>Liam Payne's dad says he missed major milestone before son's tragic hotel death - Daily Record | **Liam Payne's dad says he missed major milestone before son's tragic hotel death** | "Geoff reportedly raised concerns in the lead up to his son's death that his son was on a worrying spiral. " |

| ARTICLE 12 | November 30, 2024 | Papá de Liam Payne mostró prueba clave contra Rogelio Nores por muerte de su hijo \| Revista Vea | "Papá de Liam Payne mostró prueba clave contra Rogelio Nores por muerte de su hijo" | "En un nuevo giro en la investigación, Geoff Payne, padre de Liam Payne, exvocalista de la agrupación británica **One Direction,** ha presentado evidencia crucial que, según los fiscales, podría ser clave para condenar a Rogelio Nores."  _Translation:_  _In a new twist in the investigation, Geoff Payne, father of Liam Payne, former lead singer of the British band One Direction, has presented crucial evidence that, according to prosecutors, could be key to convicting Rogelio Nores._ |
|---|---|---|---|---|
| ARTICLE 13 | November 30, 2024 | www.infobae.com  El padre de Liam Payne entregó a la Justicia la principal prueba para imputar a Rogelio Nores por la muerte del cantante - Infobae | "El padre de Liam Payne entregó a la Justicia la principal prueba para imputar a Rogelio Nores por la muerte del cantante" | "En sus encuentros con la Justicia argentina, **Geoff Payne, padre de Liam Payne, aportó la pieza principal para construir la acusación contra el empresario Rogelio Nores**, imputado por el fiscal Andrés Madrea por el abandono seguido de muerte de su hijo, además del suministro de estupefacientes. La pieza es **un email que data del 16 de septiembre de este año, parte de la imputación del fiscal Madrea**, encargado de esclarecer el fallecimiento de Payne, ocurrido un mes más tarde, cuando cayó del balcón del tercer piso del hotel CasaSur de la calle Costa Rica en el barrio de Palermo, en la Ciudad de Buenos Aires, para caer contra l**a base de cemento de una sombrilla de jardín**, donde se |

| | | | | fracturó la base del cráneo, la herida que le costó la muerte. |
|---|---|---|---|---|
| | | | | El mail que aportó Geoff Payne a la Fiscalía N°34 conducida por Madrea fue **escrito por la neuropsiquiatra de Miami que trató a su hijo** a lo largo de este año. En el mensaje, la neuropsiquiatra se desligaba del tratamiento, asegurando que era imposible acompañar a Liam en sus crisis. También, que la mezcla de sertralina con alcohol podría ser fatal." |
| | | | | "El destinatario original de ese correo, según la Justicia argentina, fue Rogelio Nores." |
| | | | | " La familia Payne es querellante en la causa, a cargo del Juzgado N°34 de Laura Bruniard, representada por el estudio Marval O'Farrell Mairal, según confirmaron fuentes judiciales. La causa misma está en un impasse, lo que impide que, por ejemplo, que Nores sea indagado, así como Braian Paz y Ezequiel Pereyra, acusados de proveerle droga al ex cantante de One Direction." |
| | | | | *Translation:* |
| | | | | *"During his encounters with the Argentine justice system, Geoff Payne, Liam Payne's father, provided the main piece of evidence to build the accusation against businessman Rogelio Nores, accused by prosecutor Andrés Madrea of abandoning and killing his son, as well as supplying narcotics. The piece is an email dated September 16 of this year, part of the accusation by prosecutor Madrea, in charge of clarifying Payne's death, which* |

| | | | | |
|---|---|---|---|---|
| | | | | *occurred a month later, when he fell from the balcony of the third floor of the CasaSur hotel on Costa Rica Street in the Palermo neighborhood, in the City of Buenos Aires, to fall against the cement base of a garden umbrella, where he fractured the base of his skull, the wound that cost him his death. The email that Geoff Payne provided to the 34th Prosecutor's Office led by Madrea was written by the Miami neuropsychiatrist who treated his son throughout this year. In the message, the neuropsychiatrist distanced herself from the treatment, assuring that it was impossible to accompany Liam in his crises. Also, that the mixture of sertraline with alcohol could be fatal."* <br> *"The original recipient of that email, according to the Argentine Justice, was Rogelio Nores."* <br> *"The Payne family is a plaintiff in the case, in charge of Court No. 34 of Laura Bruniard, represented by the Marval O'Farrell Mairal studio, as confirmed by judicial sources. The case itself is at an impasse, which prevents, for example, Nores from being investigated, as well as Braian Paz and Ezequiel Pereyra, accused of providing drugs to the former singer of One Direction."* |
| **ARTICLE 14** | December 1, 2024 | www.lagaceta.com.ar | "Cuál es la prueba ue el papá de Liam Payne entregó a la Justicia | "Geoff Payne, padre de **Liam Payne**, aportó la pieza principal para construir la acusación contra el empresario **Rogelio Nores**, |

| | | [Cuál es la prueba que el papá de Liam Payne entregó a la Justicia contra Rogelio Nores por la muerte del cantante](#) | contra Rogelio Nores por la muerte del cantante" | imputado por el fiscal **Andrés Madrea** por el abandono seguido de muerte de su hijo, además del suministro de estupefacientes. La pieza es un email que data del 16 de septiembre de este año, parte de la imputación del fiscal Madrea, encargado de esclarecer el fallecimiento de Payne, ocurrido un mes más tarde cuando cayó del balcón del tercer piso del hotel CasaSur en el barrio de Palermo, en la Ciudad de Buenos Aires. Según la acusación, Nores habría controlado los gastos de Payne, proveyéndole dinero para comprar drogas y autorizando pedidos de whisky y champagne reportados desde el front desk del hotel, con "días permitidos" para beber y drogarse, a pesar de la indicación estricta de la neuropsiquiatra. Incluso, Nores se habría convertido en un intermediario en la comunicación entre Liam y su familia." *Translation:* *"Geoff Payne, Liam Payne's father, provided the main piece to build the accusation against businessman Rogelio Nores, accused by prosecutor Andrés Madrea of abandoning his son and killing him, as well as supplying him with drugs.* *The piece is an email dated September 16 of this year, part of the accusation by prosecutor Madrea, in charge of clarifying Payne's death, which occurred a month later when he fell from the balcony of the third* |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | *floor of the CasaSur hotel in the Palermo neighborhood, in the City of Buenos Aires.*<br><br>*According to the accusation, Nores would have controlled Payne's expenses, providing him with money to buy drugs and authorizing orders for whiskey and champagne reported from the front desk of the hotel, with "allowed days" for drinking and drug use, despite the strict indication of the neuropsychiatrist. Nores would even have become an intermediary in the communication between Liam and his family."* |
| **ARTICLE 15** | December 27, 2024 | www.clarin.com<br><br>La muerte de Liam Payne: confirman qué consumió e imputan a su enigmático amigo y a dos empleados del hotel | "La muerte de Liam Payne: confirman qué consumió e imputan a su enigmático amigo y a dos empleados del hotel" | Nores fue señalado como "manager" del artista, que lo acompañó en varias oportunidades durante sus viajes a Buenos Aires. La familia del músico direccionó su enojo contra Nores que le habría "mentido" a la familia ocultando su situación de consumo. "Está comprometido por varios testimonios directos, mensajes", confiaron fuentes de la investigación.<br><br>*Translation:*<br>*Nores was identified as the artist's "manager" who accompanied him on several occasions during his trips to Buenos Aires. The musician's family directed their anger at Nores who had "lied" to the family by hiding his drug use. "He is implicated by several direct testimonies, messages," said sources of the investigation.* |

| ARTICLE 16 | December 30, 2024 | www.rollingstone.com<br><br>https://www.rollingstone.com/music/music-news/liam-payne-died-after-trying-to-escape-hotel-balcony-judge-1235221318/ | **LIAM PAYNE DIED AFTER TRYING TO ESCAPE VIA HOTEL BALCONY, SAYS JUDGE** | "As for Payne's friend, the judge claimed that Nores, who now faces wrongful death charges, had taken the "position of guarantor" to Payne's family and was the main point of contact for the musician at the hotel. The judge wrote that, based on the autopsy results, "Payne's state of vulnerability was evident"<br>"He should have consulted with a doctor given the commitment made to the family of the deceased," wrote the judge. "He should have done this without trusting how the hotel employees could have dealt [with Payne]."when Nores left Casa Sur Palermo 50 minutes before the fall." |
| --- | --- | --- | --- | --- |
| ARTICLE 17 | January 8, 2025 | www.miamiherald.com<br><br>https://www.miamiherald.com/news/nation-world/world/article297771878.html | Liam Payne's manager, two hotel workers charged in One Direction singer's death | "R.L.N. is "responsible for the crime of manslaughter ... given that he had assumed a position of guarantor toward" Payne's family, Bruniard added." |
| ARTICLE 18 | January 9, 2025 | www.infobae.com<br><br>https://www.infobae.com/sociedad/policiales/2025/01/09/las-revelaciones-del-padre-de-liam-payne-que-complican-al-empresario-procesado-por-la-muerte-de-su-hijo/ | **Las revelaciones del padre de Liam Payne que complican al empresario procesado por la muerte de su hijo** | *"Luego, los identificó con nombre y apellido: Kate Cassidy, la novia de Liam, y **el empresario Rogelio Nores, alias "Roger"**. "Estaban a su cuidado por motivo de sus adicciones. A Kate por amor y **Roger porque acompañaba y cuidaba a Liam en estos últimos meses y me reportaba a mí su estado".**<br>Hoy, **"Roger" Nores está procesado por la jueza Laura Bruniard el homicidio culposo de Liam,** junto con otros cuatro acusados* |

|  |  |  |  | *más, señalados por la jueza Laura Bruniard por venderle cocaína al cantante y garantizar su muerte con sus imprudencias. Nores fue definido como "un garante" de Liam en su estadía en el país. Ante la jueza, en un descargo escrito, **el empresario negó cualquier rol formal con el ex One Direction**, al que solo lo unía un lazo de amistad, sin ningún contrato de por medio.* |

*Según declaró el jefe de recepción Esteban Grassi, también procesado por el homicidio culposo, Nores se presentó en el CasaSur como **"el manager de Payne"**. Así lo marcaba, por ejemplo, un mail interno del hotel que entregó el acusado, publicado ayer por este medio.*

*Payne padre conocería bien a Nores a mediados de 2024. **El empresario aparece con fuerza en un momento de crisis.** "Logramos mantenerlo, estabilizarlo, pero Liam no estaba mejorando. Estaba estable pero no mejoraba. En ese periodo, Liam recibía llamadas de Roger, yo no sabía quién era", continuó. El empresario, aseguró Payne padre, se ofreció a apoyar al ex One Direction **"a cambio de nada".***

*Sin embargo **la simple amistad luego cambiaría**, al menos, según Payne padre.*

RN/F/RNF4015 publication chart Liam Payne Roger Nores

| | | | | *El vínculo entre Nores y Liam, con el correr del caso, **se volvería una clave de la imputación.*** |
|---|---|---|---|---|
| | | | | *Ellos dos tenían una relación de amistad. Es verdad que **Roger este año gestionó reuniones para que Liam ingresara en el mercado laboral nuevamente**, pero él decía que lo hacía para ayudarlo, no por algo a cambio ni con un contrato de por medio, **buscaba sus relaciones nada más**. Yo igualmente este último tiempo noté que **Roger lo direccionaba a Liam para que se desarrollara más en los negocios** que en su parte artística. Este cambio de dirección en lo laboral de Liam no era favorecedor para él, porque a él lo que le gustaba hacer y le hacía bien era hacer música", aseveró.* |
| | | | | *"Liam sabía que yo creía que era errado dejara la música por las inversiones. Cuando yo lo conocí a Roger, él estaba enfocado en el bienestar de Liam y lo creí genuino; **luego, Roger cambió su enfoque cuando intentó integrar a su novia al circulo de confianza que teníamos con Liam**, su novia, el guardaespaldas y yo". La novia, incluso, apareció en Wellington.* |

| | | | | *En el mail interno del hotel CasaSur, **Miranda aparece nombrada como "asistente de manager".***

***Translation:***

*Later, he identified them by name and surname: Kate Cassidy, Liam's girlfriend, and businessman Rogelio Nores, alias "Roger." "They were in his care because of his addictions. Kate because of love and Roger because he accompanied and cared for Liam in these last months and reported to me his condition."*
*Today, "Roger" Nores is being prosecuted by Judge Laura Bruniard for the negligent homicide of Liam, along with four other defendants, accused by Judge Laura Bruniard of selling cocaine to the singer and guaranteeing his death with their recklessness. Nores was defined as "a guarantor" of Liam during his stay in the country. Before the judge, in a written statement, the businessman denied any formal role with the former One Direction member, who only had a friendship, without any contract in between.*
*According to the statement made by the head of reception Esteban Grassi, also prosecuted for manslaughter, Nores presented himself at the CasaSur as "Payne's manager." This was indicated, for example, by an internal email from the hotel that the accused handed over, published yesterday by this newspaper.*
*Payne Sr. would get to know Nores well in mid-2024. The businessman appears strongly at a time of crisis. "We managed to keep him, stabilize him, but Liam was not improving. He was stable* |

|  |  |  |  | *but not improving. During that period, Liam was receiving calls from Roger, I did not know who he was," he continued. The businessman, Payne Sr. assured, offered to support the former One Direction "in exchange for nothing." However, the simple friendship would later change, at least according to Payne Sr.* |
|  |  |  |  | *The link between Nores and Liam, as the case progressed, would become a key to the accusation.* |
|  |  |  |  | *"They had a friendship. It is true that Roger arranged meetings this year so that Liam could enter the labor market again, but he said he did it to help him, not for something in return or with a contract involved, he was just looking for his relationships. I also noticed lately that Roger was directing Liam to develop more in business than in his artistic side. This change of direction in Liam's career was not favorable for him, because what he liked to do and what made him good was making music," he said.* |
|  |  |  |  | *"Liam knew that I believed it was wrong to leave music for investments. When I met Roger, he was focused on Liam's well-being and I believed it genuine; then, Roger changed his focus when he tried to integrate his girlfriend into the circle of trust that we had with Liam, his girlfriend, the bodyguard* |

| | | | | |
|---|---|---|---|---|
| | | | | *and me." The girlfriend even appeared in Wellington.*<br><br>*In the internal mail of the CasaSur hotel, Miranda appears named as "assistant manager."* |
| | | You Tube / etimes<br><br>https://www.youtube.com/watch?v=J-cDqRHMAPM<br><br>**Liam Payne's Father Helps Argentina Authorities; Provides With Crucial Evidence Against Roger Nore** | Video | |
| **ARTICLE 19** | Event - January 17, 2025 | https://www.unation.com/event/one-direction-night-a-night-for-liam-in-west-palm-beach-56903209/?srsltid=AfmBOoqO9c7EJP-mrJcYyRDpqkkInz8IdI6b5oe1iycoHdOLMO2Xjua2 | One Direction Night – West Palm Beach | Welcome to One Direction Night - All For Liam! Join us on January 17th at The Banyan Live in West Palm Beach for a night filled with all your favorite One Direction hits in honor of Liam Payne. Get ready to dance and sing along to all the iconic songs that made One Direction a global |

RN/F/RNF4015 publication chart Liam Payne Roger Nores

| | | | | sensation. Lets come together to show our love and support for Liam! See you there! |
|---|---|---|---|---|

RN/F/RNF4015 publication chart Liam Payne Roger Nores

# ARTICLE 1



SUBSCRIBE

 

**CELEBRITY NEWS**

# Liam Payne's Dad Is Willing to Help in Investigation of His Son's Death

By Kaitlin Simpson  |  October 22, 2024



Liam Payne, Geoff Payne PG/Bauer-Griffin/GC Images ; Marcos Brindicci/Getty Images

Liam Payne's dad, **Geoff Payne**, is willing to help authorities with the investigation of his son's death.

The Argentine Prosecutor's Office confirmed to *Us Weekly* that Geoff has spoken to the case's prosecutor, **Dr. Andres Esteban Madrea**, about "his desire to investigate and to know [what] happened" with his son, Liam. Geoff also expressed that he [wanted to] share with authorities what he knows about his son's [death to] potentially aid the investigation.

Why the NFL Warned Beyonce Over Her Christmas Halftime S...



THE NFL HAD ITS EYES ON BEYONCE'S FASHION DURING HER CHRISTMAS HALFTIME PERFORMANCE.

Hard Rock BET  BET ON THE PLAYOFF  FIRST BET OFFER UP TO $100 BACK IN BONUS BETS IF YOU DON'T WIN
OSU vs TEX

Geoff will remain in Argentina under "dynamic police custody until the end of the judicial proceedings and given his state of logical commotion due to the death of his son," per the prosecutor's office. According to Madrea, the office's top priority is to preserve "the privacy of the family of the former member of the band One Direction."

"Everything that arises within the framework of the investigation will first be informed to the family," the department said in a statement to Us. "And given the high public exposure that the musician had, the communication will be limited to the institutional channels of the Public Prosecutor's Office."

 **Related:** Everything to Know So Far About Liam Payne's Shocking Death at 31

Why the NFL Warned Beyonce Over Her Christmas Halftime S...

*Us* confirmed that Liam died at age 31 on Wednesday The former One Direction singer suffered from sever injuries" following a falling from a third-story balcony Aires hotel, per Buenos Aires emergency services chi **Crescenti**.

with ex **Cheryl Cole**.

"We are heartbroken. Liam will forever live in our hearts and we'll remember him for his kind, funny and brave soul," Liam's family told the BBC in a statement. "We are supporting each other the best we can as a family and ask for privacy and space at this awful time."

Liam's dad arrived in Argentina after news broke of Liam's death. Outside the hotel where Liam died, fans put together an impromptu memorial for the singer with handwritten notes, letters, flowers and candles. Geoff was seen at the makeshift memorial, taking in the tributes and paying his respects.

---



**Related:** Liam Payne's Quotes About His Mental Health Struggles Over the Years

---

According to a 9-1-1 phone call from the day of Liam's death, a hotel receptionist called the authorities to report a guest who was "high on drugs" and "trashing" their room. The caller believed the unnamed guest "may be in danger," per the BBC.

One week after his death, ABC reported that Liam's partial autopsy showed that the musician had "pink cocaine" — a recreational drug that typically mixes methamphetamine, ketamine and MDMA — cocaine, benzodiazepine and crack in his system at the time of his death.

Why the NFL Warned Beyonce Over Her Christmas Halftime S...



*Deal* **of the Day**

Snag the Viral Joggers Shoppers Say are 'Sli Flattering' While They're Still 29% off!

VIEW DEAL

Liam was previously candid about his struggles with drugs and alcohol. Last year, he revealed that he was 100 days sober after a stint in rehab.

*With reporting by Luciana Arias*

*If you or someone you know is struggling with substance abuse, contact the Substance Abuse and Mental Health Services Administration (SAMHSA) National Helpline at 1-800-662-HELP (4357).*

## JUST FOR YOU





Matthew Lawrence and Chilli Pack on the PDA as They Celebrate the New Year

General Hospital's John Ca 83



EXCLUSIVE OFFER
Get 26 digital issues for only $5! That's 97% off the cover price!
SUBSCRIBE NOW

Why the NFL Warned Beyonce Over Her Christmas Halftime S...

### IN THIS ARTICLE

**Liam Payne**

# ARTICLE 2

# New Details Emerge As Liam Payne's Dad Helps With Son's Death Investigation

**Published** Oct 22, 2024 at 12:31 PM EDT



45% of manufacturing executives feel pressure to accelerate decarbonization

LEARN MORE





H. Alan Scott
Newsweek's 'The Parting Shot' Host

before his tragic fall from that third floor hotel balcony in Buenos Aires.



SUBSCRIBE FOR $1

By **Erin Keller**
Reporter (Live News)

FOLLOW

2

Liam Payne's father, Geoff Payne, is offering to help Argentine authorities in their investigation into the former One Direction member's tragic death.

Geoff Payne arrived at CasaSur Palermo Hotel in Buenos Aires on Friday where his 31-year-old son fell to his death from a third-floor balcony on October 16 and participated in a moment of silence outside led by heartbroken fans.

While the toxicological and histopathological studies complementary to Liam Payne's autopsy report have yet to be completed, Argentine authorities announced Tuesday that Geoff Payne is willing to offer up any information on his famous son.

"For his part, the musician's father expressed his desire for an investigation and knowledge of what happened and expressed to the prosecutor his willingness to testify about everything he knows about his son's life, which can help the investigation," a release, translated from Spanish, from the National Criminal and Correctional Prosecutor's Office No. 14 states.


Unlimited 2% cash back
Make purchases. Get paid.
Terms apply. Click "Learn more" for more information.
Capital One Business
SPARK BUSINESS

SUBSCRIBE FOR $1



Geoff Payne, father of Liam Payne, visits the memorial in tribute to former One Direction singer outside Casa Sur Hotel on October 18 in Buenos Aires, Argentina    **GETTY IMAGES**

A preliminary autopsy report released Thursday stated Liam Payne died from "multiple traumas" and internal and external bleeding sustained from his fall.

Several national and international outlets, including ABC News, now report that Liam Payne had drugs, including "pink cocaine" in his system at the time of death. The party drug usually includes a combination of MDMA, ketamine, and methamphetamine.

Argentine authorities added Tuesday that they informed Geoff Payne that Liam's body must stay in the country until all reports are finished. Their investigation includes the review of cell phone and computer data, as well as photos and videos from security cameras that will require longer analysis.

**Newsweek**    SUBSCRIBE FOR $1





Geoff Payne, father of Liam Payne, visits the fan tributes for the late former One Direction member outside Casa Sur Hotel on October 18 in Buenos Aires, Argentina    **GETTY IMAGES**

They have also informed the United Kingdom government of the legal proceedings since Liam Payne was a British citizen.

Andrés Esteban Madrea, the head of the Prosecutor's Office No. 14, also ordered that "Geoff Payne have a dynamic police accompaniment until the judicial proceedings are completed and given his state of logical shock by the death of his son."



SUBSCRIBE FOR $1



**Jimmy Carter Funeral: Live Updates As Trump, Biden, Obama Attend Service**

**IRS Extends Tax Deadline For Jimmy Carter Remembrance Day**

**Prince Archie and Lilibet's Heartbreaking Song to Dog Who Died**

**Suspect in Gaudreau Brothers' Deaths Pleads Not Guilty to Homicide Charges**



English singer Liam Payne and US actor Katie Cassidy pose on the red carpet upon arrival at The 2022 Fashion Awards in London on December 5, 2022. A timeline of the social media influencer and... **More** **DANIEL LEAL/AFP/GETTY IMAGES**

**Newsweek**    SUBSCRIBE FOR $1



In a statement regarding Liam's death, his family told the BBC last week, "We are heartbroken. Liam will forever live in our hearts and we'll remember him for his kind, funny, and brave soul. We are supporting each other the best we can as a family and ask for privacy and space at this awful time."

In a 911 call moments before Payne's death, one of the hotel's senior staff reported that he was behaving aggressively and may have been under the influence of drugs or alcohol.

Payne's former One Direction bandmates Harry Styles, Louis Tomlinson, Zayn Malik and Niall Horan released a joint statement, as well as their own tributes, amid the shocking loss of their "brother."



Newsweek   SUBSCRIBE FOR $1

Geoff Payne visits the fan-made Liam Payne tribute.      **GETTY IMAGES**



"We're completely devastated by the news of Liam's passing. In time, and when everyone is able to, there will be more to say. But for now, we will take some time to grieve and process the loss of our brother, who we loved dearly."

"The memories we shared with him will be treasured forever. For now, our thoughts are with his family, his friends, and the fans who loved him alongside us. We will miss him terribly. We love you Liam," the statement concluded.

# ARTICLE 3

Case 9:25-cv-80060-AMC    Document 1    Entered on FLSD Docket 01/15/2025    Page 90 of 263

# Instagram

Log In    **Sign Up**



**people** ✓ • Follow

**people** ✓ Liam Payne's father, Geoff Payne, is cooperating with the Argentine authorities in their investigation into Liam's unexpected death, a National Criminal and Correctional Prosecutor's Office No. 14 states in a press release translated from Spanish. Read more in our bio link. | 📷: GC Images; AP Photo

11w

**8,854 likes**

October 23, 2024

Log in to like or comment.

More posts from people





g into Instagram

g in to see photos and videos from friends and discover other accounts you'll love.

# ARTICLE 4

NEWS > WORLD NEWS

# Argentine prosecutors charge 3 people linked to the death of former One Direction star Liam Payne



A picture of former One Direction singer Liam Payne adorns a memorial outside the hotel where he was found dead after falling from a balcony in Buenos Aires, Argentina, Thursday, Oct. 17, 2024. (AP Photo/Natacha Pisarenko)

By **ASSOCIATED PRESS** | ap@dfmdev.com

**By ALMUDENA CALATRAVA**

BUENOS AIRES (AP) — Three people have been charged in connection with the death of Liam Payne, a former member of musical group One Direction who died after falling from the balcony of his hotel room in Buenos Aires last month, Argentine prosecutors said Thursday.

Prosecutor Andrés Madrea charged the three suspects, whose identities were not revealed, with the crimes of "abandonment of a person followed by death" and "supplying and facilitating the use of narcotics," the prosecutor's office said. Madrea also requested their arrest to judge Laura Bruniard, who ruled the three cannot leave the country.

Payne fell from his room's balcony on the third floor of his hotel in the upscale neighborhood of Palermo, in the Argentine capital. His autopsy said he died from multiple injuries and external bleeding.

Prosecutors also said that Payne's toxicological exams showed that his body had "traces of alcohol, cocaine and a prescribed antidepressant" in the moments before his death.

Investigators said hours after Payne's death that he was by himself when he fell. The prosecutors' office said one of the people charged was often with the singer during his time in Buenos Aires. The second is a hotel staffer who allegedly gave Payne cocaine during his stay between Oct. 13 and 16. And the third is a drug dealer.



Read More

00:00                                                                03:00

The charges bear some resemblance to the U.S. cases stemming from the death of "Friends" star Matthew Perry a year ago. The actor's personal assistant and a longtime friend are among those charged with helping supply him with ketamine in the final months of his life, leading up to his overdose on the anesthetic.

Three young men were similarly charged in the opioid-overdose death of rapper Mac Miller in 2018.

One Direction was among the most successful boy bands of recent times. It announced an indefinite hiatus in 2016 and Payne — like his former bandmates Zayn Malik, Harry Styles, Niall Horan, and Louis Tomlinson — pursued a solo career.

The singer had posted on his Snapchat account that he traveled to Argentina to attend Horan's concert in Buenos Aires on Oct. 2. He shared videos of himself dancing with his girlfriend, American influencer Kate Cassidy, and singing along in the stands. Cassidy had left Argentina after the show, but Payne stayed behind.

# ARTICLE 5

Friend of Liam Payne, who was charged with his death, spoke out: 'I never left him'

  **Vea** | The world of stars

Home > See > The Latest

# Liam Payne's friend charged with his death spoke out: 'I never left him'. Who is he?

Rogelio Nores, the friend of the One Direction singer who is accused of abandoning him in a vulnerable state and who, according to authorities, contradicts himself in his statements, gave his version of events. He could go to prison.

**By Vea Editorial Staff**

November 8, 2024

  





consider that you accept its use, in accordance with this **policy.**          Accept



Photography by: Samir Hussein

1/10/25, 9:35 PM
Case 9:25-cv-80060-AMC Document 1 Entered on FLSD Docket 01/15/2035 Page 98 of 263
Friend of Liam Payne, who was charged with his death, spoke out: 'I never abandoned him'


charged with ... of Liam Payne ... According to ... testimonies, presented himself as the artist's manager and apparently also hid from the family that the former member of **One Direction** relapsed into his addiction problems.

The Prosecutor's Office explained: "The first of the accused, who accompanied the artist on a daily basis during his stay in the city of Buenos Aires, is charged with the crimes of abandonment of a person followed by death and which carries a sentence of 5 to 15 years in prison, as the perpetrator, in conjunction with the supply and facilitation of narcotics," said prosecutor Andrés Madrea.

## Related links

3 people arrested for the death of Liam Payne. He consumed a lethal mixture for 72 hours

Liam Payne's friend is being investigated for his death. Hotel employees are under scrutiny

Liam Payne's funeral: when is it, where is it and who will attend One Direction's farewell

Liam Payne donated large sums of money before his death. To whom and why?

Liam Payne: Witness who saw him fall emerges. Video would support his version What happened?

consider that you accept its use, in accordance with this **policy.**    Accept

EE    **Vea** | The world of stars

A few hours after it was made public that it was Mr Rogelio Nores, also known as Roger, he gave an interview to the Daily Mail denying the accusations.

## Liam Payne's best friend reveals what their last meeting was like

**"I never left Liam** ; I went to his hotel three times that day and left 40 minutes before this happened," Nores said. "There were over 15 people in the hotel lobby talking and joking with him when I left," she said, adding that she had already given her statement and has not given further evidence.

**"I could never have imagined that something like this would happen** . I gave my statement to the prosecutor on October 17 as a witness and have not spoken to any police officer or prosecutor since. **I was not Liam's manager** ; he was just a very dear friend, and please refer to the email I sent to Liam and his team on August 23. I am truly devastated by this tragedy and **miss my friend every day** ."

ADVERTISING



**Invest in Portuguese Residence — From EUR…**
Henley & Partners · Sponsored        Contact Us

You could read: They claim that Liam Payne arrived clean and sober at the hotel. He was rehabilitated

## Liam Payne's friend accused of abandoning him will not be able to attend his funeral

Rogelio also explained that his home in Buenos Aires has not been raided as reported in some media.

At the moment it is known that this friend of the artist will not be at his funeral, since although initially an arrest warrant was issued, it was later decided that the accused can be released, since they presented themselves voluntarily, while the investigation progresses, however they cannot leave the country and in the case of Nores, his passport was requested.

Nores also mentioned that he was not presenting himself as a manager, as has also been reported. "He was just a very dear friend. I am truly heartbroken by this tragedy and have missed my friend every day."



# ARTICLE 6

# Comments /





**New York Post** ✅ · **Follow**
verified publisher · 1.3M followers

# Liam Payne pal, accused of 'abandonment,' texting with singer about drugs, prostitutes before fatal fall

By Patrick Reilly, 2024-11-26



Liam Payne texted his friend and designated caretaker about using drugs and having sex with prostitutes just hours before he fell to his death — with prosecutors wanting to try the pal for "abandonment" for failing to save him from his spiraling drug abuse.

Argentine businessman Roger Nores, 35, who was one of the three men charged in connection to the One Direction star's death after he plummeted from a hotel balcony in a drug-induced daze last month, checked in on Payne a total of three times the day he died, Argentinian prosecutors claimed in court documents obtained by TMZ .

# Comments /



Liam Payne with manager Rogelio 'Roger' Nores and friends. SnapChat

Around 7 a.m. on Oct. 16, an already intoxicated Payne texted Nores and said, "Dude I think I'm going to f—k a hooker," prosecutors said. About two and a half hours later, Payne texted him and asked for "6 grams" — presumably meaning cocaine.

Payne and Nores had breakfast together at the CasaSur Palermo Hotel in Buenos Aires, where Payne was drinking whiskey. Afterwards, Payne went back to his trashed hotel room and frantically searched for a "powder," according to a maid who was in the room.

A pair of prostitutes showed up to Payne's room around 11:30 p.m. and had sex with him, they told police. He also asked them for cocaine because he was all out.

**Liam Payne was attempting to escape from hotel room before he fell to his death: report**

# Comments /

ported hearing Payne smash things. Someone from the hotel tried calling Nores, but he did not answer.

When the prostitutes asked for payment, Payne freaked out and punched the television. Nores came back to the hotel around 3:45 p.m. to pay the women, by which time staffers noticed the singer appeared "visibly drunk."



Photo from the Buenos Aires Police shows a candle and traces of white powder on a table of Payne's hotel room. Buenos Aires Police/AFP via Getty Images

**Liam Payne's girlfriend Kate Cassidy sobs over 'painful' CCTV footage showing singer being carried through hotel lobby before death: 'He could have been saved'**

Nores texted Payne, "Are you ok?" at 4:25 p.m. but the star did not respond.

Nores has maintained that Payne appeared fine when he left him at the hotel about an hour before he fell to his death from the balcony, sources close to Nores told TMZ.

# Comments /

Nores was charged with abandonment for allegedly failing to inform the musician's family that he had relapsed on drugs. He testified as a witness, which led a judge to decide that he had allegedly breached his duty of care with respect to Payne.



Roger Nores was charged with abandonment in connection to Payne's death. Courtesy of Rogelio 'Roger' Nores.

Authorities interviewed Payne's father, who said that Nores volunteered to takeover as Payne's caretaker in May and arrange for him to go to rehab, the documents state.

**CLICK HERE TO SIGN UP FOR OUR MORNING REPORT NEWSLETTER**

Payne's dad said it was important that Payne always stayed busy and was never alone in his recovery.

Earlier this month, Nores, said he "never abandoned Liam ."

# ARTICLE 7










| Gov. Gavin Newsom Confronted by CA Wildfire Victim, Demands to Talk to the President | Celebrity Heart Hands For A Feel-Good Friday! | Ronda Rousey & Travis Browne Welcome New Baby Girl | Guess Who This Star Student Turned Into! | Heidi Klum and Tom Kaulitz Get Physical on St. Barts Beach |

Liam Payne Prosecutors Say Why They Accused His Friend of Abandonment

# LIAM PAYNE
# PROSECUTORS LAY OUT WHY THEY ACCUSED HIS FRIEND OF ABANDONMENT

*EXCLUSIVE*    223    *11/26/2024 1:00 AM PT*





Getty

**Liam Payne**'s good friend who Buenos Aires authorities want to prosecute for "abandonment" knew Liam had fallen off the wagon but still left him alone ... so claim prosecutors in an official document obtained by TMZ.

**Roger Nores** had been extremely close to Liam in the last months of his life. The 2 traveled to Argentina together, but Liam stayed in the CasaSur Hotel alone and Roger stayed elsewhere.





Backgrid

According to the docs, Liam's dad was interviewed by authorities and said in May 2024, Roger volunteered to take over Liam's care and arrange to put him in rehab. The docs say Liam's father said it was **critical that Liam always stayed busy and was never alone**.

Ad removed. Details

Liam's dad said he became alarmed in September after his son fired a bodyguard who was trying to stop him from doing drugs.

Prosecutors say Roger knew Liam was clearly off the wagon. They say at 10 PM the night before Liam died, Liam ordered 4 bottles of whiskey, and at 6:36 AM the next morning he ordered 5 more bottles of whiskey. They say at 7 AM he texted Roger, "Dude I think I'm going to f*** a hooker." And, authorities say, at 9:32 AM Liam texted Roger, "Can you get 6 grams?" ... presumably referring to cocaine.





They say when Roger arrived at the hotel they went to breakfast where Liam drank whiskey. The maid went to the room when they were at breakfast and said the room was trashed. Authorities say Liam went back to the room after breakfast and the maid said he was chaotically looking for something and eventually found a "powder."



*THE TROUBLING TIMELINE*

TMZ.com

At 11:30 AM 2 prostitutes showed up ... and they told police they had sex with Liam. They say he asked them for cocaine because he was out. They also say Liam became enraged when they asked for payment and punched the TV 3 times.

At around 2:00 PM authorities say he asked a hotel employee ... "I'm gonna need another 7 grams for today."





According to the docs, Roger came back to the hotel at 3:45 PM to pay the prostitutes, and at 4 PM a staffer claimed Liam was "visibly drunk" with dilated pupils. At 4:04 PM Roger left the hotel. A short time later, a housekeeper heard Liam breaking objects in his room, and someone from the hotel tried calling Roger but he didn't answer. At 4:25 PM Roger texted Liam, "How are you?" but Liam didn't respond.

Sources connected to Roger tell TMZ ... he checked on Liam 3 times the day he died and insists when he left Liam at the hotel about an hour before the fatal fall from the balcony, Liam was fine and showed no evidence of being under the influence of anything.

Now the twist ... the prosecutors who wrote this document are national prosecutors, but a judge ruled any case involving alleged abandonment should be handled by local prosecutors. So, the judge told national prosecutors they had no jurisdiction to pursue abandonment. So far, there have been no charges filed by local prosecutors. The national prosecutors tried appealing the judge's ruling, but the appeal was rejected.

Prosecutor Andre Madrea tells TMZ ... he is still fully on the case and the judge has not made a final decision on whether he has jurisdiction ... and that will happen Monday. Madrea also tells us additional people may be charged in connection with Liam's death.





As TMZ reported, 3 hotel workers **grabbed Liam by the arms and legs** against his will and took him to his room. Documents show the first time they did this Liam got back in the elevator and when the door opened in the lobby he was unconscious but regained consciousness and went into the lobby, and collapsed again. They took him back upstairs and left him in the room alone.



As we reported, one of the employees who carried Liam **called 911** and said they were worried he might hurt himself because of the balcony ... suggesting Liam may have said he was going to use the balcony to escape.





**REMEMBERING LIAM PAYNE**                                        LAUNCH GALLERY

Getty

In fact, it appears Liam tried to do just that, because he put a hat on, strapped a bag to his shoulder, and apparently dropped a leather bag from his third-floor balcony to the second-floor balcony directly below. It appears Liam was trying to scale down to the second-floor balcony when he fell to his death.

SHARE                                        SHARE

**RELATED ARTICLES**

 **Zayn Malik Pays Tribute to Liam Payne at First Concert Since Death, Fans Cry**

 **Harry Styles, One Direction Members Arrive at Liam Payne's Funeral**

 **Liam Payne Talking to Hotel Staffer Charged with Drug Delivery, Video Shows**

 **Liam Payne's Florida Mansion Back Up For Rent After His Death**

# ARTICLE 8

BREAKING NEWS  **Bronx fire leaves 7 injured as 200 firefighters respond to 5-alarm blaze**

WORLD NEWS

# Liam Payne pal, accused of 'abandonment,' texting with singer about drugs, prostitutes before fatal fall

By Patrick Reilly

Published Nov. 26, 2024, 1:08 p.m. ET

21

*NEW YORK POST*                                                                    LOG IN

US News    Metro    Long Island    Politics    **World News**

TRENDING NOW IN WORLD NEWS

 Driver charged after ramming car head-on in terrifying road-rage...

 European brothel manager reveals 'eight-second' rule

 CDC monitoring spike of mysterious virus in China as US cases...

 Locals stunned a water mysterious turns red near Sy



Keep Watching ⏸ ⏭ Next video in 8 seconds

Liam Payne texted his friend and designated caretaker about using drugs and having sex with prostitutes just hours before he fell to his death — with prosecutors wanting to try the pal for "abandonment" for failing to save him from his spiraling drug abuse.

Argentine businessman Roger Nores, 35, who was one of the three men charged in connection to the One Direction star's death after he plummeted from a hotel balcony in a drug-induced daze last month, checked in on Payne a total of three times the day he died, Argentinian prosecutors claimed in court documents obtained by TMZ.

1/10/25, 8:56 AM
Case 9:25-cv-80060-AMC Document 1 Liam Payne pal accused of abandonment texting with singer about drugs, prostitutes before fatal fall
Entered on FLSD Docket 01/15/2025 Page 115 of 263



Liam Payne with manager Rogelio 'Roger' Nores and friends.
SnapChat

Around 7 a.m. on Oct. 16, an already intoxicated Payne texted Nores and said, "Dude I think I'm going to f—k a hooker," prosecutors said. About two and a half hours later, Payne texted him and asked for "6 grams" — presumably meaning cocaine.

Payne and Nores had breakfast together at the CasaSur Palermo Hotel in Buenos Aires, where Payne was drinking whiskey. Afterwards, Payne went back to his trashed hotel room and frantically searched for a "powder," according to a maid who was in the room.





# ARTICLE 9

Publicidad

INICIO / ENTRETENIMIENTO /

Entretenimiento

# Caso Liam Payne: ¿quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante?

*Nores enfrenta serias acusaciones por su presunta participación en la muerte de Liam Payne, y los cargos en su contra podrían llevarlo a la cárcel por hasta 15 años*



Caso Liam Payne: ¿quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante? Foto: Canva/Archivo

## LO MÁS LEÍDO

**Mike Salazar: Confiesa terrible momento de incertidumbre, su niña está en cuidados intermedios**

**Muere Enrique Páez Rubio, actor y director de teatro, a los 61 años**

**Yurem Rojas propone matrimonio durante concierto y es rechazado (VIDEO)**

**¡Primero Cinemex!, ahora Sears anuncia el cierre de una de sus tiendas en Nuevo León**

1/10/25, 8:35 AM · Caso Liam Payne ¿Quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante? | Posta Nuevo León

Case 9:25-cv-80060-AMC Document 1 Entered on FLSD Docket 01/15/2025 Page 118 of 263

Publicidad

**PUBLICADO EL**
**Noviembre 26, 2024, 10:05**

**POR:**
<u>Abraham López</u>

---

**MONTERREY Nuevo León.-** Una imagen de cámara de seguridad que muestra al **ex One Direction Liam Payne** ocho minutos antes de morir llevado a rastras por personal del **hotel CasaSur** fue publicada por diversos medios del mundo. <u>La reconstrucción minuto a minuto de la fiscalía revela un dato clave para acusar a **Roger Nores.**</u>



## Algunos medios han dado a conocer una imagen que puede cambiar las investigaciones

En los últimos días, medios como **TMZ, el Mail Online en Londres y el New York Post** han difundido la imagen verídica que forma parte del expediente que investiga la muerte del cantante en **Buenos Aires**. <u>La imagen corresponde a las **16:54 del 16 de octubre, apenas ocho minutos antes de que Payne cayera desde el balcón de su habitación el tercer piso del hotel CasaSur, falleciendo en el acto.**</u>

descarta
s por el
'neumovirus'
en Nuevo León

**Ataque armado en San Nicolás deja a un joven herido**

**VIDEO | Regia se vuelve viral tras su reacción en presentación de Yeri Mua**

Publicidad

Publicidad
Publicidad

1/10/25, 8:08 AM    Caso Liam Payne: ¿Quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante? | Posta Nuevo León

Case 9:25-cv-80060-AMC    Document 1    Entered on FLSD Docket 01/15/2025    Page 119 of 263

**El análisis toxicológico** posterior reveló la presencia de alcohol, cocaína y sertralina en la sangre de **Payne,** un potente antidepresivo. **Los peritos** concluyeron que el cantante no pudo haber tenido conciencia de lo que ocurría, ya que su cabeza sufrió graves traumatismos. Además, se encontró que llevaba un morral en el momento de su muerte, el cual fue visto en varias ocasiones en los análisis de video mientras buscaba cocaína.

**El fiscal Andrés Madrea** ha investigado a fondo el caso, entrevistando a decenas de testigos y analizando horas de grabaciones de cámaras de seguridad. Se ha determinado que el músico fue llevado a su habitación a rastras en dos ocasiones ese día, siendo la segunda vez minutos antes de su trágica muerte. Los empleados del hotel declararon que el cantante estaba en un **estado groggy** y que rompió objetos dentro de la habitación antes de su fatal caída.

## ¿Quién es Rogelio Nores?

**Rogelio Nores, el empresario acusado de ser el manager de facto de Payne**, enfrenta cargos de abandono de persona seguido de muerte y de facilitarle sustancias estupefacientes. A pesar de intentos de desmentir su imputación, los registros judiciales confirman que está bajo investigación. **Nores dejó el hotel poco antes de que Payne** fuera llevado a rastras, y se le ha incautado su iPhone y pasaporte para peritaje.

El testimonio del padre de **Liam** reveló que el cantante estaba siendo tratado por una psiquiatra en **Estados Unidos,** quien advirtió sobre los riesgos de mezclar alcohol, drogas y sertralina. A pesar de estas advertencias, **Payne** habría continuado consumiendo bajo la influencia de Nores, quien incluso le habría facilitado dinero para comprar drogas.

## NOTAS MÉXICO


¿Quieres pagar tu refrendo vehicular por Internet en Tabasco? Acá te explicamos

Chihuahua se cubre de blanco tras caída de nieve; alcanzará temperaturas de -10°


¿Cómo puedo revisar el adeudo de placas en Jalisco?


¿Qué pasó entre Ofelia Cano y la hija de Dulce tras la filtración de supuestos audios?

1/10/25, 8:08 AM          Caso Liam Payne: Quién es Rogelio Nores, el amigo argentino acusado de abandonar al cantante | Posta Nuevo León

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 120 of 263



## Nores podría pasar 15 años de prisión por el caso Liam Payne

**Nores enfrenta serias acusaciones por su presunta participación en la muerte de Liam Payne,** y los cargos en su contra podrían llevarlo a la cárcel por hasta **15 años.** La investigación continúa, con la fiscalía analizando la computadora del front desk y los teléfonos de los empleados para esclarecer los hechos que rodearon **la trágica muerte del ex cantante de One Direction.**

**Ver Nota...**

Caso Liam Payne da giro inesperado, aseguran que hotel es el culpable

**Ver Nota...**

El mensaje que Liam Payne dejó sobre la muerte muchos años antes de la tragedia

**Ver Nota...**

Inicia el funeral de Liam Payne en Inglaterra y sus compañeros de One Direction dicen presente



# ARTICLE 10

AD

**FAMOUS PEOPLE**

## They reveal why Liam Payne's friend was accused of abandoning a person

Rogelio Nores claims he visited the One Direction singer on 3 occasions the day he died

November 27, 2024 • Alexis Ceja

 



(GETTY IMAGES/FILE)

pain of his loss. With **the release of images from the day of his death** , new details have slowly emerged, including decisions made by the police surrounding the incident. One of the most recent points is why his friend, Rogelio Nores, was charged with abandonment of a person.

## Don't miss:



**FAMOUS PEOPLE**

**Alejandra Guzmán is criticized for her controversial outfit during a concert: 'Someone should tell her'**

January 06, 2025 · Alexis Ceja

AD



**FAMOUS PEOPLE**

**What did Leo Dan die of? This is what we know about the news th**

January 01, 2025 · Judith Martinez

Roger had travelled to Argentina with the One Direction singe.  in September. According to reports, it was

1/10/25, 8:58 AM
Case 9:25-cv-80060-AMC    Document 1    Entered on FLSD Docket 01/15/2025    Page 124 of 263
Revelan por qué acusaron al amigo de Liam Payne de abandono de persona



*Liam Payne died on October 16 after falling from a third-floor balcony at a hotel in Argentina.*

(INSTAGRAM @LIAMPAYNE)

In this regard, the police charged him with abandonment of a person, since he knew of his delicate situation and would not have supported him at that critical moment.

While the strong accusation against him might not be accepted by a judge, it was a statement from Liam Payne's father that changed the perspective.

According to TMZ, **Geoff Payne revealed that Rogelio had offered to take care of Liam and also organize his admission to rehabilitation** . The father asked his friend not to leave him alone, as it was important that he always be accompanied due to his delicate situation.

Nores had stated that **on the day Liam Payne died** , on Octo<br>claims that he had seen him well.

AD

## What will happen to Liam Payne's fai

**Liam Payne's family** said goodbye to the singer at a funeral,<br>**of One Direction** : Harry Syles. Zavn Malik. Louis Tomlinson and Naii Moran :

No estaba lista mentalmente para ver a Louis, Niall, Zayn y Harry en el funeral de Liam. 😭💔

#LiamPayne



12:01 PM · Nov 20, 2024                                      ⓘ

♥ 9.4K      💬 Reply      🔗 Copy link

Read 5 replies

AD

But now, according to Page Six, they are ready to begin legal
young artist's death.

It is not yet clear whether the Argentine prosecutor's office w
defendants, who have accused Roger of abandonment, a wai
employee of the hotel where he died of supplying the drugs.

# ARTICLE 11

   

# Liam Payne's dad says he missed major milestone before son's tragic death

Direction star tragically fell to his death from a third-floor balcony of a hotel in Buenos Aires in Argentina, on October 16. His father Geoff Payne jetted erica after his son's holiday with girlfriend Kate Cassidy took a drastic turn.

|  | SHARE | | | Comments 1 | | By **Saffron Otter** Assistant Features Editor & **Ryan Thom** 17:15, 27 NOV 2024 |



📷 **Geoff Payne (left) reportedly struggled with his son's fame** (Image: Express & Star / SWNS)

🔴 **Get the latest Daily Record breaking news on WhatsApp**

1/10/25, 4:08 AM
Liam Payne's dad says he missed major milestone before son's tragic Love Island - Daily Record
Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 128 of 263

   

Join us on WhatsApp

**Liam Payne's** devastated dad flew to Argentina to bring his son home to be laid to rest.

The former One Direction star tragically fell to his death from a third-floor balcony of a hotel in Buenos Aires in Argentina, on October 16. His father **Geoff Payne** jetted out to South America after his son's holiday with girlfriend Kate Cassidy took a drastic turn.

Ad • CompareCredit™    Sponsored Link by Taboola

| Wipe Out Interest For 18 Months With These Cards | 2 Cards Charging 0% Interest Until Nearly 2027 | Wipe Out Interest For 18 Months With These Cards | 2 Cards Charging Nearly 2027 |

‹   ›

## SIMILAR ARTICLES TO THIS

POWERED BY mantis

   

...num dies as son ...losing two grans in

Emmerdale's Dean Andrews retires after being axed from soap in tragic Christmas Day scenes

Lucy Letby's Christmas in jail after twisted new friendship with Sara Sharif's stepmum

Body of woman who vanished two years ago found tanks to Google Maps

...lly raised concerns in the lead up to his son's death that his son was on a worrying spiral. The heartbroken parent travelled to the ...ere his son died to organise repatriation of **Liam** as a police probe into the singer's death continued, **The Mirror** reports.

**Wife of millionaire killed on Titan sub left less than £80k after invalid will**

**Driver killed and another man in critical condition after horror crash on Scots road**

...I refused to leave the hotel with an eye-witness dad telling how Geoff was 'determined' to cling onto the memory of his son. At ...last Wednesday at St Mary's Church in Amersham, **Geoff** fulfilled the unbreakable promise he made to his family to remain by their ...iam's coffin was carried into the church.

...e Academy's Christmas film 'The Snow-In'

NOW PLAYING



The dad-of-three reportedly always struggled to come to terms with losing his pop star son for the first time, when his overnight fame saw him tour across the globe with **One Direction**, playing in front of millions of adoring fans. Following the funeral, a friend of the family told Mail Online : "Geoff is a lovely, lovely man. He struggled with Liam becoming famous.

**You May Like**                                                           Sponsored Links by Taboola

**1/2 Cup Of This (Before Bed) Can Melt Your Belly Fat Like Never Before**
Fitness

When he jetted off around the world on tours, his parents shared how difficult it was to see him go. Geoff said that he mourned missing "rites of passage" with his teenage son, like buying him his first **beer.**

LOADING

📷 **Liam Payne with father Geoff and mother Karen after the X Factor final outside Fountain Studios in 2010**

# ARTICLE 12

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 131 of 263



**Vea** | El mundo de las estrellas

Home — See — *Famous people*

# Liam Payne's father showed key evidence against Rogelio Nores for the death of his son

**Geoff Payne** has provided the courts with important information to build the case against the Argentine businessman, who is accused of abandonment followed by death and supplying drugs to **Liam Payne, former member of One Direction.**

**By Vea Editorial Staff**

November 30, 2024

   



Photograph by: Getty Images




The Argentine businessman, who was a close friend and de facto manager of Liam Payne, faces charges of abandonment resulting in death and drug supply. **Authorities are investigating whether Nores had any involvement in the death of the singer, whose** lifeless body was found after he jumped from the third floor of a hotel room where he was staying in Buenos Aires.

**Related links**

| Liam Payne's funeral: One Direction members reunite for their final farewell

| Video released of Liam Payne with hotel employee investigated for his death

| Investigation into the disappearance of the luxury watch that Liam Payne was wearing on the day of his death

| Liam Payne's friend charged with his death spoke out: 'I never left him'. Who is he?


Follow Vea Magazine on WhatsApp






## Vea | El mundo de las estrellas



Photography by: Samir Hussein

Liam Payne

The prosecution also claims that **Nores was prioritising professional interests related to a possible return of the British singer to the stage;** however, the businessman has denied these accusations.

La entrega de las nuevas pruebas por parte de Geoff Payne ha reavivado el interés mediático en este caso que ha impactado al mundo de la música. La opinión pública clama por justicia por la muerte del artista de 31 años y espera que las autoridades actúen con rapidez y eficacia.

## ¿Qué prueba presentó el papá de Liam Payne?

**El padre de Liam Payne logró acceder a un correo electrónico importante, fechado el 16 de septiembre, de la psiquiatra del cantante en Miami.** En este mensaje, la especialista explicaba que no podía seguir con el tratamiento debido a la gravedad de las crisis de Liam y **advertía sobre los riesgos de mezclar sertralina (un antidepresivo que consumía el artista) con alcohol.** Curiosamente, el destinatario de este correo era Rogelio Nores.

**Puedes leer:** *Las noticias que son tendencia en el mundo del entretenimiento aquí*

La autopsia mostró que el cantante había consumido cocaína, sertralina y alcohol en las horas previas a su muerte. Los registros del hotel indican que el cantante tuvo una noche turbulenta, caracterizada por un consumo excesivo de bebidas alcohólicas y, además, habría tenido una acalorada discusión con trabajadoras sexuales, a quienes había contratado, pero, al parecer, no quería pagarles.

Según fuentes cercanas al caso, Rogelio Nores tenía un papel crucial en la vida de Liam Payne, encargándose de sus finanzas, facilitando el acceso a drogas y alcohol, y sirviendo como intermediario entre el cantante y su familia.

La autopsia mostró la presencia de una mezcla mortal de cocaína y antidepresivos en el cuerpo del cantante, sustancias que pueden inducir efectos psicóticos y comportamientos autodestructivos.


**Por Redacción Vea**

**Temas:**  Liam Payne    Muerte de Liam Payne    Cómo murió Liam Payne    One Direction    Canciones de One Direction    Video Liam Payne    Rogelio Nores

Papá de Liam Payne

# ARTICLE 13

**Liam Payne's father gave the courts the main evidence to charge Rogelio Nores with the singer's death**

**The American psychiatrist who treated the former One Direction member told Rogelio Nores in an email that mixing the antidepressant Zoloft with alcohol could be fatal. The victim's family filed a complaint. Key hearing in court for the future of the case**

.

By [Federico Fahsbender](#)
Nov 30, 2024 09:31 am EST

  Keep



Geoff Payne, Liam Payne's father, in front of the altar made by fans at the hotel door

In his encounters with the Argentine justice system, **Geoff Payne, Liam Payne's father, provided the main piece of evidence to build the accusation against businessman Rogelio Nores** , accused by prosecutor Andrés Madrea of abandoning and killing his son, as well as supplying narcotics. The piece is **an email dated September 16 of this year, part of the accusation by prosecutor Madrea** , in charge of investigating Payne's death, which occurred a month later, when he fell from the balcony of the third floor of the CasaSur hotel on Costa Rica Street in the Palermo neighborhood of Buenos Aires, and fell against the **cement base of a garden umbrella** , fracturing the base of his skull, the wound that cost him his death.

📖
[You may be interested in:The death of the judge who investigated the drug kidnapping of Los Monos: what the autopsy and camera analysis revealed](#)

1/10/25, 8:48 AM
Case 9:25-cv-80060-AMC Document 1 Entered on FLSD Docket 01/15/2025 Page 136 of 263
Liam Payne: father gave the court the death evidence to charge Rogelio Nores / world the singer's death on probe

the Supreme Court revealed metabolites of the drug that indicate consumption at least two hours before death . **The drug was in his urine, his blood, in his gastric contents, in his nasal passages.** The toxicological analysis also revealed another substance: **sertraline, a powerful antidepressant, sold in the United States under the brand name Zoloft.**

00:00                                                                                              00:00

La sertralina, según la pericia toxicológica, **estaba presente en la sangre y en el contenido estomacal de Liam** al momento de su muerte. El consumo de alcohol junto con la sertralina está gravemente contraindicado; **puede llevar a alucinaciones, incluso a ideaciones suicidas.**

You may be interested in:He had been missing since December and was found after being involved in an accident and trying to escape

El mail que aportó Geoff Payne a la Fiscalía N°34 conducida por Madrea fue **escrito por la neuropsiquiatra de Miami que trató a su hijo** a lo largo de este año. En el mensaje, la neuropsiquiatra se desligaba del tratamiento, asegurando que era imposible acompañar a Liam en sus crisis. También, que la mezcla de sertralina con alcohol podría ser fatal.

1/10/25, 8:58 AM — Liam Payne's father gave the court the main evidence to charge Rogelio Nores with the singer's death - Infobae

Case 9:25-cv-80060-AMC  Document 1  Entered on FLSD Docket 01/15/2025  Page 137 of 263

You may be interested in:Madness in a clandestine nursing home in Córdoba: they heard screams and found seven elderly people tied to their beds



Liam Payne

**Infobae** intentó dialogar esta semana con Nores, así como su abogado defensor. **Ambos se negaron a comentar.** En paralelo, fuentes muy cercanas al empresario apuntaron que Payne era **"solo un amigo" al que "había conocido años atrás en Inglaterra"** y que simplemente lo acompañaba. Madrea sospecha lo contrario; que Nores no era solo un chaperón, sino un manager de facto, con un interés en su posible regreso a los escenarios. En su estadía en Argentina, **Nores acompañó a Payne en un importante hotel cinco estrellas de la zona** de Recoleta, de donde fue echado, luego en un departamento de la calle Armenia -que fue allanado por la Justicia-, más tarde en un club de polo y finalmente en el hotel CasaSur, donde Payne se registró al filo de la medianoche del 13 de octubre.

Según la acusación, **Nores habría controlado los gastos de Payne, proveyéndole dinero para comprar drogas y autorizando pedidos de whisky y champagne reportados** desde el *front desk* del hotel, para beber y drogarse, a pesar de la indicación estricta de la neuropsiquiatra. Incluso, Nores se habría convertido en un intermediario en la comunicación entre Liam y su familia.

Curiosamente, **estas fuentes cercanas a Nores aseveran que el empresario conoció a la especialista "una vez".**

Hoy, **la familia Payne es querellante en la causa, a cargo del Juzgado N°34 de Laura Bruniard, representada por el estudio Marval O'Farrell Mairal**, según confirmaron fuentes judiciales. La causa misma está en un impasse, lo que impide que, por ejemplo, que Nores sea indagado, así como Braian Paz y Ezequiel Pereyra, acusados de proveerle droga al ex cantante de One Direction.

**Este impasse se trata, básicamente, de la letra de la ley.**

1/10/25, 8:56 AM    Liam Payne's father gave the court the main evidence to charge Rogelio Nores with singing beat on Infobae

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 138 of 263



1/10/25, 8:58 AM
Liam Payne's father gives the court fresh evidence to charge Rogelio Nores with singing the act - Infobae
Case 9:25-cv-80060-AMC Document 1 Entered on FLSD Docket 01/15/2025 Page 139 of 263



Rogelio Nores en el Juzgado N°34, con una docena de medialunas

### What's happening in the case today

La jueza Bruniard **se declaró incompetente para investigar el caso a comienzos de este mes.** El motivo: la acusación de abandono seguido de muerte no corresponde al fuero de instrucción, al que pertenecen Madrea y Bruniard, sino al contravencional porteño.

**Madrea apeló este planteo, considerándolo prematuro.** El fiscal, que llevó adelante una de las mayores tareas investigativas de los últimos años, con el análisis de 800 horas de filmaciones de cámaras de seguridad y testimonios clave, **asegura que la causa continúa** y que, tal como adelantó **Infobae _esta semana_,** podría tener nuevos **imputados.** El fiscal plantea como hipótesis una posible culpa de los empleados del hotel que asistieron a Liam en su crisis final, luego de que Nores y las prostitutas abandonaran el lobby del CasaSur. El **empleado que llamó al 911 para anunciar la crisis que explotaba aseguró que Liam estaba en "una habitación con balcón".**

Esto, en los cálculos de los investigadores, **podría constituir un homicidio culposo.** ¿Por qué, entonces, no lo retuvieron en el lobby a la espera de la ambulancia?

Para determinar esto, **se deben concluir las pericias a la computadora principal de la recepción del CasaSur,** así como a teléfonos de los empleados del lugar.

1/10/25, 6:58 AM    Liam Payne's father gave the court the health evidence to charge Rogelio Nores about the singer's death - Infobae

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 140 of 263

La muerte de Liam Payne en Palermo: el audio del llamado al 911

La narrativa de las fuentes cercanas a Nores intenta **girar la posible culpa hacia los empleados del hotel** de cara a esta chance, afirmando, incluso, que Liam intentó escapar, cuando los forenses determinaron que estaba, en el mejor de los casos, en un estado de semiconciencia al momento de su muerte. **Una imputación de homicidio culposo, sin embargo, no aliviaría la situación del empresario.**

Este lunes próximo, **la Cámara Criminal y Correccional celebrará una audiencia** para tratar la apelación.

El jueves último, Nores se presentó en el Juzgado N°34 con una sonrisa. Ll**evó una docena de medialunas para el personal del lugar.** Intentaba recuperar el teléfono y la laptop de una mujer. Los aparatos habían sido incautados en un allanamiento a su casa. Según Nores, la mujer no estaba "ni siquiera mencionada en la causa". **Las medialunas fueron gentilmente rechazadas.**

Compartir nota:



Guardar

### 👁 Seguir leyendo

| | |
|---|---|
| **Lomas de Zamora: un jubilado mató a balazos al marido de su sobrina por los ladridos de un perro** | → |
| **Así funciona la barra brava de Newell's bajo el mando de Los Monos: el negocio y la feroz interna** | → |
| **Así fue la reacción de los ciclistas de Punta Lara luego de que fueran tiroteados y robados** | → |

+

**Temas Relacionados**

Rogelio Nores  Liam Payne  Geoff Payne  One Direction  Fiscal Andrés Madrea  últimas noticias

## Últimas Noticias

## Así funciona la barra brava de Newell's bajo el mando de Los Monos: el negocio y la feroz interna

Según la Justicia. "Guille" Cantero daba las órdenes a la tribuna desde la cárcel de Marcos Paz. También fueron imputados "El Pollo"

# ARTICLE 14

1/10/25, 10:32 AM
Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 142 of 263
What is the evidence that Liam Payne's father gave to the court against Rogelio Nores for the singer's death?




# LA GACETA

Society  >  Present

# What is the evidence that Liam Payne's father gave to the court against Rogelio Nores for the singer's death?

The former One Direction member died after falling from the balcony of the hotel where he was staying during his stay in Argentina.

                       

1/10/25, 8:32 AM | What is the evidence that Liam Payne's father gave to the Court against Rogelio Nores for the singer's death?

Case 9:25-cv-80060-AMC Document 1 Entered on FLSD Docket 01/15/2025 Page 143 of 263



Liam Payne with Rogelio Nores, the man charged with his death

01 December 2024

Geoff Payne, **Liam Payne** 's father , provided the main piece to build the accusation against the businessman**Rogelio Nores**, charged by prosecutor **Andrés Madrea** with abandonment followed by the death of his son, in addition to the supply of narcotics.

The piece is an email dated September 16 of this year, part of the indictment of prosecutor Madrea, in charge of clarifying Payne's death, which occurred a month later when he fell from the balcony of the third floor of the CasaSur hotel in the Palermo neighborhood, in the City of Buenos Aires.



**Details of Liam Payne's troubled hours leading up to his death have emerged**

According to the investigators' reconstruction based on information recovered from hotel records, Liam had started drinking whiskey at six in the morning on the day of his death. He then drank champagne with the prostitutes he invited to his room, had sex with them and then caused a minor scandal in the lobby by not paying them.

He consumed cocaine throughout the day; the toxicological analysis carried out by the Forensic Medical Corps of the Supreme Court revealed

metabolites of the drug that indicate consumption at least two hours before death.

———

**What is the evidence that Liam Payne's father gave to the court against Rogelio Nores for the singer's death?**

The email that **Geoff Payne** provided to the 34th Prosecutor's Office led by Madrea was written by the Miami neuropsychiatrist who treated his son throughout this year. In the message, the neuropsychiatrist disassociated herself from the treatment, stating that it was impossible to accompany Liam in his crises. The original recipient of that email, according to the Argentine Justice, was **Rogelio Nores**.

Madrea suspects that Nores was not just a friend of Payne's, but a de facto manager, with an interest in his possible return to the stage. During his stay in Argentina, Nores accompanied Payne to a major five-star hotel in the Recoleta area, from which he was thrown out, then to an apartment on Armenia Street, later to a polo club and finally to the CasaSur hotel, where Payne checked in at around midnight on October 13.

According to the indictment, Nores allegedly controlled Payne's spending, providing him with money to buy drugs and authorizing orders for whiskey and champagne reported from the hotel's front desk, with "allowed days" for drinking and drug use, despite the neuropsychiatrist's strict instructions. Nores even became an intermediary in communication between Liam and his family.

🏷 **TOPICS**

Liam Payne

# ARTICLE 15



Subscribe



# Liam Payne's death: what he consumed is confirmed and his enigmatic friend and two hotel employees are charged

Businessman Rogelio "Roger" Nores was charged with "abandonment of a person." Two employees of the Hotel Casa Sur in Palermo were charged with "supplying narcotics." The toxicology report showed that the former One Direction member had cocaine, alcohol and a prescription antidepressant in his system.

AD







British musician Liam Payne, with his friend Rogelio "Roger" Nores, and behind him his father Geoff.



NATALIA
IOCCO

   

 0

07/11/2024 13:04 / Updated on 07/11/2024 16:58 



**Liam Payne**'s father (31) a
the United Kingdom on W
of flights due to the Interc
British Airways, via Madri

1/10/25, 8:08 AM
Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 150 of 263
Liam Payne's death: while the consulate confirmed about his enigmatic friend, two hotel employees are charged

Almost in parallel, the Argentine Justice carried out a series of raids **on three people** in the case investigating the death of the British musician. They are two employees of the hotel and **Rogelio** "**Roger**" **Nores (36)** , an American businessman and friend of the victim, but based in Argentina, who worked as a "manager".

In an official statement issued by the prosecutor's office, they confirmed that prosecutor Andrés Madrea issued a ruling on Friday in which he requested the **indictment and arrest of three people.**

AD

"El primero de los acusado
cotidiana al artista durant
Aires, a quien se lo imputa por los delitos de abandono de persona

1/10/25, 8:03 AM    Liam Payne's death: enigmatic and consulted – confirmed a bonus employee trend and two hotel employees are charged

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 151 of 263

seguido de muerte y que **prevé una pena de 5 a 15 años de prisión**, en calidad de autor, en concurso ideal con suministro y facilitación de estupefacientes", indicó Madrea a través del sitio *fiscales.gob.ar*

Además, confirmó que detectaron a dos empleados del hotel **proporcionandole drogas al ex One Direction** en dos oportunidades. Si bien Madrea pidió la detención, la jueza otorgó los allanamientos para obtener evidencia que les permita avanzar con la investigación. Los tres imputados no estaban en los domicilios allanados pero se presentaron espontáneamente en el juzgado dejando a disposición sus pasaportes.

Como se consideró que estaban "a derecho", el fiscal Madrea optó por avanzar con la investigación y que permanezcan en libertad. Lo cierto es que con la evidencia recolectada la situación de los imputados es -por lo menos- complicada.

Entre las evidencias recolectadas, los investigadores apuntaron a reconstruir la estadía de Payne en el hotel, entre el 13 y el 16 de octubre, el día del hecho. Más de 800 horas de cámaras de seguridad, el teléfono celular de la víctima y la computadora personal son algunos de los elementos analizados para concretar las imputaciones.

AD

## Dieron a conocer el ir de Liam Payne

Otro de los datos revelado

**toxicológicos** que confirm

su muerte y en el lapso de al menos sus últimas 72 horas, Payne

solo presentaba en su cuerpo rastros de un **policonsumo de alcohol, cocaína y un antidepresivo recetado**".

Además, a través de diferentes pericias ratificaron que Payne no tuvo "reflejo de conservación en la caída", lo que junto a su consumo, les permitió concluir que Liam Payne "no estaba plenamente consciente o atravesaba un estado de disminución notoria o abolición de la consciencia al momento de la caída", lo que descarta completamente la hipótesis del suicidio.



El cuerpo de Liam Payne fue repatriado a Inglaterra.

AD

Ahora están en manos de l
cuándo los cita a declaraci
detención. El fiscal Madre
hasta que se ejecutaran los
información que pudiera d

## El traslado del cuerpo

Geoff Payne estuvo en Buenos Aires durante 18 días, a la espera de la autorización del traslado de su cuerpo de regreso a Gran Bretaña. Se hospedó en un hotel de Retiro y visitó el memorial que las fanáticas dedicaron al ex One Direction en la puerta del hotel Casa Sur, en Costa Rica al 6000, barrio de Palermo.

Un día antes de volar, el martes, se acercó al sitio creado en honor a Liam y se encontró con algunas seguidoras que todavía lo visitan para rendirle homenaje. Según publicaron medios británicos, Payne será despedido en la Catedral de St. Peter, en Wolverhampton.

El mismo día que el Geoff Payne se despedía del lugar donde su hijo falleció el 16 de octubre, alrededor de las 17, después de caer del tercer piso de su habitación en medio de una crisis presuntamente provocada por el consumo de estupefacientes, la Justicia ordenaba **nueve allanamientos** que fueron concretados por la División Investigaciones Especiales de la Policía de la Ciudad de Buenos Aires.

Los procedimientos se realizaron en el hotel Casa Sur, en otro hotel de Retiro, en una casa de Palermo, en otra de Balvanera y en un departamento de Belgr AD



El empresario Rogelio "Roger" Nores, amigo del músico británico Liamy Payne, reconocido por la revista Forbes en 2017.

También, en el Patagones Polo Club, donde Payne se hospedó antes de instalarse en el hotel de Palermo, entrenando y jugando al polo con el equipo local. Y en tres domicilios de Lomas de Zamora, Tigre y La Matanza. En los procedimientos se secuestraron "varios teléfonos más" confirmaron fuentes de la investigación.

Los objetivos fueron los lugares que visitó el músico durante su paso por Buenos Aires, pero también la casa de **Rogelio** "**Roger**" **Nores**, amigo del artista y AD visitado en Buenos Aires e

Nores fue señalado como " en varias oportunidades d familia del músico direcci habría "mentido" a la fami "Está comprometido por varios testimonios directos, mensajes , confiaron fuentes de la investigación.

Es empresario y quien habría realizado la reserva en Casa Sur para Liam Payne. Incluso fue una de las últimas personas que estuvo con la víctima antes de la tragedia, la única de su entorno.



El hotel donde murió Liam Payne. Foto Federico López Claro.

Nacido en Estados Unidos y radicado en Argentina, Nores había estado vinculado a la off shore canadiense Stoneway Capital Corp. La **revista Forbes** lo reconoció como uno de los 30 jóvenes menores de 30 años más p AD
en 2017.

En sus registros comercial
directivos en la empresa A
Stoneway, que en 2016 gan
de energía en Buenos Aire

de Energía y Minería de la Nación, a cargo de Juan José Aranguren.



Allanamiento en Casa Sur. Foto Federico López Claro.

En las redes sociales, Nores había aparecido en reiteradas oportunidades junto al músico británico, incluso en estudios de grabación y, sobre todo, durante sus viajes a Buenos Aires.

Había declarado en el expediente durante los primeros días de la investigación cuando el fis

Ahora no está claro si Nore

como su representante du

Lo cierto es que la Justicia

***persona***" y será investigad

terminó con la muerte del

AD

## Los empleados del hotel

Liam Payne había llegado a Casa Sur apenas dos días antes de su trágica muerte. El 16 de octubre, su estadía se descontroló. Huéspedes y empleados declararon en el expediente y relataron lo que vivieron en sus últimas horas.

Ese día, a las 17.01, Esteban, jefe de la recepción del hotel, llamó al 911 para pedir una ambulancia. "*Hola, llamo del Hotel Casa Sur de Palermo, en Costa Rica al 6032, tenemos a un huésped que está sobrepasado de droga y alcohol y cuando está consciente está rompiendo toda la habitación. Necesitamos que manden a alguien por favor...*".



AD

**Video**
El encargado comunicó que drogas".

1/10/25, 8:38 AM    Liam Payne's death: Why the consumer confidence dial, but Luis enigmatic friend and two hotel employees are charged

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 158 of 263

Tres minutos después, asignaron personal de la Policía de la Ciudad para que se acerque al lugar. A las 17.05 llegó un patrullero. Apenas dos minutos después, la Policía informó que había caído una persona del tercer piso y pidieron una ambulancia con prioridad. A las 17.12 se presentó el SAME y constató el fallecimiento.

Durante las primeras horas calientes de la investigación, los responsables del hotel dieron un reporte de sus últimos movimientos. En la habitación se encontraron objetos destrozados y restos de drogas.

Fue así que detectaron un taxi que había sido cargado a la habitación pero que tenía como destino un domicilio que coincidía con el de un empleado. Esta persona fue despedida - según trascendió en un audio que se viralizó rápidamente-.

AD

**Video**

El padre de Liam Payne se despidió del memorial de su hijo en Buenos Aires

Ese empleado de Casa Sur y otro más ahora serían investigados por "*suministro de estupefacientes*". Se trata de **Ezequiel (21)**, que en realidad era contratado por una empresa que tenía a cargo la limpieza del hotel, y **Braian (24)**, que también cumplía funciones allí.

Los imputados quedaron registrados concretamente en cuatro oportunidades, entre el 13 y el 16 de octubre, entregándole droga a Liam Payne. Uno deberá responder debe responder "por dos suministros comprobados" durante su estadía en el hotel y el otro por "otros dos suministros claramente comprobados durante dos momentos diferentes del 14 de octubre", de acuerdo a la acusación fiscal.

Para la investigación fueron clave los estudios toxicológicos para determinar qué clase de drogas había consumido Payne antes de arrojarse por el balcón de su habitación en el tercer piso de Casa Sur. También un informe de psiquiatría forense adicional que solicitó el fiscal y que aún resta analizar en contexto con la historia clínica de Payne. AD

1/10/25, 8:08 AM    Liam Payne's death: An intimate consumer, a confident and his enigmatic friend and two hotel employees are charged

Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 160 of 263

**Video**

Así aterrizaba el avión con el cuerpo de Liam Payne en Londres

El 1° de noviembre, la jueza Bruniard autorizó la entrega del cuerpo a Geoff Payne, "luego de que se cumplieron y finalizaron todos los estudios tanatológicos y de laboratorio (completos) que fueron necesarios", expresaron fuentes judiciales consultadas por **Clarín** en ese momento.

Además, se reservaron muestras específicas por si resultan necesarias para futuras ins...

AD

Lo cierto es que, desde ent trasladado al Cementerio l conservación y poder ejec concretó este miércoles.

1/10/25, 8:03 AM
Case 9:25-cv-80060-AMC Document 1 Entered on FLSD Docket 01/15/2025 Page 161 of 263
Liam Payne's death: enigmatic friend, consumers, confusion about a contaminated and two hotel employees are charged

**Video**

La últimas fotos y videos de Liam Payne en Buenos Aires

*EMJ / MG*

## Sobre la firma

Natalia Iocco
Redactora de la sección Sociedad
niocco@clarin.com
**Bio completa**

AD

## Mirá también

# ARTICLE 16



CASE UPDATE

# LIAM PAYNE DIED AFTER TRYING TO ESCAPE VIA HOTEL BALCONY, SAYS JUDGE

Payne's friend and two hotel workers now face wrongful death charges for negligence, while two others face prison time for allegedly selling him drugs

**By TOMÁS MIER**

DECEMBER 30, 2024



**Liam Payne attends the Summer Party 2019 at the Serpentine Gallery on June 25, 2019, in London.**

MIKE MARSLAND/WIREIMAGE

**Liam Payne** didn't "lose his balance" before falling from a hotel balcony; he was trying to escape the building while in a drugged state, according to the judge handling his **death investigation**. In a ruling today obtained by *Rolling Stone,* Judge Laura Bruniard shared new information on what led to the One Direction **singer's death** and updated charges against five people questioned in the case.

Bruniard leveled "**homicidio culposo,**" or wrongful **death**, charges against Payne's friend Roger Nores and both CasaSur Palermo hotel manager Gilda Martin and reception head Esteban Grassi for their acts of "imprudence and negligence" leading up to Payne's death. Nores' charges were significantly lowered after he originally faced five to 15 years behind bars for "abandonment followed by death."

"I do not believe that [Nores, Martin, and Grassi] planned and wanted Payne's death. They did not plan the result but created a legally disapproved risk," wrote the judge.

If convicted, two other people — Ezequiel Pereyra and Braian Paiz — may face four to 15 years in prison for the alleged sale of cocaine to the singer, and were ordered preventative jail time for the alleged crime.

ADVERTISEMENT



The wrongful death charges against hotel workers Martin and Grassi came after reviewing evidence that "clearly" captured Payne being "**dragged up**" to his hotel room **on Oct. 16** while he was in an alleged "vulnerable state," with the judge claiming that them bringing him to his room with that level of intoxication "created a legally disapproved risk to his life." **Payne died** of multiple traumas and internal bleeding after the fall, according to a **post-autopsy report**.

"Payne's consciousness was altered and a balcony was in the room. The proper thing to do was to leave him in a safe place, and with company, until a doctor arrived," wrote the judge in her ruling, adding that the two hotel workers "did not act maliciously" but were "imprudent" in their actions. (Martin allegedly instructed Grassi and the other workers to carry Payne to his room.)

## EDITOR'S PICKS

The 100 Best TV Episodes of All Time

The 250 Greatest Guitarists of All Time

The 500 Greatest Albums of All Time

The 200 Greatest Singers of All Time

Despite a previous claim from the prosecutor that the One Direction singer fainted on the hotel balcony and fell, the judge declared that Payne — in a severely intoxicated state — was "trying to leave his room through the balcony" before his fall.

"I maintain that [Payne] tried to leave from the balcony of the place where he was left because the forensic experts noted that he did not lose his balance. This is how the fall occurred," wrote the judge.

As for Payne's friend, the judge claimed that Nores, who now faces wrongful death charges, had taken the "position of guarantor" to Payne's family and was the main point of contact for the musician at the hotel. The judge wrote that, based on the autopsy results, "Payne's state of vulnerability was evident" when Nores left CasaSur Palermo 50 minutes before the fall.

ADVERTISEMENT



### The Best Wireless Headphones for Audiophiles

We review the best wireless headphones based on sound quality, connectivity, battery life and comfort. Here are four to buy online.

**PRESENTED BY RS RECOMMENDS**

"He should have consulted with a doctor given the commitment made to the family of the deceased," wrote the judge. "He should have done this without trusting how the hotel employees could have dealt [with Payne]."

According to the investigation, the new wrongful death charges followed reviews of interviews and footage surrounding Payne's death that confirmed Payne's high level of addiction and the "presence of cocaine and alcohol in large quantities" in his body at the time of his death. (Nores claimed in a filing **reviewed by** *Rolling Stone* earlier this month that Payne came "close to death" because of his struggle with substance abuse multiple times in the past two years.)

ADVERTISEMENT

The people accused of selling Payne drugs — Pereyra and Paiz — will have to face preventative jail time. Payne allegedly paid Pereyra $100 for drugs, per the judge, and later sent a car to his home to bring more cocaine. As for Paiz, despite him claiming that the pair did drugs together but he wasn't paid for it, the judge determined that Payne "asked for money at the reception desk" while Paiz was in the room.

## RELATED CONTENT

# ARTICLE 17



☰ ⌕  **Miami Herald**                                          Log In  |  **Subscribe**

**WELCOME OFFER**      **6 MONTHS FOR $1.99**      Gain unlimited access to our exclusive stories.      SUBSCRIBE NOW

**WORLD**

# Liam Payne's manager, two hotel workers charged in One Direction singer's death

By Alexandra Del Rosario and Karen Garcia, Los Angeles Times *The Tribune Content Agency*
Updated December 31, 2024 2:03 AM



Liam Payne poses on the red carpet for the BRIT AWARDS 2019 in London on Feb. 20, 2019. (Tolga Akmen/AFP/Getty Images/TNS)
TOLGA AKMEN/AFP *TNS*

  Only have a minute? Listen instead          ↺    ↻    1.0x
Powered by **Trinity Audio**

00:00                                                                                    04:26

A representative for Liam Payne was charged with manslaughter in connection with the One Direction veteran's death in October, Argentine officials confirmed Monday.

The National Criminal and Correctional Prosecutor's Office of Argentina announced in a Spanish-language statement that Judge Laura Graciela Bruniard on Friday prosecuted five people for alleged involvement in the pop singer's death. Payne's representative (identified as "R.L.N.") and the manager and the head of reception of the Buenos Aires hotel where the British singer fell to his death were charged with manslaughter.

TOP VIDEOS

AD



Learn more

Skip Ad

Another hotel employee and a waiter whom Payne met in a restaurant were charged with allegedly supplying the singer with narcotics.

Payne, an "X Factor" alum who was one-fifth of the global boy-band sensation One Direction, died Oct. 16 after falling from a balcony at the CasaSur Palermo Hotel. He was 31. Shortly after his death, officials determined the singer died from multiple traumas and internal and external bleeding caused by the fall.

Payne had traces of alcohol, cocaine and a prescription antidepressant in his system when he fell, officials announced in November. Prosecution at the time said it was considering ruling out the possibility of suicide.

In Monday's announcement, the prosecutor's office detailed the defendants' alleged roles in Payne's death. The hotel employee (identified as "E.D.P.") and waiter ("B.N.P.") both allegedly supplied Payne with cocaine multiple times during his stay in Buenos Aires. Payne died two weeks after arriving in Argentina, where he attended an Oct. 2 concert by his former bandmate Niall Horan.

According to Monday's announcement, Payne's representative "failed to comply with his duties of care, assistance and assistance that he had with respect to" the singer. Prosecutors alleged R.L.N. abandoned the singer despite knowing he was "unable to fend for himself" and having previous knowledge of Payne's struggles with addiction.

The prosecutor's office detailed an alleged incident where Payne was carried up to his third-floor room by a group of three people prior to his death. The hotel manager (identified as "G.A.M.") and the hotel's head of reception ("E.R.G."), who allegedly led the group, should have kept Payne "in a safe area without sources of danger, in company and until he could be provided with medical care," the prosecutor's office said.

Bruniard, the judge, said Monday that the hotel managers "did not act maliciously" in connection with Payne's death "but they have been reckless in enabling him to be taken to his room and driven there respectively."

"They created a legally disapproved risk and Payne's death is the realization of that risk," Bruniard said.

R.L.N. is "responsible for the crime of manslaughter ... given that he had assumed a position of guarantor toward" Payne's family, Bruniard added.

Ultimately, Payne's representative and the hotel managers "have contributed, although not in a planned manner, to creating a risk that resulted in Payne's death, whether by action or omission," Monday's statement said.

The two people charged with supplying Payne drugs before his death were sentenced to pre-trial detention. R.L.N. and the two hotel managers were charged without pretrial detention, according to the prosecutor's office.

More than a month after Payne's death, his former bandmates, family and friends gathered for a funeral service in England. Harry Styles, Zayn Malik, Louis Tomlinson and Horan attended the ceremony northwest of London. Also in attendance were "X Factor" judges Simon Cowell and Cheryl Cole (who shares a young son with Payne), and his girlfriend Kate Cassidy.

Though Payne is best known for his work with One Direction, he also pursued a solo career after the boy band went on hiatus in 2016. As a soloist he released songs "Strip That Down," "Bedroom Floor" and "Teardrops" and teamed with artists including Quavo, Ed Sheeran and Charlie Puth.

Payne was also open about his struggles with mental health and addiction. In a YouTube vlog shared in 2023, he revealed he was six months sober.

*Times staff writer Nardine Saad contributed to this report.*

*Copyright (C) 2024, Tribune Content Agency, LLC. Portions copyrighted by the respective providers.*

This story was originally published December 30, 2024 at 4:50 PM.

 **5-MINUTE HERALD**

The best of the morning's Miami Herald.

| | |
|---|---|
| | SIGN UP |

By submitting, I agree to the Privacy Policy and Terms of Service.

**Take Us With You**

Real-time updates and all local stories you want right in the palm of your hand.

🅗 **MIAMI HERALD APP →**

**VIEW NEWSLETTERS →**

| SUBSCRIPTIONS | LEARN MORE | ADVERTISING |
|---|---|---|
| Start a Subscription | About Us | McClatchy Advertising |
| Customer Service | Contact Us | Place an Ad |
| Edition | Newsletters | Place a Classified Ad |

# ARTICLE 18

# Revelations from Liam Payne's father that complicate the businessman prosecuted for the death of his son

Geoff Payne became a key witness for the Argentine Justice case, which seeks to clarify the death of his son. His conversation with "Roger" Nores minutes after the death

 By Federico Fahsbender

09 Jan, 2025 09:00 am EST



Geoff Payne, Liam Payne's father, in front of the altar made by fans at the hotel door

PUBLICIDAD



Find mental health resources at **LoveYourMindToday.org**

HUNTSMAN MENTAL HEALTH INSTITUTE    ad COUNCIL

**Revelations from Liam Payne's father that complicate the businessman prosecuted for the death of his son**

**Geoff Payne became a key witness for the Argentine Justice case, which seeks to clarify the death of his son. His conversation with "Roger" Nores minutes after the death**

.

By Federico Fahsbender
09 Jan, 2025 09:00 am EST
 Keep



Geoff Payne, Liam Payne's father, in front of the altar made by fans at the hotel door

On October 22, 2024, accompanied by a psychologist and an interpreter, Geoff Payne appeared as a witness before prosecutor Andrés Madrea , the person in charge of clarifying the death of his son Liam, who eight days earlier had fallen from his balcony in his third-floor room at the CasaSur hotel in Palermo. Payne Sr. had **arrived in Buenos Aires less than 48 hours** after the news of the death, which occurred on Wednesday afternoon, the 16th. Shortly after landing, with Liam's body still in the Judicial Morgue, **he visited the CasaSur** , where the fans of the group One Direction who loved his son in life were holding a vigil. **They erected a shrine there.** Payne Sr., in a sport coat, visited it, stunned, dazed, in front of the candles and the photos and the stuffed animals, but with a gesture perhaps of peace. **He kissed his right hand, as if kissing the memory of his son in the air** .

You may be interested in:The death of the judge who investigated the drug kidnapping of Los Monos: what the autopsy and camera analysis revealed

1/10/25, 8:49 AM
Case 9:25-cv-80060-AMC    Document 1    Entered on FLSD Docket 01/15/2025    Page 176 of 263
Liam Payne's father's revelations complicate the business tickets case for his drug dealer

to his death, **the two prostitutes from El Talar and Isidro Casanova** who had called CasaSur to have sex hours before dying, **the Argentine businessman who accompanied Liam** , whom Geoff Payne knew well.



Liam's parents Karen and Geoff Payne attend their son's funeral in Amersham (REUTERS/Toby Melville)

Payne father and son had a pleasant relationship before his death, fluid: they met every month in London, at the singer's house, to **play all afternoon with Bear, the son of the former One Direction** , Geoff's grandson. He knew that his son was an addict. They had last seen each other on August 29 last year in Manchester, for the singer's birthday. **"He was fine, stable, clean** ," he said in his testimony in Buenos Aires. But, according to the contents of his statement, **he did not know everything.** He assured investigators that Liam planned to stay only five days in Argentina. Also, that **the former One Direction singer did not have a phone.**

[You may be interested in:He had been missing since December and was found after being involved in an accident and trying to escape](#)

›

"Liam **didn't have his own cell phone and it was his decision** . Over the last few years he changed his cell phone many times. He decided to be offline as a protection method to avoid social media and also to stay away from the possibility of relapsing into his addictions. That decision was his personal one and he had the full support of the family group. Personally, **I agreed that it was really a way for him to take care of himself** ."

1/10/25, 8:49 AM
Case 9:25-cv-80060-AMC   Document 1   Entered on FLSD Docket 01/15/2025   Page 178 of 263
Liam Payne's father's revelations complicate the businessman case.docx - Google Docs

00:00                                                                                                                    03:51

It wasn't like that: **Liam, in Argentina, had his cell phone** , which he used, for example, to contact prostitutes via WhatsApp. It was seized by the City Police after his death and examined by order of the Court. Geoff, then, depended on intermediaries to find out about his son. **" For that reason, my telephone contact with Liam was not direct, it was always through third parties** ," he said.

You may be interested in:Madness in a clandestine nursing home in Córdoba: they heard screams and found seven elderly people tied to their beds
›

Then, he identified them by name and surname: Kate Cassidy, Liam's girlfriend, and **businessman Rogelio Nores, alias "Roger."** "They were in his care because of his addictions. Kate was there because of love and **Roger because he accompanied and cared for Liam in these last months and reported to me on his condition** ."

⌄



Liam Payne

He didn't find out from the television. It was **Nores himself who told him that his son had died, in a way** : "I learned of Liam's death from Roger. I was at home with my wife. He called me at 5:23 p.m., Buenos Aires time, but I didn't see the call until about an hour later. In the meantime, he called me once more and sent me a message to call him as soon as possible. **When I saw all those calls at 6:18 p.m. here, I called him back,** " according to his testimony, which **Infobae had access to.**

- *What happened?* Geoff Payne asked.

- *An accident happened* , Nores replied: *It's true, it's true.*

-*He's dead?! He's dead?!*

-You have to come to Argentina.

Luego, Geoff Payne contactó a sus hijas, las hermanas mayores de Liam: **ya lo sabían, como el resto del mundo.** Nores lo llamaba mientras tanto, una y otra vez. El padre del cantante, esta vez, **no le devolvió el contacto.**

Minutos más tarde, **el asistente personal de Liam en Londres le buscaba un pasaje** a Buenos Aires, en el primer vuelo disponible.



"Roger" Nores y Liam Payne

Hoy, **"Roger" Nores está procesado por la jueza Laura Bruniard el homicidio culposo de Liam**, junto con otros cuatro acusados más, señalados por la jueza Laura Bruniard por venderle cocaína al cantante y garantizar su muerte con sus imprudencias. Nores fue definido como "un garante" de Liam en su estadía en el país. Ante la jueza, en un descargo escrito, **el empresario negó cualquier rol formal con el ex One Direction**, al que solo unía un lazo de amistad, sin ningún contrato de por medio.

Según declaró el jefe de recepción Esteban Grassi, también procesado por el homicidio culposo, Nores se presentó en el CasaSur como **"el manager de Payne"**. Así lo marcaba, por ejemplo, un mail interno del hotel que entregó el acusado, publicado ayer por este medio.

Payne padre conocería bien a Nores a mediados de 2024. **El empresario aparece con fuerza en un momento de crisis.** "Logramos mantenerlo, estabilizarlo, pero Liam no estaba mejorando. Estaba estable pero no mejoraba. En ese periodo, Liam recibía llamadas de Roger, yo no sabía quién era", continuó. El empresario, aseguró Payne padre, se ofreció a apoyar al ex One Direction **"a cambio de nada".**

Así, **viajaron a Wellington, Florida, a una hora y media de viaje del aeropuerto de Miami**, el punto clave del polo en Estados Unidos, donde un amigo de Nores controlaba varias canchas del deporte.

⌄



El mail interno del hotel CasaSur que señala a Nores como "manager" de Payne

## The circle of trust and "business"

El vínculo entre Nores y Liam, con el correr del caso, **se volvería una clave de la imputación.**

Payne padre afirmó:

"Ellos dos tenían una relación de amistad. Es verdad que **Roger este año gestionó reuniones para que Liam ingresara en el mercado laboral nuevamente**, pero él decía que lo hacía para ayudarlo, no por algo a cambio ni con un contrato de por medio, **buscaba sus relaciones nada más**. Yo igualmente este último tiempo noté que **Roger lo direccionaba a Liam para que se desarrollara más en los negocios** que en su parte artística. Este cambio de dirección en lo laboral de Liam no era favorecedor para él, porque a él lo que le gustaba hacer y le hacía bien era hacer música", aseveró.

Aquí, entra en juego otra pieza en el tablero, que no fue imputada por la Justicia: **la supuesta novia de Nores.**

"Liam sabía que yo creía que era errado dejar la música por las inversiones. Cuando yo lo conocí a Roger, él estaba enfocado en el bienestar de Liam y lo creí genuino;

# ARTICLE 19


(https://www.unation.com)

**Categories**

**Select City** 



# One Direction Night - A Night For Liam in West Palm Beach

Fri, Jan 17, 2025  |  9:00pm

Banyan Estates
Banyan Estates, West Palm Beach, FL, United States

$25.00                     **Get tickets**

---

**Description** ›

(/scripts/click/camref:1100ldcuC/destination:https%3A//www.stubhub.com/one-direction-night-jacksonville-tickets-1-17-2025/event/156637373/)

One Direction Night - A Night For Liam in West Palm Beach is happening on Friday, January 17, 2025 at 09:00PM EST at Banyan Estates.
To access further details about this event, Click on the provided website link. Moreover, if

# unation
(https://www.unation.com)

All Ages

Categories

Select City

# Upcoming dates

ALL

---

📅 Jan 17, 2025        🕐 9:00 pm        🎫 **Get tickets**

---

*Note: This event may contain affiliate links curated by our local city teams, therefore, UNATION may collect a share of sales or other compensation for all purchases made.*

---

# Mobile Apps

iPhone app (https://apps.apple.com/us/app/unation-events-near-me-buy-sell-tickets/id953269522)

Android app (https://play.google.com/store/apps/details?id=com.unation.app)

## About

About Us (https://www.unation.com/about-us/)

Careers (https://www.unation.com/careers/)

Press (https://www.unation.com/press-page/)

Blog (/blog/)

## Explore

Activity (https://www.unation.com/activity/)

Attraction (https://www.unation.com/attraction/)

Business (https://www.unation.com/business/)

Events (https://www.unation.com/events/)

Offers (/offer/)

Categories



Promote
(https://www.unation.com)

Select City

Promote With Us (https://www.unation.com/promote-with-us/)

**City Partners**

Become a City Partner (https://www.unation.com/city-partner/)

Become a Content Creator (https://www.unation.com/ugc-program/)

© UNATION, INC. 2025 • v5.2.1

Terms (https://www.unation.com/terms/)       Privacy (https://www.unation.com/privacy/)
       FAQ's (https://www.unation.com/faqs/)

# **<u>EXHIBIT G</u>**

Confirmation of Palm Beach County Access to
Articles.

## Exhibit G

**Confirmation of the Publication of Relevant Contents to Defendant Geoff Two Sworn Declaration being available in Palm Beach County Florida and confirming the accessibility to the content from Palm Beach County Florida.**

1. The below and other online articles and media/video posts were accessible and were viewable from Palm Beach County, Florida and are generally available to the public accessing from Palm Beach County Florida.

2. Specific articles that accessed and viewed from Palm Beach County, Florida include:
   - **Newsweek:**
     - Article published on October 22, 2024 entitled :"New Details Emerge as Liam Payne's Dad helps with son's death investigation":
       https://www.newsweek.com/liam-payne-dad-geoff-death-investigation-update-1972993

   - **Infobae.com**:
     - Article published on November 30, 2024 entitled: "Liam Payne's father gave the courts the main evidence to charge Rogelio Nores with the singer's death."
       https://www.infobae.com/sociedad/policiales/2024/11/30/el-padre-de-liam-payne-entrego-a-la-justicia-la-principal-prueba-para-imputar-a-rogelio-nores-por-la-muerte-del-cantante/

     - Article published on January 9, 2025 entitled: "Revelations from Liam Payne's father complicate the businessman prosecuted for the death of his son."
       https://www.infobae.com/sociedad/policiales/2025/01/09/las-revelaciones-del-padre-de-liam-payne-que-complican-al-empresario-procesado-por-la-muerte-de-su-hijo/

   - **Elespectador.com**
     - Article published on November 30, 2024 entitled: "Liam Payne's father showed key evidence against Rogelio Nores for the death of his son."

# **EXHIBIT H**

Liam's July 2024 one-year lease of residence in
Wellington, Florida shared with Kate Cassidy (prior
girlfriend) and Bledar Vata (prior bodyguard) in
September 2024. REDACTED.

## Nonlawyer Disclosure


PARTNERSHIP REALTY

**Instructions to Licensee:** Before you begin to complete the next form, you must give this nonlawyer disclosure to the landlord or tenant for whom you are filling in the blanks. (If you are filling in the blanks for both landlord and tenant, complete two nonlawyer disclosures and give one to each.)

1. Insert your name in the first 5 blank "*Name*" spaces and **sign** below.

2. Have the landlord or tenant whom you are assisting complete the provision regarding her/his ability to read English, and have her/him **sign** below.

3. Give this completed disclosure to the landlord or tenant, as appropriate. Keep a copy of this completed disclosure and all forms you give to the landlord or tenant in your files for at least 6 years.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

_____ told me that he/she is a nonlawyer and may not give legal
        *(Name)*

advice, cannot tell me what my rights or remedies are, cannot tell me how to testify in court, and cannot represent me in court.

Rule 10-2.1(b) of the Rules Regulating The Florida Bar defines a paralegal as a person who works under the supervision of a member of The Florida Bar, an out-of-state lawyer engaged in the authorized practice of law in Florida, or a foreign lawyer engaged in the authorized practice of law in Florida, and who performs specifically delegated substantive legal work for which the supervising lawyer is responsible. Only persons who meet the definition may call themselves paralegals. _____ informed me that he/she is
                                                        *(Name)*

not a paralegal as defined by the rule and cannot call himself/herself a paralegal,

_____ told me that he/she may only type the factual information
        *(Name)*

provided by me in writing into the blanks on the form. Except for typing, _____

                                                                          *(Name)*

may not tell me what to put in the form and may not complete the form for me. However, if using a form approved by the Supreme Court of Florida. _____ may ask me factual questions to fill in
                                        *(Name)*

the blanks on the form and may also tell me how to file the form.


**Landlord or Tenant:**

_____ I can read English.

_____ I cannot read English but this notice was read to me by _____

                                                                          *(Name)*

in _____ which I understand.
        *(Language)*

_____
Landlord or Tenant signature

_____
Landlord or Tenant signature


_____
Licensee signature

ND-3  Rev 4:22
Serial: 088641-300172-1599896

©2022 Florida Realtors®
Form Simplicity

## Residential Lease for Single Family Home or Duplex
## (FOR A TERM NOT TO EXCEED ONE YEAR)



A BOX ([____]) OR A BLANK SPACE (____) INDICATES A PROVISION WHERE A CHOICE OR DECISION MUST BE MADE BY THE PARTIES.

THE LEASE IMPOSES IMPORTANT LEGAL OBLIGATIONS. MANY RIGHTS AND RESPONSIBILITIES OF THE PARTIES ARE GOVERNED BY CHAPTER 83, PART II, RESIDENTIAL LANDLORD AND TENANT ACT, FLORIDA STATUTES. A COPY OF THE RESIDENTIAL LANDLORD AND TENANT ACT IS ATTACHED TO THIS LEASE.

**1. PARTIES.** This is a lease (the "Lease") between _____

(name and address of owner of the property)

_____ ("Landlord") and

Liam James Payne

(name(s) of person(s) to whom the property is leased)

Liam James Payne

("Tenant").

Landlord's E-mail Address: _____

Landlord's Telephone Number: _____

Tenant's E-mail Address: _____

Tenant's Telephone Number: _____

**2. PROPERTY RENTED.** Landlord leases to Tenant the land and buildings located at _____ 11640 S Sea Court

(street address)

Wellington _____ , Florida _____ 33449

(zip code)

together with the following furniture and appliances [List all furniture and appliances. If none, write "none."] (In the Lease, the property leased, including furniture and appliances, if any, is called the "Premises"):

Fully furnished _____

_____

_____

The Premises shall be occupied only by the Tenant and the following persons: Liam James Payne

_____

**3. TERM.** This is a lease for a term, not to exceed twelve months, beginning on _____ 09/01/2024 _____ and

(month, day, year)

ending _____ August 31, 2025 _____ (the "Lease Term").

(month, day, year)

**4. RENT PAYMENTS, TAXES AND CHARGES.** Tenant shall pay total rent in the amount of $_____ (excluding taxes) for the Lease Term. The rent shall be payable by Tenant in advance in installments or in full as provided in the options below:

☐ in installments. If in installments, rent shall be payable

☒ monthly, on the _12.000_ day of each month (if left blank, on the first day of each month) in the amount of $_____ per installment.

OR

☐ weekly, on the _____ day of each week (If left blank, on Monday of each week.) in the amount of $_____ per installment.

☐ in full on _____ in the amount of $_____ .

(date)

**Tenant** (____) (____) and Landlord (____) (____) acknowledge receipt of a copy of this page, which is Page 1 of 18.

RLHD-3x Rev 7/16 Approved on April 15, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar

Tenant shall also be obligated to pay taxes on the rent when applicable in the amount of $_____ ☐ with each rent installment

☐ with the rent for the full term of the Lease. Landlord will notify Tenant if the amount of the tax changes.

**Payment Summary**

☐ If rent is paid in installments, the total payment per installment including taxes shall be in the amount of $_____.

☐ If rent is paid in full, the total payment including taxes shall be in the amount of $_____.

All rent payments shall be payable to _____ ▰▰▰▰▰ _____ at

_____ ▰▰▰▰▰▰ _____. (If left blank, to Landlord at Landlord's address.)
           (address)          (name)

☐ If the tenancy starts on a day other than the first day of the month or week as designated above, the rent shall be prorated from

_____ through _____ in the amount of $_____ and shall be due
    (date)                (date)

on _____. (If rent paid monthly, prorate on a 30-day month.)
    (date)

Tenant shall make rent payments required under the Lease by (choose all applicable) ☐ cash, ☒ personal check, ☒ money order, ☒ cashier's check, or ☐ other _____ wire _____ (specify). If payment is accepted by any means other than cash, payment is not considered made until the other instrument is collected.

If Tenant makes a rent payment with a worthless check, Landlord can require Tenant ☐ to pay all future payments by ☐ money order, cashier's check, or official bank check or ☐ cash or other (specify) _____ and ☐ to pay bad check fees in the amount of $_____ (not to exceed the amount prescribed by Section 68.065, Florida Statutes).

**5. MONEY DUE PRIOR TO OCCUPANCY.** Tenant shall pay the sum of $38,000.00 in accordance with this paragraph prior to occupying the Premises. Tenant shall not be entitled to move in or to keys to the Premises until all money due prior to occupancy has been paid. If no date is specified below, then funds shall be due prior to Tenant occupancy. Any funds designated in this paragraph due after occupancy, shall be paid accordingly. Any funds due under this paragraph shall be payable to Landlord at Landlord's address or

to _____
                        (name)

at _____
                        (address)

| | | | |
|---|---|---|---|
| First ☒ month's ☐ week's rent plus applicable taxes | $ ▰▰▰▰ | due | 08/20/24 |
| Prorated rent plus applicable taxes | $ _____ | due | _____ |
| Advance rent for ☐ month ☐ week of | | | |
| _____ plus applicable taxes | $ _____ | due | _____ |
| Last ☒ month's ☐ week's rent plus applicable taxes | $ ▰▰▰▰ | due | 08/20/24 |
| Security deposit | $ ▰▰▰▰ | due | 08/20/24 |
| Additional security deposit | $ _____ | due | _____ |
| Security deposit for homeowners' association | $ _____ | due | _____ |
| Pet Deposit | $ _____ | due | _____ |
| Other _____ HOA Fees | $ ▰▰▰ | due | 07/22/24 |
| Other _____ | $ _____ | due | _____ |

Tenant (▰) (▰) and Landlord (▰) (▰) acknowledge receipt of a copy of this page, which is Page 2 of 18.

RLHD-3x   Rev 7:18    Approved on April 15, 2010  by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar.
Serial# 088641-300172-1599898
Electronically Signed using eSignOnline™ [ Session ID : ▰▰▰▰▰▰▰ ]

**6. LATE FEES.** (Complete if applicable) In addition to rent, Tenant shall pay a late charge in the amount of $_____ (If left blank, 4% of the rent payment) for each rent payment made ____5____ days after the day it is due (if left blank, 5 days if rent is paid monthly, 1 day if rent is paid weekly).

**7. PETS AND SMOKING.** Unless this box ☒ is checked or a pet deposit is paid, Tenant may not keep pets or animals on the Premises. If Tenant may keep pets, the pets described in this paragraph are permitted on the Premises.

_____
(Specify number of pets, type(s), breed, maximum adult weight of pets.)

Unless this box ☐ is checked, no smoking is permitted in the Premises.

**8. NOTICES.**

_____████████_____ is Landlord's Agent. All notices must be sent to

☐ Landlord  _____  at  _____

☒ Landlord's Agent  _____████_____  at  _____████_____

unless Landlord gives Tenant written notice of a change. All notices of such names and addresses or changes thereto shall be delivered to the Tenant's residence or, if specified in writing by the Tenant, to any other address. All notices to the Landlord or the Landlord's Agent (whichever is specified above) shall be given by U.S. mail or by hand delivery.

Any notice to Tenant shall be given by U.S. mail or delivered to Tenant at the Premises. If Tenant is absent from the Premises, a notice to Tenant may be given by leaving a copy of the notice at Premises.

**9. UTILITIES.** Tenant shall pay for all utilities services during the Lease Term and connection charges and deposits for activating existing utility connections to the Premises except for _____, that Landlord agrees to provide at Landlord's expense (if blank, then "NONE").

**10. MAINTENANCE.** Landlord shall be responsible for compliance with Section 83.51, Florida Statutes, and shall be responsible for maintenance and repair of the Premises, unless otherwise stated below: (Fill in each blank space with "Landlord" for Landlord or "Tenant" for Tenant, if left blank, Landlord will be responsible for the item):

| Landlord/Tenant | | | Landlord/Tenant | | | Landlord/Tenant | | | Landlord/Tenant | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ | ☐ | roofs | ☒ | ☐ | windows | ☒ | ☐ | screens | ☒ | ☐ | steps |
| ☒ | ☐ | doors | ☒ | ☐ | floors | ☒ | ☐ | porches | ☒ | ☐ | exterior walls |
| ☒ | ☐ | foundations | ☒ | ☐ | plumbing | ☒ | ☐ | structural components | | | |
| ☒ | ☐ | heating | ☒ | ☐ | hot water | ☒ | ☐ | running water | ☐ | ☒ | locks and keys |
| ☒ | ☐ | electrical system | | | | ☒ | ☐ | cooling | ☐ | ☒ | smoke detection devices |
| ☐ | ☒ | garbage removal/ outside receptacles | | | | | | | | | |
| ☐ | ☒ | extermination of rats, mice, roaches, ants and bedbugs | | | | | | | | | |
| ☒ | ☐ | extermination of wood-destroying organisms | | | | | | | | | |
| ☐ | ☒ | lawn /shrubbery | ☒ | ☐ | pool/spa/hot tub | | | | | | |
| ☒ | ☐ | water treatment | ☐ | ☒ | filters (specify) | AC filters | | | | | |
| ☒ | ☐ | ceilings | ☒ | ☐ | interior walls | | | | | | |
| ☐ | ☒ | Other (specify) | | | AC filters should be to change one a month | | | | | | |

Tenant shall notify _____████_____ at _____████_____
(name)                              (address)

(If left blank, Landlord at Landlord's address) and _____████_____ of maintenance and repair requests.
(telephone number)

**11. ASSIGNMENT.** Unless this box ☐ is checked, Tenant may not assign the Lease or sublease all or any part of the Premises without first obtaining the Landlord's written approval and consent to the assignment or sublease.

**12. KEYS AND LOCKS.** Landlord shall furnish Tenant

__2__ # of sets of keys to the dwelling
_____ # of mail box keys
__2__ # of garage door openers

Tenant ( __ ) ( __ ) and Landlord ( __ ) ████ acknowledge receipt of a copy of this page, which is Page 3 of 16.

RLHD-3x   Rev 7/16   Approved on April 15, 2010, by the Supreme Court of Florida for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar
Serial# 088641-300172-1599996

Form Simplicity

Electronically Signed using eSignOnline™ [ Session ID : ████████████████████ ]

If there is a homeowners' association, Tenant will be provided with the following to access the association's common areas/facilities:

_____ # of keys to _____
_____ # of remote controls to _____
_____ # of electronic cards to _____
_____ other (specify) to _____

At end of Lease Term, all items specified in this paragraph shall be returned to _____

at _____ ▓▓▓▓▓ (name)
(address)    (If left blank, Landlord at Landlord's address).

**13. LEAD-BASED PAINT.** ☐ Check and complete if the dwelling was built before January 1, 1978. **Lead Warning Statement** (when used in this article, the term Lessor refers to Landlord and the term Lessee refers to Tenant).

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, Lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

**Lessor's Disclosure (initial)**

_____ (a) Presence of lead-based paint or lead-based paint hazards (check (i) or (ii) below):
      (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____
_____
_____

      (ii) ☐ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
_____ (b) Records and reports available to the Lessor (check (i) or (ii) below):
      (i) ☐ Lessor has provided the Lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____
_____
_____

      (ii) ☐ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment (initial)**

_____ (c) Lessee has received copies of all information listed above.
_____ (d) Lessee has received the pamphlet **Protect Your Family From Lead in Your Home**.

**Agent's Acknowledgment (initial)**

_____ (e) Agent has informed the Lessor of the Lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | | |
|---|---|---|---|
| Lessor's signature | Date | Lessor's signature | Date |
| | Date | Lessee's signature | Date |
| | 07.29.24 | | |
| Agent's signature | Date | Agent's signature | Date |

**14. SERVICEMEMBER.** If Tenant is a member of the United States Armed Forces on active duty or state active duty or a member of the Florida National Guard or United States Reserve Forces, the Tenant has rights to terminate the Lease as provided in Section 83.682, Florida Statutes, the provisions of which can be found in the attachment to this Lease.

Tenant ( ▓ ) ( ____ ) and Landlord ( ▓ ) ( ____ ) acknowledge receipt of a copy of this page, which is **Page 4 of 18.**

RLHD-3x   Rev 7-16    Approved on April 15, 2016, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar
Serial# 058641-300172-1599898
Electronically Signed using eSignOnline™ ( Session ID : ▓▓▓▓▓▓ )
Form
Simplicity

15. **LANDLORD'S ACCESS TO THE PREMISES.** Landlord's Agent may enter the Premises in the following circumstances:

   A. At any time for the protection or preservation of the Premises.

   B. After reasonable notice to Tenant at reasonable times for the purpose of repairing the Premises.

   C. To inspect the Premises; make necessary or agreed-upon repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors under any of the following circumstances:

     (1) with Tenant's consent;

     (2) in case of emergency;

     (3) when Tenant unreasonably withholds consent; or

     (4) if Tenant is absent from the Premises for a period of at least one-half a rental installment period. (If the rent is current and Tenant notifies Landlord of an intended absence, then Landlord may enter only with Tenant's consent or for the protection or preservation of the Premises.)

16. **HOMEOWNERS' ASSOCIATION. IF TENANT MUST BE APPROVED BY A HOMEOWNERS' ASSOCIATION ("ASSOCIATION"), LANDLORD AND TENANT AGREE THAT THE LEASE IS CONTINGENT UPON RECEIVING APPROVAL FROM THE ASSOCIATION. ANY APPLICATION FEE REQUIRED BY AN ASSOCIATION SHALL BE PAID BY** ☐ **LANDLORD** ☐ **TENANT. IF SUCH APPROVAL IS NOT OBTAINED PRIOR TO COMMENCEMENT OF LEASE TERM, EITHER PARTY MAY TERMINATE THE LEASE BY WRITTEN NOTICE TO THE OTHER GIVEN AT ANY TIME PRIOR TO APPROVAL BY THE ASSOCIATION, AND IF THE LEASE IS TERMINATED, TENANT SHALL RECEIVE RETURN OF DEPOSITS SPECIFIED IN ARTICLE 5, IF MADE.** If the Lease is not terminated, rent shall abate until the approval is obtained from the association. Tenant agrees to use due diligence in applying for association approval and to comply with the requirements for obtaining approval. ☐ Landlord ☐ Tenant shall pay the security deposit required by the association, if applicable.

17. **USE OF THE PREMISES.** Tenant shall use the Premises for residential purposes. Tenant shall have exclusive use and right of possession to the dwelling. The Premises shall be used so as to comply with all state, county, municipal laws and ordinances, and all covenants and restrictions affecting the Premises and all rules and regulations of homeowners' associations affecting the Premises. Tenant may not paint or make any alterations or improvements to the Premises without first obtaining the Landlord's written consent to the alteration or improvement. However, unless this box ☐ is checked, Tenant may hang pictures and install window treatments in the Premises without Landlord's consent, provided Tenant removes all such items before the end of the Lease Term and repairs all damage resulting from the removal. Any improvements or alterations to the Premises made by the Tenant shall become Landlord's property. Tenant agrees not to use, keep, or store on the Premises any dangerous, explosive, toxic material which would increase the probability of fire or which would increase the cost of insuring the Premises.

18. **RISK OF LOSS/INSURANCE.**

   A. Landlord and Tenant shall each be responsible for loss, damage, or injury caused by its own negligence or willful conduct.

   B. Tenant should carry insurance covering Tenant's personal property and Tenant's liability insurance.

19. **PROHIBITED ACTS BY LANDLORD.** Landlord is prohibited from taking certain actions as described in Section 83.67, Florida Statutes, the provisions of which can be found in the attachment to this Lease.

20. **CASUALTY DAMAGE.** If the Premises are damaged or destroyed other than by wrongful or negligent acts of Tenant or persons on the Premises with Tenant's consent, so that the use of the Premises is substantially impaired, Tenant may terminate the Lease within 30 days after the damage or destruction and Tenant will immediately vacate the Premises. If Tenant vacates, Tenant is not liable for rent that would have been due after the date of termination. Tenant may vacate the part of the Premises rendered unusable by the damage or destruction, in which case Tenant's liability for rent shall be reduced by the fair rental value of the part of the Premises that was damaged or destroyed.

21. **DEFAULTS/REMEDIES.** Should a party to the Lease fail to fulfill their responsibilities under the Lease or need to determine whether there has been a default of the Lease, refer to Part II, Chapter 83, entitled Florida Residential Landlord and Tenant Act which contains information on defaults and remedies. A copy of the current version of this Act is attached to the Lease.

22. **SUBORDINATION.** The Lease is automatically subordinate to the lien of any mortgage encumbering the fee title to the Premises from time to time.

23. **LIENS. THE INTEREST OF THE LANDLORD SHALL NOT BE SUBJECT TO LIENS FOR IMPROVEMENTS MADE BY THE TENANT AS PROVIDED IN SECTION 713.10, FLORIDA STATUTES.** Tenant shall notify all parties performing work on the Premises at Tenant's request that the Lease does not allow any liens to attach to Landlord's interest.

24. **RENEWAL/EXTENSION.** The Lease can be renewed or extended only by a written agreement signed by both Landlord and Tenant, but the term of a renewal or extension together with the original Lease Term may not exceed one year. A new lease is required for each year.

25. **TENANT'S TELEPHONE NUMBER.** Tenant shall, within 5 business days of obtaining telephone services at the Premises, send written notice to Landlord of Tenant's telephone numbers at the Premises.

26. **ATTORNEYS' FEES.** In any lawsuit brought to enforce the Lease or under applicable law, the party in whose favor a judgment or decree has been rendered may recover reasonable court costs, including attorneys' fees, from the non-prevailing party.

Tenant ( ☐ ) ( ☐ ) and Landlord ( ☐ ) ( ☐ ) acknowledge receipt of a copy of this page, which is Page 5 of 18.

RLHD-3x   Rev 7/16    Approved on April 15, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar

Serial: 088641-300172-1590898

Electronically Signed using eSignOnline™ [ Session ID : 0029345c40450400d475e0049b30692f ]

Form
Simplicity

**27. MISCELLANEOUS.**

A. Time is of the essence of the performance of each party's obligations under the Lease.

B. The Lease shall be binding upon and for the benefit of the heirs, personal representatives, successors, and permitted assigns of Landlord and Tenant, subject to the requirements specifically mentioned in the Lease. Whenever used, the singular number shall include the plural or singular and the use of any gender shall include all appropriate genders.

C. The agreements contained in the Lease set forth the complete understanding of the parties and may not be changed or terminated orally.

D. No agreement to accept surrender of the Premises from Tenant will be valid unless in writing and signed by Landlord.

E. All questions concerning the meaning, execution, construction, effect, validity, and enforcement of the Lease shall be determined pursuant to the laws of Florida.

F. A facsimile copy of the Lease and any signatures hereon shall be considered for all purposes originals.

G. As required by law, Landlord makes the following disclosure: "RADON GAS." Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

**28. BROKERS' COMMISSION.** ☐ Check and complete if applicable. The brokerage companies named below will be paid the commission set forth in this paragraph by ☐ Landlord ☐ Tenant for procuring a tenant for this transaction.

_____     _____
Real Estate Licensee                 Real Estate Licensee

_____     _____
Real Estate Brokerage Company        Real Estate Brokerage Company

_____     _____
Commission                           Commission

**29. TENANT'S PERSONAL PROPERTY.** TENANT MUST INITIAL IN THIS BOX [____] FOR THE FOLLOWING PROVISION TO APPLY. BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SURRENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY.

The Lease has been executed by the parties on the dates indicated below.

_____     _____
Landlord's Signature                 Date

_____     _____
Landlord's Signature                 Date

_____     _____
Tenant's Signature                   Date

_____     _____
Tenant's Signature                   Date

This form was completed with the assistance of:

Name of Individual:   _____
Name of Business:     _____
Address:              _____
Telephone Number:     _____

Copy of Current Version of Florida Residential Landlord and Tenant Act, Part II, Chapter 83, Florida Statutes to Be Attached

Tenant (____) (____) and Landlord (____) (____) acknowledge receipt of a copy of this page, which is Page 6 of 18.

RLHD-3x   Rev 7/16   Approved on April 15, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar
Serial# 088641-300172-1599898
Electronically Signed using eSignOnline™ [ Session ID: _____ ]

Form
Simplicity

## Early Termination Fee/Liquidated Damages Addendum

[x] I agree, as provided in the rental agreement, to pay $ 24,000.00 _____ (an amount that does not exceed two months' rent) as liquidated damages or an early termination fee if I elect to terminate the rental agreement and the landlord waives the right to seek additional rent beyond the month in which the landlord retakes possession.

[ ] I do not agree to liquidated damages or an early termination fee, and I acknowledge that the landlord may seek damages as provided by law.

_____            _____
Landlord's Signature                                      Date

_____            _____
Landlord's Signature                                      Date

_____            _____
Landlord's Signature                                      Date

_____            _____
Tenant's Signature                                        Date

_____            _____
Tenant's Signature                                        Date

Tenant ( ___ ) ( ___ )  and Landlord ( HU ) ( MCF ) acknowledge receipt of a copy of this page, which is Page 7 of 18.

RLHD-3x   Rev 7-16      Approved on April 15, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar

Serial #. 088641-300172-1599598

Electronically Signed using eSignOnline™ | Session ID : 5809350d9494922d4f4e9336f530580) |

Form
Simplicity

## PART II

Florida Residential Landlord and Tenant Act

### RESIDENTIAL TENANCIES

83.40   Short title.
83.41   Application.
83.42   Exclusions from application of part.
83.43   Definitions.
83.44   Obligation of good faith.
83.45   Unconscionable rental agreement or provision.
83.46   Rent; duration of tenancies.
83.47   Prohibited provisions in rental agreements.
83.48   Attorney fees.
83.49   Deposit money or advance rent; duty of landlord and tenant.
83.50   Disclosure of landlord's address.
83.51   Landlord's obligation to maintain premises.
83.515  Background screening of apartment employees; employment disqualification
83.52   Tenant's obligation to maintain dwelling unit.
83.53   Landlord's access to dwelling unit.
83.535  Flotation bedding system; restrictions on use.
83.54   Enforcement of rights and duties; civil action; criminal offenses.
83.55   Right of action for damages.
83.56   Termination of rental agreement.
83.5615 Termination of rental agreement upon foreclosure.
83.57   Termination of tenancy without specific term.
83.575  Termination of tenancy with specific duration.
83.58   Remedies; tenant holding over.
83.59   Right of action for possession.
83.595  Choice of remedies upon breach or early termination by tenant.
83.60   Defenses to action for rent or possession; procedure.
83.61   Disbursement of funds in registry of court; prompt final hearing.
83.62   Restoration of possession to landlord.
83.625  Power to award possession and enter money judgment.
83.63   Casualty damage.
83.64   Retaliatory conduct.
83.67   Prohibited practices.
83.681  Orders to enjoin violations of this part.
83.682  Termination of rental agreement by a servicemember.
83.683  Rental application by a servicemember

**83.40 Short title.** --This part shall be known as the "Florida Residential Landlord and Tenant Act."
History. --s. 2, ch. 73-330.

**83.41 Application.** --This part applies to the rental of a dwelling unit.
History. --s. 2, ch. 73-330; ss. 2, 20, ch. 82-66.

**83.42 Exclusions from application of part.** --This part does not apply to:
(1) Residency or detention in a facility, whether public or private, when residence or detention is incidental to the provision of medical, geriatric, educational, counseling, religious, or similar services. For residents of a facility licensed under part II of chapter 400, the provisions of s. 400.0255 are the exclusive procedures for all transfers and discharges.
(2) Occupancy under a contract of sale of a dwelling unit or the property of which it is a part in which the buyer has paid at least 12 months' rent or in which the buyer has paid at least 1 month's rent and a deposit of at least 5 percent of the purchase price of the property.
(3) Transient occupancy in a hotel, condominium, motel, roominghouse, or similar public lodging, or transient occupancy in a mobile home park.
(4) Occupancy by a holder of a proprietary lease in a cooperative apartment.
(5) Occupancy by an owner of a condominium unit.
History. --s. 2, ch. 73-330; s. 40, ch. 2012-160; s. 1, ch. 2013-136.

**83.43 Definitions.** --As used in this part, the following words and terms shall have the following meanings unless some other meaning is plainly indicated:
(1) "Building, housing, and health codes" means any law, ordinance, or governmental regulation concerning health, safety, sanitation or fitness for habitation, or the construction, maintenance, operation, occupancy, use, or appearance, of any dwelling unit.
(2) "Dwelling unit" means:
(a) A structure or part of a structure that is rented for use as a home, residence, or sleeping place by one person or by two or more persons who maintain a common household.
(b) A mobile home rented by a tenant.
(c) A structure or part of a structure that is furnished, with or without rent, as an incident of employment for use as a home, residence, or sleeping place by one or more persons.
(3) "Landlord" means the owner or lessor of a dwelling unit.
(4) "Tenant" means any person entitled to occupy a dwelling unit under a rental agreement.

Tenant (_____) (_____) and Landlord (_____) (_____) acknowledge receipt of a copy of this page, which is Page 8 of 18.

(5) "Premises" means a dwelling unit and the structure of which it is a part and a mobile home lot and the appurtenant facilities and grounds, areas, facilities, and property held out for the use of tenants generally.

(6) "Rent" means the periodic payments due the landlord from the tenant for occupancy under a rental agreement and any other payments due the landlord from the tenant as may be designated as rent in a written rental agreement.

(7) "Rental agreement" means any written agreement, including amendments or addenda, or oral agreement for a duration of less than 1 year, providing for use and occupancy of premises.

(8) "Good faith" means honesty in fact in the conduct or transaction concerned.

(9) "Advance rent" means moneys paid to the landlord to be applied to future rent payment periods, but does not include rent paid in advance for a current rent payment period.

(10) "Transient occupancy" means occupancy when it is the intention of the parties that the occupancy will be temporary.

(11) "Deposit money" means any money held by the landlord on behalf of the tenant, including, but not limited to, damage deposits, security deposits, advance rent deposit, pet deposit, or any contractual deposit agreed to between landlord and tenant either in writing or orally.

(12) "Security deposits" means any moneys held by the landlord as security for the performance of the rental agreement, including, but not limited to, monetary damage to the landlord caused by the tenant's breach of lease prior to the expiration thereof.

(13) "Legal holiday" means holidays observed by the clerk of the court.

(14) "Servicemember" shall have the same meaning as provided in s. 250.01.

(15) "Active duty" shall have the same meaning as provided in s. 250.01.

(16) "State active duty" shall have the same meaning as provided in s. 250.01.

(17) "Early termination fee" means any charge, fee, or forfeiture that is provided for in a written rental agreement and is assessed to a tenant when a tenant elects to terminate the rental agreement, as provided in the agreement, and vacates a dwelling unit before the end of the rental agreement. An early termination fee does not include:

(a) Unpaid rent and other accrued charges through the end of the month in which the landlord retakes possession of the dwelling unit.

(b) Charges for damages to the dwelling unit.

(c) Charges associated with a rental agreement settlement, release, buyout, or accord and satisfaction agreement.

History. --s. 2, ch. 73-330; s. 1, ch. 74-143; s. 1, ch. 81-190; s. 3. ch. 83-151; s. 17, ch. 94-170; s. 2, ch. 2003-72; s. 1, ch. 2008-131.

**83.44 Obligation of good faith.** --Every rental agreement or duty within this part imposes an obligation of good faith in its performance or enforcement.

History. --s. 2, ch. 73-330.

**83.45 Unconscionable rental agreement or provision.** --

(1) If the court as a matter of law finds a rental agreement or any provision of a rental agreement to have been unconscionable at the time it was made, the court may refuse to enforce the rental agreement, enforce the remainder of the rental agreement without the unconscionable provision, or so limit the application of any unconscionable provision as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the rental agreement or any provision thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to meaning, relationship of the parties, purpose, and effect to aid the court in making the determination.

History. --s. 2, ch. 73-330.

**83.46 Rent; duration of tenancies.** --

(1) Unless otherwise agreed, rent is payable without demand or notice; periodic rent is payable at the beginning of each rent payment period; and rent is uniformly apportionable from day to day.

(2) If the rental agreement contains no provision as to duration of the tenancy, the duration is determined by the periods for which the rent is payable. If the rent is payable weekly, then the tenancy is from week to week; if payable monthly, tenancy is from month to month; if payable quarterly, tenancy is from quarter to quarter; if payable yearly, tenancy is from year to year.

(3) If the dwelling unit is furnished without rent as an incident of employment and there is no agreement as to the duration of the tenancy, the duration is determined by the periods for which wages are payable. If wages are payable weekly or more frequently, then the tenancy is from week to week; and if wages are payable monthly or no wages are payable, then the tenancy is from month to month. In the event that the employee ceases employment, the employer shall be entitled to rent for the period from the day after the employee ceases employment until the day that the dwelling unit is vacated at a rate equivalent to the rate charged for similarly situated residences in the area. This subsection shall not apply to an employee or a resident manager of an apartment house or an apartment complex when there is a written agreement to the contrary.

History. --s. 2, ch. 73-330; s. 2, ch. 81-190; s. 2, ch. 87-195; s. 2, ch. 90-133; s. 1, ch. 93-255.

**83.47 Prohibited provisions in rental agreements.** --

(1) A provision in a rental agreement is void and unenforceable to the extent that it:

(a) Purports to waive or preclude the rights, remedies, or requirements set forth in this part.

(b) Purports to limit or preclude any liability of the landlord to the tenant or of the tenant to the landlord, arising under law.

(2) If such a void and unenforceable provision is included in a rental agreement entered into, extended, or renewed after the effective date of this part and either party suffers actual damages as a result of the inclusion, the aggrieved party may recover those damages sustained after the effective date of this part.

History. --s. 2. ch. 73-330.

**83.48 Attorney fees.** --In any civil action brought to enforce the provisions of the rental agreement or this part, the party in whose favor a judgment or decree has been rendered may recover reasonable attorney fees and court costs from the nonprevailing party. The right to attorney fees in this section may not be waived in a lease agreement. However, attorney fees may not be awarded under this section in a claim for personal injury damages based on a breach of duty under s. 83.51.

History. --s. 2, ch. 73-330; s. 4, ch. 83-151; s. 2, ch. 2013-136.

**83.49 Deposit money or advance rent; duty of landlord and tenant.** --

Tenant (  ) and Landlord (  ) (  ) acknowledge receipt of a copy of this page, which is Page 9 of 18.

Serial# 058641-300172-1599898

Electronically Signed using eSignOnline™ ( Session ID : 8609902-0840-4808-b07a-088d7b508b0 )

From
Simplicity

(1) Whenever money is deposited or advanced by a tenant on a rental agreement as security for performance of the rental agreement or as advance rent for other than the next immediate rental period, the landlord or the landlord's agent shall either:

(a) Hold the total amount of such money in a separate non-interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord;

(b) Hold the total amount of such money in a separate interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants, in which case the tenant shall receive and collect interest in an amount of at least 75 percent of the annualized average interest rate payable on such account or interest at the rate of 5 percent per year, simple interest, whichever the landlord elects. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord; or

(c) Post a surety bond, executed by the landlord as principal and a surety company authorized and licensed to do business in the state as surety, with the clerk of the circuit court in the county in which the dwelling unit is located in the total amount of the security deposits and advance rent he or she holds on behalf of the tenants or $50,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of the provisions of this section. In addition to posting the surety bond, the landlord shall pay to the tenant interest at the rate of 5 percent per year, simple interest. A landlord, or the landlord's agent, engaged in the renting of dwelling units in five or more counties, who holds deposit moneys or advance rent and who is otherwise subject to the provisions of this section, may, in lieu of posting a surety bond in each county, elect to post a surety bond in the form and manner provided in this paragraph with the office of the Secretary of State. The bond shall be in the total amount of the security deposit or advance rent held on behalf of tenants or in the amount of $250,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of this section. In addition to posting a surety bond, the landlord shall pay to the tenant interest on the security deposit or advance rent held on behalf of that tenant at the rate of 5 percent per year simple interest.

(2) The landlord shall, in the lease agreement or within 30 days after receipt of advance rent or a security deposit, give written notice to the tenant which includes disclosure of the advance rent or security deposit. Subsequent to providing such written notice, if the landlord changes the manner or location in which he or she is holding the advance rent or security deposit, he or she must notify the tenant within 30 days after the change as provided in paragraphs (a)-(d). The landlord is not required to give new or additional notice solely because the depository has merged with another financial institution, changed its name, or transferred ownership to a different financial institution. This subsection does not apply to any landlord who rents fewer than five individual dwelling units. Failure to give this notice is not a defense to the payment of rent when due. The written notice must

(a) Be given in person or by mail to the tenant.

(b) State the name and address of the depository where the advance rent or security deposit is being held or state that the landlord has posted a surety bond as provided by law.

(c) State whether the tenant is entitled to interest on the deposit.

(d) Contain the following disclosure:

YOUR LEASE REQUIRES PAYMENT OF CERTAIN DEPOSITS. THE LANDLORD MAY TRANSFER ADVANCE RENTS TO THE LANDLORD'S ACCOUNT AS THEY ARE DUE AND WITHOUT NOTICE. WHEN YOU MOVE OUT, YOU MUST GIVE THE LANDLORD YOUR NEW ADDRESS SO THAT THE LANDLORD CAN SEND YOU NOTICES REGARDING YOUR DEPOSIT. THE LANDLORD MUST MAIL YOU NOTICE, WITHIN 30 DAYS AFTER YOU MOVE OUT, OF THE LANDLORD'S INTENT TO IMPOSE A CLAIM AGAINST THE DEPOSIT. IF YOU DO NOT REPLY TO THE LANDLORD STATING YOUR OBJECTION TO THE CLAIM WITHIN 15 DAYS AFTER RECEIPT OF THE LANDLORD'S NOTICE, THE LANDLORD WILL COLLECT THE CLAIM AND MUST MAIL YOU THE REMAINING DEPOSIT, IF ANY.

IF THE LANDLORD FAILS TO TIMELY MAIL YOU NOTICE, THE LANDLORD MUST RETURN THE DEPOSIT BUT MAY LATER FILE A LAWSUIT AGAINST YOU FOR DAMAGES. IF YOU FAIL TO TIMELY OBJECT TO A CLAIM, THE LANDLORD MAY COLLECT FROM THE DEPOSIT, BUT YOU MAY LATER FILE A LAWSUIT CLAIMING A REFUND.

YOU SHOULD ATTEMPT TO INFORMALLY RESOLVE ANY DISPUTE BEFORE FILING A LAWSUIT. GENERALLY, THE PARTY IN WHOSE FAVOR A JUDGMENT IS RENDERED WILL BE AWARDED COSTS AND ATTORNEY FEES PAYABLE BY THE LOSING PARTY.

THIS DISCLOSURE IS BASIC. PLEASE REFER TO PART II OF CHAPTER 83, FLORIDA STATUTES, TO DETERMINE YOUR LEGAL RIGHTS AND OBLIGATIONS.

(3) The landlord or the landlord's agent may disburse advance rents from the deposit account to the landlord's benefit when the advance rental period commences and without notice to the tenant. For all other deposits:

(a) Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or her intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

This is a notice of my intention to impose a claim for damages in the amount of _____ upon your security deposit, due to _____. It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to  (landlord's address) .

Tenant (____) (____)  and Landlord    acknowledge receipt of a copy of this page, which is Page 10 of 18.

Form
Simplicity

If the landlord fails to give the required notice within the 30-day period, he or she forfeits the right to impose a claim upon the security deposit and may not seek a setoff against the deposit but may file an action for damages after return of the deposit.

(b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages. The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

(c) If either party institutes an action in a court of competent jurisdiction to adjudicate the party's right to the security deposit, the prevailing party is entitled to receive his or her court costs plus a reasonable fee for his or her attorney. The court shall advance the cause on the calendar.

(d) Compliance with this section by an individual or business entity authorized to conduct business in this state, including Florida-licensed real estate brokers and sales associates, constitutes compliance with all other relevant Florida Statutes pertaining to security deposits held pursuant to a rental agreement or other landlord-tenant relationship. Enforcement personnel shall look solely to this section to determine compliance. This section prevails over any conflicting provisions in chapter 475 and in other sections of the Florida Statutes, and shall operate to permit licensed real estate brokers to disburse security deposits and deposit money without having to comply with the notice and settlement procedures contained in s. 475.25(1)(d).

(4) The provisions of this section do not apply to transient rentals by hotels or motels as defined in chapter 509; nor do they apply in those instances in which the amount of rent or deposit, or both, is regulated by law or by rules or regulations of a public body, including public housing authorities and federally administered or regulated housing programs including s. 202, s. 221(d)(3) and (4), s. 236, or s. 8 of the National Housing Act, as amended, other than for rent stabilization. With the exception of subsections (3), (5), and (6), this section is not applicable to housing authorities or public housing agencies created pursuant to chapter 421 or other statutes.

(5) Except when otherwise provided by the terms of a written lease, any tenant who vacates or abandons the premises prior to the expiration of the term specified in the written lease, or any tenant who vacates or abandons premises which are the subject of a tenancy from week to week, month to month, quarter to quarter, or year to year, shall give at least 7 days' written notice by certified mail or personal delivery to the landlord prior to vacating or abandoning the premises which notice shall include the address where the tenant may be reached. Failure to give such notice shall relieve the landlord of the notice requirement of paragraph (3)(a) but shall not waive any right the tenant may have to the security deposit or any part of it.

(6) For the purposes of this part, a renewal of an existing rental agreement shall be considered a new rental agreement, and any security deposit carried forward shall be considered a new security deposit.

(7) Upon the sale or transfer of title of the rental property from one owner to another, or upon a change in the designated rental agent, any and all security deposits or advance rents being held for the benefit of the tenants shall be transferred to the new owner or agent, together with any earned interest and with an accurate accounting showing the amounts to be credited to each tenant account. Upon the transfer of such funds and records to the new owner or agent, and upon transmittal of a written receipt therefor, the transferor is free from the obligation imposed in subsection (1) to hold such moneys on behalf of the tenant. There is a rebuttable presumption that any new owner or agent received the security deposit from the previous owner or agent; however, this presumption is limited to 1 month's rent. This subsection does not excuse the landlord or agent for a violation of other provisions of this section while in possession of such deposits.

(8) Any person licensed under the provisions of s. 509.241, unless excluded by the provisions of this part, who fails to comply with the provisions of this part shall be subject to a fine or to the suspension or revocation of his or her license by the Division of Hotels and Restaurants of the Department of Business and Professional Regulation in the manner provided in s. 509.261.

(9) In those cases in which interest is required to be paid to the tenant, the landlord shall pay directly to the tenant, or credit against the current month's rent, the interest due to the tenant at least once annually. However, no interest shall be due a tenant who wrongfully terminates his or her tenancy prior to the end of the rental term.

History. --s. 1, ch. 69-282; s. 3, ch. 70-360; s. 1, ch. 72-19; s. 1, ch. 72-43; s. 5, ch. 73-330; s. 1, ch. 74-93; s. 3, ch. 74-146; ss. 1, 2, ch. 75-133; s. 1, ch. 76-15; s. 1, ch. 77-445; s. 20, ch. 79-400; s. 21, ch. 82-66; s. 5, ch. 83-151; s. 13, ch. 83-217; s. 3, ch. 87-195; s. 1, ch. 87 -369; s. 3, ch. 88-379; s. 2, ch. 93-255; s. 5, ch. 94-218; s. 1372, ch. 95-147; s. 1, ch. 96-146; s. 1, ch. 2001-179; s. 53, ch. 2003-164; s. 3, ch. 2013-136.

Note. --Former s. 83.261.

**83.50 Disclosure of landlord's address.** --In addition to any other disclosure required by law, the landlord, or a person authorized to enter into a rental agreement on the landlord's behalf, shall disclose in writing to the tenant, at or before the commencement of the tenancy, the name and address of the landlord or a person authorized to receive notices and demands in the landlord's behalf. The person so authorized to receive notices and demands retains authority until the tenant is notified otherwise. All notices of such names and addresses or changes thereto shall be delivered to the tenant's residence or, if specified in writing by the tenant, to any other address.
History. --s. 2, ch. 73-330; s. 443, ch. 95-147; s. 5, ch. 2013-136.

**83.51 Landlord's obligation to maintain premises.** --
(1) The landlord at all times during the tenancy shall:
(a) Comply with the requirements of applicable building, housing, and health codes; or
(b) Where there are no applicable building, housing, or health codes, maintain the roofs, windows, doors, floors, steps, porches, exterior walls, foundations, and all other structural components in good repair and capable of resisting normal forces and loads and the plumbing in reasonable working condition. The landlord, at commencement of the tenancy, must ensure that screens are installed in a reasonable condition. Thereafter, the landlord must repair damage to screens once annually, when necessary, until termination of the rental agreement.

The landlord is not required to maintain a mobile home or other structure owned by the tenant. The landlord's obligations under this subsection may be altered or modified in writing with respect to a single-family home or duplex.
(2)(a) Unless otherwise agreed in writing, in addition to the requirements of subsection (1), the landlord of a dwelling unit other than a single-family home or duplex shall, at all times during the tenancy, make reasonable provisions for:

Tenant (____) (____) and Landlord  ( acknowledge receipt of a copy of this page, which is Page 11 of 18.

Senate 088641-300172-1599898
Electronically Signed using eSignOnline™ | Session ID: 6889846-6840-4830-876b-630bef096fed)

Form
Simplicity

1. The extermination of rats, mice, roaches, ants, wood-destroying organisms, and bedbugs. When vacation of the premises is required for such extermination, the landlord is not liable for damages but shall abate the rent. The tenant must temporarily vacate the premises for a period of time not to exceed 4 days, on 7 days' written notice, if necessary, for extermination pursuant to this subparagraph.
2. Locks and keys.
3. The clean and safe condition of common areas.
4. Garbage removal and outside receptacles therefor.
5. Functioning facilities for heat during winter, running water, and hot water.
(b) Unless otherwise agreed in writing, at the commencement of the tenancy of a single-family home or duplex, the landlord shall install working smoke detection devices. As used in this paragraph, the term "smoke detection device" means an electrical or battery-operated device which detects visible or invisible particles of combustion and which is listed by Underwriters Laboratories, Inc., Factory Mutual Laboratories, Inc., or any other nationally recognized testing laboratory using nationally accepted testing standards.
(c) Nothing in this part authorizes the tenant to raise a noncompliance by the landlord with this subsection as a defense to an action for possession under s. 83.59.
(d) This subsection shall not apply to a mobile home owned by a tenant.
(e) Nothing contained in this subsection prohibits the landlord from providing in the rental agreement that the tenant is obligated to pay costs or charges for garbage removal, water, fuel, or utilities.
(3) If the duty imposed by subsection (1) is the same or greater than any duty imposed by subsection (2), the landlord's duty is determined by subsection (1).
(4) The landlord is not responsible to the tenant under this section for conditions created or caused by the negligent or wrongful act or omission of the tenant, a member of the tenant's family, or other person on the premises with the tenant's consent.
**History.** --s. 2, ch. 73-330; s. 22, ch. 82-66; s. 4, ch. 87-195; s. 1, ch. 90-133; s. 3, ch. 93-255; s. 444, ch. 95-147; s. 8, ch. 97-95; s. 6, ch. 2013-136.

**83.515 Background screening of apartment employees; employment disqualification. --**
(1) The landlord of a public lodging establishment classified under s. 509.242(1)(d) or (e) as a nontransient apartment or transient apartment, respectively, must require that each employee of the establishment undergo a background screening as a condition of employment.
(2) The background screening required under subsection (1) must be performed by a consumer reporting agency in accordance with the federal Fair Credit Reporting Act, and must include a screening of criminal history records and sexual predator and sexual offender registries of all states and the District of Columbia.
(3) A landlord may disqualify a person from employment if the person has been convicted or found guilty of, or entered a plea of guilty or nolo contendere to, regardless of adjudication, any of the following offenses:
(a) A criminal offense involving disregard for the safety of others which, if committed in this state, is a felony or a misdemeanor of the first degree or, if committed in another state, would be a felony or a misdemeanor of the first degree if committed in this state.
(b) A criminal offense committed in any jurisdiction which involves violence, including, but not limited to, murder, sexual battery, robbery, carjacking, home-invasion robbery, and stalking.

**83.52 Tenant's obligation to maintain dwelling unit.** --The tenant at all times during the tenancy shall:
(1) Comply with all obligations imposed upon tenants by applicable provisions of building, housing, and health codes. (2) Keep that part of the premises which he or she occupies and uses clean and sanitary.
(3) Remove from the tenant's dwelling unit all garbage in a clean and sanitary manner.
(4) Keep all plumbing fixtures in the dwelling unit or used by the tenant clean and sanitary and in repair.
(5) Use and operate in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances, including elevators.
(6) Not destroy, deface, damage, impair, or remove any part of the premises or property therein belonging to the landlord nor permit any person to do so.
(7) Conduct himself or herself, and require other persons on the premises with his or her consent to conduct themselves, in a manner that does not unreasonably disturb the tenant's neighbors or constitute a breach of the peace.
**History.** --s. 2, ch. 73-330; s. 445, ch, 95-147.

**83.53 Landlord's access to dwelling unit. --**
(1) The tenant shall not unreasonably withhold consent to the landlord to enter the dwelling unit from time to time in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workers, or contractors.
(2) The landlord may enter the dwelling unit at any time for the protection or preservation of the premises. The landlord may enter the dwelling unit upon reasonable notice to the tenant and at a reasonable time for the purpose of repair of the premises. "Reasonable notice" for the purpose of repair is notice given at least 24 hours prior to the entry, and reasonable time for the purpose of repair shall be between the hours of 7: 30 a. m. and 8: 00 p. m. The landlord may enter the dwelling unit when necessary for the further purposes set forth in subsection (1) under any of the following circumstances:
(a) With the consent of the tenant;
(b) In case of emergency;
(c) When the tenant unreasonably withholds consent; or
(d) If the tenant is absent from the premises for a period of time equal to one-half the time for periodic rental payments. If the rent is current and the tenant notifies the landlord of an intended absence, then the landlord may enter only with the consent of the tenant or for the protection or preservation of the premises.
(3) The landlord shall not abuse the right of access nor use it to harass the tenant.
**History.** --s. 2, ch. 73-330; s. 5, ch. 87-195; s. 4, ch. 93-255; s. 446, ch. 95-147.

Tenant (  ) (_____) and Landlord (  ) (  ) acknowledge receipt of a copy of this page, which is Page 12 of 18.

Serial# 088641-300172-1599898
Electronically Signed using eSignOnline™ [ Session ID : 6699f6f0-6b40-4b90-07be-930a7b3f6f83 ]

Form
Simplicity

**83.535 Flotation bedding system; restrictions on use.** --No landlord may prohibit a tenant from using a flotation bedding system in a dwelling unit, provided the flotation bedding system does not violate applicable building codes. The tenant shall be required to carry in the tenant's name flotation insurance as is standard in the industry in an amount deemed reasonable to protect the tenant and owner against personal injury and property damage to the dwelling units. In any case, the policy shall carry a loss payable clause to the owner of the building.
History. --s. 7, ch. 82-66; s. 5, ch. 93-255.

**83.54 Enforcement of rights and duties; civil action; criminal offenses.** --Any right or duty declared in this part is enforceable by civil action. A right or duty enforced by civil action under this section does not preclude prosecution for a criminal offense related to the lease or leased property.
History. --s. 2, ch. 73-330; s. 7, ch. 2013-136.

**83.55 Right of action for damages.** --If either the landlord or the tenant fails to comply with the requirements of the rental agreement or this part, the aggrieved party may recover the damages caused by the noncompliance.
History. --s. 2, ch. 73-330.

**83.56 Termination of rental agreement.** --
(1) If the landlord materially fails to comply with s. 83.51(1) or material provisions of the rental agreement within 7 days after delivery of written notice by the tenant specifying the noncompliance and indicating the intention of the tenant to terminate the rental agreement by reason thereof, the tenant may terminate the rental agreement. If the failure to comply with s. 83.51(1) or material provisions of the rental agreement is due to causes beyond the control of the landlord and the landlord has made and continues to make every reasonable effort to correct the failure to comply, the rental agreement may be terminated or altered by the parties, as follows:
(a) If the landlord's failure to comply renders the dwelling unit untenantable and the tenant vacates, the tenant shall not be liable for rent during the period the dwelling unit remains uninhabitable.
(b) If the landlord's failure to comply does not render the dwelling unit untenantable and the tenant remains in occupancy, the rent for the period of noncompliance shall be reduced by an amount in proportion to the loss of rental value caused by the noncompliance.
(2) If the tenant materially fails to comply with s. 83.52 or material provisions of the rental agreement, other than a failure to pay rent, or reasonable rules or regulations, the landlord may:
(a) If such noncompliance is of a nature that the tenant should not be given an opportunity to cure it or if the noncompliance constitutes a subsequent or continuing noncompliance within 12 months of a written warning by the landlord of a similar violation, deliver a written notice to the tenant specifying the noncompliance and the landlord's intent to terminate the rental agreement by reason thereof. Examples of noncompliance which are of a nature that the tenant should not be given an opportunity to cure include, but are not limited to, destruction, damage, or misuse of the landlord's or other tenants' property by intentional act or a subsequent or continued unreasonable disturbance. In such event, the landlord may terminate the rental agreement, and the tenant shall have 7 days from the date that the notice is delivered to vacate the premises. The notice shall be in substantially the following form:

You are advised that your lease is terminated effective immediately. You shall have 7 days from the delivery of this letter to vacate the premises. This action is taken because (cite the noncompliance).

(b) If such noncompliance is of a nature that the tenant should be given an opportunity to cure it, deliver a written notice to the tenant specifying the noncompliance, including a notice that, if the noncompliance is not corrected within 7 days from the date that the notice is delivered, the landlord shall terminate the rental agreement by reason thereof. Examples of such noncompliance include, but are not limited to, activities in contravention of the lease or this part such as having or permitting unauthorized pets, guests, or vehicles; parking in an unauthorized manner or permitting such parking; or failing to keep the premises clean and sanitary. If such noncompliance recurs within 12 months after notice, an eviction action may commence without delivering a subsequent notice pursuant to paragraph (a) or this paragraph. The notice shall be in substantially the following form:

You are hereby notified that (cite the noncompliance). Demand is hereby made that you remedy the noncompliance within 7 days of receipt of this notice or your lease shall be deemed terminated and you shall vacate the premises upon such termination. If this same conduct or conduct of a similar nature is repeated within 12 months, your tenancy is subject to termination without further warning and without your being given an opportunity to cure the noncompliance.
(3) If the tenant fails to pay rent when due and the default continues for 3 days, excluding Saturday, Sunday, and legal holidays, after delivery of written demand by the landlord for payment of the rent or possession of the premises, the landlord may terminate the rental agreement. Legal holidays for the purpose of this section shall be court-observed holidays only. The 3-day notice shall contain a statement in substantially the following form:

You are hereby notified that you are indebted to me in the sum of _____ dollars for the rent and use of the premises (address of leased premises, including county), Florida, now occupied by you and that I demand payment of the rent or possession of the premises within 3 days (excluding Saturday, Sunday, and legal holidays) from the date of delivery of this notice, to wit: on or before the day of . (year) .

(landlord's name, address and phone number)
(4) The delivery of the written notices required by subsections (1), (2), and (3) shall be by mailing or delivery of a true copy thereof or, if the tenant is absent from the premises, by leaving a copy thereof at the residence. The notice requirements of subsections (1), (2), and (3) may not be waived in the lease.



Tenant (____) (____) and Landlord  (____) acknowledge receipt of a copy of this page, which is Page 13 of 18.

Electronically Signed using eSignOnline™ [ Session ID : 88 f89fd0-0bf0-40b0-b9af-b30a7b3d9ab7 ]

Form
Simplicity

(5)(a) If the landlord accepts rent with actual knowledge of a noncompliance by the tenant or accepts performance by the tenant of any other provision of the rental agreement that is at variance with its provisions, or if the tenant pays rent with actual knowledge of a noncompliance by the landlord or accepts performance by the landlord of any other provision of the rental agreement that is at variance with its provisions, the landlord or tenant waives his or her right to terminate the rental agreement or to bring a civil action for that noncompliance, but not for any subsequent or continuing noncompliance. However, a landlord does not waive the right to terminate the rental agreement or to bring a civil action for that noncompliance by accepting partial rent for the period. If partial rent is accepted after posting the notice for nonpayment, the landlord must:

1. Provide the tenant with a receipt stating the date and amount received and the agreed upon date and balance of rent due before filing an action for possession;

2. Place the amount of partial rent accepted from the tenant in the registry of the court upon filing the action for possession; or

3. Post a new 3-day notice reflecting the new amount due.

(b) Any tenant who wishes to defend against an action by the landlord for possession of the unit for noncompliance of the rental agreement or of relevant statutes must comply with s. 83.60(2). The court may not set a date for mediation or trial unless the provisions of s. 83.60(2) have been met, but must enter a default judgment for removal of the tenant with a writ of possession to issue immediately if the tenant fails to comply with s. 83.60(2).

(c) This subsection does not apply to that portion of rent subsidies received from a local, state, or national government or an agency of local, state, or national government; however, waiver will occur if an action has not been instituted within 45 days after the landlord obtains actual knowledge of the noncompliance.

(6) If the rental agreement is terminated, the landlord shall comply with s. 83.49(3).

**History.** --s. 2, ch. 73-330; s. 23, ch. 82-66; s. 6, ch. 83-151; s. 14, ch. 83-217; s. 6, ch. 87-195; s. 6, ch. 93-255; s. 6, ch. 94-170; s. 1373,

ch. 95-147; s. 5, ch. 99-6; s. 8, ch. 2013-136.

### 83.5615 Termination of rental agreement upon foreclosure. --

(1) If a tenant is occupying residential premises that are the subject of a foreclosure sale, upon issuance of a certificate of title following the sale, the purchaser named in the certificate of title takes title to the residential premises subject to the rights of the tenant under this section.

(a) The tenant may remain in possession of the premises for 30 days following the date of the purchaser's delivery of a written 30-day notice of termination.

(b) The tenant is entitled to the protections of s. 83.67.

(c) The 30-day notice of termination must be in substantially the following form:

NOTICE TO TENANT OF TERMINATION

You are hereby notified that your rental agreement is terminated on the date of delivery of this notice, that your occupancy is terminated 30 days following the date of the delivery of this notice, and that I demand possession of the premises on (date). If you do not vacate the premises by that date, I will ask the court for an order allowing me to remove you and your belongings from the premises. You are obligated to pay rent during the 30-day period for any amount that might accrue during that period. Your rent must be delivered to (landlord's name and address)   .

(d) The 30-day notice of termination shall be delivered in the same manner as provided in s. 83.56(4).

(2) The purchaser at the foreclosure sale may apply to the court for a writ of possession based upon a sworn affidavit that the 30-day notice of termination was delivered to the tenant and the tenant has failed to vacate the premises at the conclusion of the 30-day period. If the court awards a writ of possession, the writ must be served on the tenant. The writ of possession shall be governed by s. 83.62.

(3) This section does not apply if:

(a) The tenant is the mortgagor in the subject foreclosure or is the child, spouse, or parent of the mortgagor in the subject foreclosure.

(b) The tenant's rental agreement is not the result of an arm's length transaction.

(c) The tenant's rental agreement allows the tenant to pay rent that is substantially less than the fair market rent for the premises, unless the rent is reduced or subsidized due to a federal, state, or local subsidy.

(4) A purchaser at a foreclosure sale of a residential premises occupied by a tenant does not assume the obligations of a landlord, except as provided in paragraph (1)(b), unless or until the purchaser assumes an existing rental agreement with the tenant that has not ended or enters into a new rental agreement with the tenant.

**History.** --s. 1, ch. 2015-96.

### 83.57 Termination of tenancy without specific term. --

A tenancy without a specific duration, as defined in s. 83.46(2) or (3), may be terminated by either party giving written notice in the manner provided in s. 83.56(4), as follows:

(1) When the tenancy is from year to year, by giving not less than 60 days' notice prior to the end of any annual period;

(2) When the tenancy is from quarter to quarter, by giving not less than 30 days' notice prior to the end of any quarterly period;

(3) When the tenancy is from month to month, by giving not less than 15 days' notice prior to the end of any monthly period; and

(4) When the tenancy is from week to week, by giving not less than 7 days' notice prior to the end of any weekly period.

**History.** --s. 2, ch. 73-330; s. 3, ch. 81-190; s. 15, ch. 83-217.

### 83.575 Termination of tenancy with specific duration. --

(1) A rental agreement with a specific duration may contain a provision requiring the tenant to notify the landlord within a specified period before vacating the premises at the end of the rental agreement, if such provision requires the landlord to notify the tenant within such notice period if the rental agreement will not be renewed; however, a rental agreement may not require more than 60 days' notice from either the tenant or the landlord.



Tenant (           ) and Landlord  (         ) acknowledge receipt of a copy of this page, which is Page 14 of 18.

Serial# 058641-300172-1599898

Electronically Signed using eSignOnline™ | Session ID : 68089850-0b40-4090-d7fe-b0bbf53f8889 |

≡ Form
Simplicity

(2) A rental agreement with a specific duration may provide that if a tenant fails to give the required notice before vacating the premises at the end of the rental agreement, the tenant may be liable for liquidated damages as specified in the rental agreement if the landlord provides written notice to the tenant specifying the tenant's obligations under the notification provision contained in the lease and the date the rental agreement is terminated. The landlord must provide such written notice to the tenant within 15 days before the start of the notification period contained in the lease. The written notice shall list all fees, penalties, and other charges applicable to the tenant under this subsection.

(3) If the tenant remains on the premises with the permission of the landlord after the rental agreement has terminated and fails to give notice required under s. 83.57(3), the tenant is liable to the landlord for an additional 1 month's rent.
History. --s. 3, ch. 2003-30; s. 1, ch. 2004-375; s. 9, ch. 2013-136.

**83.58 Remedies; tenant holding over.** --If the tenant holds over and continues in possession of the dwelling unit or any part thereof after

the expiration of the rental agreement without the permission of the landlord. the landlord may recover possession of the dwelling unit in the manner provided for in s. 83.59. The landlord may also recover double the amount of rent due on the dwelling unit, or any part thereof, for the period during which the tenant refuses to surrender possession.
History. --s. 2, ch. 73-330; s. 10, ch. 2013-136.

**83.59 Right of action for possession. --**

(1) If the rental agreement is terminated and the tenant does not vacate the premises, the landlord may recover possession of the dwelling unit as provided in this section.

(2) A landlord, the landlord's attorney, or the landlord's agent, applying for the removal of a tenant, shall file in the county court of the county where the premises are situated a complaint describing the dwelling unit and stating the facts that authorize its recovery. A landlord's agent is not permitted to take any action other than the initial filing of the complaint, unless the landlord's agent is an attorney. The landlord is entitled to the summary procedure provided in s. 51.011, and the court shall advance the cause on the calendar.

(3) The landlord shall not recover possession of a dwelling unit except:

(a) In an action for possession under subsection (2) or other civil action in which the issue of right of possession is determined;

(b) When the tenant has surrendered possession of the dwelling unit to the landlord;

(c) When the tenant has abandoned the dwelling unit. In the absence of actual knowledge of abandonment, it shall be presumed that the tenant has abandoned the dwelling unit if he or she is absent from the premises for a period of time equal to one-half the time for periodic rental payments. However, this presumption does not apply if the rent is current or the tenant has notified the landlord, in writing, of an intended absence; or

(d) When the last remaining tenant of a dwelling unit is deceased, personal property remains on the premises, rent is unpaid, at least 60 days have elapsed following the date of death, and the landlord has not been notified in writing of the existence of a probate estate or of the name and address of a personal representative. This paragraph does not apply to a dwelling unit used in connection with a federally administered or regulated housing program, including programs under s. 202, s. 221(d)(3) and (4), s. 236, or s. 8 of the National Housing Act, as amended.

(4) The prevailing party is entitled to have judgment for costs and execution therefor.
History. --s. 2, ch. 73-330; s. 1, ch. 74-146; s. 24, ch. 82-66; s. 1, ch. 92-36; s. 447, ch. 95-147; s. 1, ch. 2007-136; s. 11, ch. 2013-136.

**83.595 Choice of remedies upon breach or early termination by tenant.** --If the tenant breaches the rental agreement for the dwelling unit and the landlord has obtained a writ of possession, or the tenant has surrendered possession of the dwelling unit to the landlord, or the tenant has abandoned the dwelling unit, the landlord may:

(1) Treat the rental agreement as terminated and retake possession for his or her own account, thereby terminating any further liability of the tenant;

(2) Retake possession of the dwelling unit for the account of the tenant, holding the tenant liable for the difference between the rent stipulated to be paid under the rental agreement and what the landlord is able to recover from a reletting. If the landlord retakes possession, the landlord has a duty to exercise good faith in attempting to relet the premises, and any rent received by the landlord as a result of the reletting must be deducted from the balance of rent due from the tenant. For purposes of this subsection, the term "good faith in attempting to relet the premises" means that the landlord uses at least the same efforts to relet the premises as were used in the initial rental or at least the same efforts as the landlord uses in attempting to rent other similar rental units but does not require the landlord to give a preference in renting the premises over other vacant dwelling units that the landlord owns or has the responsibility to rent;

(3) Stand by and do nothing, holding the lessee liable for the rent as it comes due; or

(4) Charge liquidated damages, as provided in the rental agreement, or an early termination fee to the tenant if the landlord and tenant have agreed to liquidated damages or an early termination fee, if the amount does not exceed 2 months' rent, and if, in the case of an early termination fee, the tenant is required to give no more than 60 days' notice, as provided in the rental agreement, prior to the proposed date of early termination. This remedy is available only if the tenant and the landlord, at the time the rental agreement was made, indicated acceptance of liquidated damages or an early termination fee. The tenant must indicate acceptance of liquidated damages or an early termination fee by signing a separate addendum to the rental agreement containing a provision in substantially the following form:

? I agree, as provided in the rental agreement, to pay $_____ (an amount that does not exceed 2 months' rent) as liquidated damages or an early termination fee if I elect to terminate the rental agreement, and the landlord waives the right to seek additional rent beyond the month in which the landlord retakes possession.

? I do not agree to liquidated damages or an early termination fee, and I acknowledge that the landlord may seek damages as provided by law.



Tenant ( ) ( ) and Landlord ( ) ( ) acknowledge receipt of a copy of this page, which is Page 15 of 18.

(a) In addition to liquidated damages or an early termination fee, the landlord is entitled to the rent and other charges accrued through the end of the month in which the landlord retakes possession of the dwelling unit and charges for damages to the dwelling unit.
(b) This subsection does not apply if the breach is failure to give notice as provided in s. 83.575.
**History.** --s. 2, ch. 87-369; s. 4, ch. 88-379; s. 448, ch. 95-147; s. 2, ch. 2008-131.

## 83.60 Defenses to action for rent or possession; procedure. --

(1)(a) In an action by the landlord for possession of a dwelling unit based upon nonpayment of rent or in an action by the landlord under s. 83.55 seeking to recover unpaid rent, the tenant may defend upon the ground of a material noncompliance with s. 83.51(1), or may raise any other defense, whether legal or equitable, that he or she may have, including the defense of retaliatory conduct in accordance with s. 83.64. The landlord must be given an opportunity to cure a deficiency in a notice or in the pleadings before dismissal of the action.
(b) The defense of a material noncompliance with s. 83.51(1) may be raised by the tenant if 7 days have elapsed after the delivery of written notice by the tenant to the landlord, specifying the noncompliance and indicating the intention of the tenant not to pay rent by reason thereof. Such notice by the tenant may be given to the landlord, the landlord's representative as designated pursuant to s. 83.50, a resident manager, or the person or entity who collects the rent on behalf of the landlord. A material noncompliance with s. 83.51(1) by the landlord is a complete defense to an action for possession based upon nonpayment of rent, and, upon hearing, the court or the jury, as the case may be, shall determine the amount, if any, by which the rent is to be reduced to reflect the diminution in value of the dwelling unit during the period of noncompliance with s. 83.51(1). After consideration of all other relevant issues, the court shall enter appropriate judgment.
(2) In an action by the landlord for possession of a dwelling unit, if the tenant interposes any defense other than payment, including, but not limited to, the defense of a defective 3-day notice, the tenant shall pay into the registry of the court the accrued rent as alleged in the complaint or as determined by the court and the rent that accrues during the pendency of the proceeding, when due. The clerk shall notify the tenant of such requirement in the summons. Failure of the tenant to pay the rent into the registry of the court or to file a motion to determine the amount of rent to be paid into the registry within 5 days, excluding Saturdays, Sundays, and legal holidays, after the date of service of process constitutes an absolute waiver of the tenant's defenses other than payment, and the landlord is entitled to an immediate default judgment for removal of the tenant with a writ of possession to issue without further notice or hearing thereon. If a motion to determine rent is filed, documentation in support of the allegation that the rent as alleged in the complaint is in error is required. Public housing tenants or tenants receiving rent subsidies are required to deposit only that portion of the full rent for which they are responsible pursuant to the federal, state, or local program in which they are participating.
**History.** --s. 2, ch. 73-330; s. 7, ch. 83-151; s. 7, ch. 87-195; s. 7, ch. 93-255; s. 7, ch. 94-170; s. 1374, ch. 95-147; s. 12, ch. 2013-136.

## 83.61 Disbursement of funds in registry of court; prompt final hearing. --When the tenant has deposited funds into the registry of the court in accordance with the provisions of s. 83.60(2) and the landlord is in actual danger of loss of the premises or other personal hardship resulting from the loss of rental income from the premises, the landlord may apply to the court for disbursement of all or part of the funds or for prompt final hearing. The court shall advance the cause on the calendar. The court, after preliminary hearing, may award all or any portion of the funds on deposit to the landlord or may proceed immediately to a final resolution of the cause.
**History.** --s. 2, ch. 73-330; s. 2, ch. 74-146.

## 83.62 Restoration of possession to landlord. --

(1) In an action for possession, after entry of judgment in favor of the landlord, the clerk shall issue a writ to the sheriff describing the premises and commanding the sheriff to put the landlord in possession after 24 hours' notice conspicuously posted on the premises. Saturdays, Sundays, and legal holidays do not stay the 24-hour notice period.
(2) At the time the sheriff executes the writ of possession or at any time thereafter, the landlord or the landlord's agent may remove any personal property found on the premises to or near the property line. Subsequent to executing the writ of possession, the landlord may request the sheriff to stand by to keep the peace while the landlord changes the locks and removes the personal property from the premises. When such a request is made, the sheriff may charge a reasonable hourly rate, and the person requesting the sheriff to stand by to keep the peace shall be responsible for paying the reasonable hourly rate set by the sheriff. Neither the sheriff nor the landlord or the landlord's agent shall be liable to the tenant or any other party for the loss, destruction, or damage to the property after it has been removed.
**History.** --s. 2, ch. 73-330; s. 3, ch. 82-66; s. 5, ch. 88-379; s. 8, ch. 94-170; s. 1375, ch. 95-147; s. 2, ch. 96-146; s. 13, ch. 2013-136.

## 83.625 Power to award possession and enter money judgment. --In an action by the landlord for possession of a dwelling unit based upon nonpayment of rent, if the court finds the rent is due, owing, and unpaid and by reason thereof the landlord is entitled to possession of the premises, the court, in addition to awarding possession of the premises to the landlord, shall direct, in an amount which is within its jurisdictional limitations, the entry of a money judgment with costs in favor of the landlord and against the tenant for the amount of money found due, owing, and unpaid by the tenant to the landlord. However, no money judgment shall be entered unless service of process has been effected by personal service or, where authorized by law, by certified or registered mail, return receipt, or in any other manner prescribed by law or the rules of the court; and no money judgment may be entered except in compliance with the Florida Rules of Civil Procedure. The prevailing party in the action may also be awarded attorney's fees and costs.
**History.** --s. 1, ch. 75-147; s. 8, ch. 87-195; s. 6, ch. 88-379.

## 83.63 Casualty damage. --If the premises are damaged or destroyed other than by the wrongful or negligent acts of the tenant so that the enjoyment of the premises is substantially impaired, the tenant may terminate the rental agreement and immediately vacate the premises. The tenant may vacate the part of the premises rendered unusable by the casualty, in which case the tenant's liability for rent shall be reduced by the fair rental value of that part of the premises damaged or destroyed. If the rental agreement is terminated, the landlord shall comply with s. 83.49(3).
**History.** --s. 2, ch. 73-330; s. 449, ch. 95-147; s. 14, ch. 2013-136.

## 83.64 Retaliatory conduct. --



Tenant (____) (____) and Landlord (____) (____) acknowledge receipt of a copy of this page, which is Page 16 of 18.

Serial # 098641-300172-1599898
Electronically Signed using eSignOnline™ [ Session ID : 8830580-0b40-4225-078a-930affb50900 ]

Form Simplicity

(1) It is unlawful for a landlord to discriminatorily increase a tenant's rent or decrease services to a tenant, or to bring or threaten to bring an action for possession or other civil action, primarily because the landlord is retaliating against the tenant. In order for the tenant to raise the defense of retaliatory conduct, the tenant must have acted in good faith. Examples of conduct for which the landlord may not retaliate include, but are not limited to, situations where:

(a) The tenant has complained to a governmental agency charged with responsibility for enforcement of a building, housing, or health code of a suspected violation applicable to the premises;

(b) The tenant has organized, encouraged, or participated in a tenant organization;

(c) The tenant has complained to the landlord pursuant to s. 83.56(1);

(d) The tenant is a servicemember who has terminated a rental agreement pursuant to s. 83.682;

(e) The tenant has paid rent to a condominium, cooperative, or homeowners' association after demand from the association in order to pay the landlord's obligation to the association; or

(f) The tenant has exercised his or her rights under local, state, or federal fair housing laws.

(2) Evidence of retaliatory conduct may be raised by the tenant as a defense in any action brought against him or her for possession.

(3) In any event, this section does not apply if the landlord proves that the eviction is for good cause. Examples of good cause include, but are not limited to, good faith actions for nonpayment of rent, violation of the rental agreement or of reasonable rules, or violation of the terms of this chapter.

(4) "Discrimination" under this section means that a tenant is being treated differently as to the rent charged, the services rendered, or the action being taken by the landlord, which shall be a prerequisite to a finding of retaliatory conduct.
**History.** --s. 8, ch. 83-151; s. 450, ch. 95-147; s. 3, ch. 2003-72; s. 15, ch. 2013-136.

### 83.67 Prohibited practices. --

(1) A landlord of any dwelling unit governed by this part shall not cause, directly or indirectly, the termination or interruption of any utility service furnished the tenant, including, but not limited to, water, heat, light, electricity, gas, elevator, garbage collection, or refrigeration, whether or not the utility service is under the control of, or payment is made by, the landlord.

(2) A landlord of any dwelling unit governed by this part shall not prevent the tenant from gaining reasonable access to the dwelling unit by any means, including, but not limited to, changing the locks or using any bootlock or similar device.

(3) A landlord of any dwelling unit governed by this part shall not discriminate against a servicemember in offering a dwelling unit for rent or in any of the terms of the rental agreement.

(4) A landlord shall not prohibit a tenant from displaying one portable, removable, cloth or plastic United States flag, not larger than 4 and 1/2 feet by 6 feet, in a respectful manner in or on the dwelling unit regardless of any provision in the rental agreement dealing with flags or decorations. The United States flag shall be displayed in accordance with s. 83.52(6). The landlord is not liable for damages caused by a United States flag displayed by a tenant. Any United States flag may not infringe upon the space rented by any other tenant.

(5) A landlord of any dwelling unit governed by this part shall not remove the outside doors, locks, roof, walls, or windows of the unit except for purposes of maintenance, repair, or replacement; and the landlord shall not remove the tenant's personal property from the dwelling unit unless such action is taken after surrender, abandonment, recovery of possession of the dwelling unit due to the death of the last remaining

tenant in accordance with s. 83.59(3)(d), or a lawful eviction. If provided in the rental agreement or a written agreement separate from the rental agreement, upon surrender or abandonment by the tenant, the landlord is not required to comply with s. 715.104 and is not liable or responsible for storage or disposition of the tenant's personal property; if provided in the rental agreement, there must be printed or clearly stamped on such rental agreement a legend in substantially the following form:

BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SURRENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY

For the purposes of this section, abandonment shall be as set forth in s. 83.59(3)(c).

(6) A landlord who violates any provision of this section shall be liable to the tenant for actual and consequential damages or 3 months' rent, whichever is greater, and costs, including attorney's fees. Subsequent or repeated violations that are not contemporaneous with the initial violation shall be subject to separate awards of damages.

(7) A violation of this section constitutes irreparable harm for the purposes of injunctive relief.

(8) The remedies provided by this section are not exclusive and do not preclude the tenant from pursuing any other remedy at law or equity that the tenant may have. The remedies provided by this section shall also apply to a servicemember who is a prospective tenant who has been discriminated against under subsection (3).
**History.** --s. 3, ch. 87-369; s. 7, ch. 88-379; s. 3, ch. 90-133; s. 3, ch. 96-146; s. 2, ch. 2001-179; s. 2, ch. 2003-30; s. 4, ch. 2003-72; s. 1, ch. 2004-236; s. 2, ch. 2007-136.

### 83.681 Orders to enjoin violations of this part. --

(1) A landlord who gives notice to a tenant of the landlord's intent to terminate the tenant's lease pursuant to s. 83.56(2)(a), due to the tenant's intentional destruction, damage, or misuse of the landlord's property may petition the county or circuit court for an injunction prohibiting the tenant from continuing to violate any of the provisions of that part.

(2) The court shall grant the relief requested pursuant to subsection (1) in conformity with the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases.

(3) Evidence of a tenant's intentional destruction, damage, or misuse of the landlord's property in an amount greater than twice the value of money deposited with the landlord pursuant to s. 83.49 or $300, whichever is greater, shall constitute irreparable harm for the purposes of injunctive relief.
**History.** --s. 8, ch. 93-255; s. 451, ch. 95-147.

Tenant (  ) (  ) and Landlord (  ) (  ) **acknowledge receipt of a copy of this page, which is Page 17 of 18.**

**83.682 Termination of rental agreement by a servicemember. --**

(1) Any servicemember may terminate his or her rental agreement by providing the landlord with a written notice of termination to be effective on the date stated in the notice that is at least 30 days after the landlord's receipt of the notice if any of the following criteria are met:

(a) The servicemember is required, pursuant to a permanent change of station orders, to move 35 miles or more from the location of the rental premises;

(b) The servicemember is prematurely or involuntarily discharged or released from active duty or state active duty;

(c) The servicemember is released from active duty or state active duty after having leased the rental premises while on active duty or state active duty status and the rental premises is 35 miles or more from the servicemember's home of record prior to entering active duty or state active duty;

(d) After entering into a rental agreement, the servicemember receives military orders requiring him or her to move into government quarters or the servicemember becomes eligible to live in and opts to move into government quarters;

(e) The servicemember receives temporary duty orders, temporary change of station orders, or state active duty orders to an area 35 miles or more from the location of the rental premises, provided such orders are for a period exceeding 60 days; or

(f) The servicemember has leased the property, but prior to taking possession of the rental premises, receives a change of orders to an area that is 35 miles or more from the location of the rental premises.

(2) The notice to the landlord must be accompanied by either a copy of the official military orders or a written verification signed by the servicemember's commanding officer.

(3) In the event a servicemember dies during active duty, an adult member of his or her immediate family may terminate the servicemember's rental agreement by providing the landlord with a written notice of termination to be effective on the date stated in the notice that is at least 30 days after the landlord's receipt of the notice. The notice to the landlord must be accompanied by either a copy of the official military orders showing the servicemember was on active duty or a written verification signed by the servicemember's commanding officer and a copy of the servicemember's death certificate.

(4) Upon termination of a rental agreement under this section, the tenant is liable for the rent due under the rental agreement prorated to the effective date of the termination payable at such time as would have otherwise been required by the terms of the rental agreement. The tenant is not liable for any other rent or damages due to the early termination of the tenancy as provided for in this section. Notwithstanding any provision of this section to the contrary, if a tenant terminates the rental agreement pursuant to this section 14 or more days prior to occupancy, no damages or penalties of any kind will be assessable.

(5) The provisions of this section may not be waived or modified by the agreement of the parties under any circumstances.

History. --s. 6, ch. 2001-179; s. 1, ch. 2002-4; s. 1, ch. 2003-30; s. 5, ch. 2003-72.

**83.683 Rental application by a servicemember. --**

(1) If a landlord requires a prospective tenant to complete a rental application before residing in a rental unit, the landlord must complete processing of a rental application submitted by a prospective tenant who is a servicemember, as defined in s. 250.01, within 7 days after submission and must, within that 7-day period, notify the servicemember in writing of an application approval or denial and, if denied, the reason for denial. Absent a timely denial of the rental application, the landlord must lease the rental unit to the servicemember if all other terms of the application and lease are complied with.

(2) If a condominium association, as defined in chapter 718, a cooperative association, as defined in chapter 719, or a homeowners' association, as defined in chapter 720, requires a prospective tenant of a condominium unit, cooperative unit, or parcel within the association's control to complete a rental application before residing in a rental unit or parcel, the association must complete processing of a rental application submitted by a prospective tenant who is a servicemember, as defined in s. 250.01, within 7 days after submission and must, within that 7-day period, notify the servicemember in writing of an application approval or denial and, if denied, the reason for the denial. Absent timely denial of the rental application, the association must allow the unit or parcel owner to lease the rental unit or parcel to the servicemember and the landlord must lease the unit or parcel to the servicemember if all other terms of the application and lease are complied with.

(3) The provisions of this section may not be waived or modified by the agreement of the parties under any circumstances.

Tenant (  ) (  ) and Landlord (  ) ( ) acknowledge receipt of a copy of this page, which is Page 18 of 18.

# **<u>EXHIBIT I</u>**

August 23-26, 2024 e-mails between Plaintiff and Defendant Geoff – Plaintiff confirms not responsible for Liam and Defendant Geoff acknowledgment

**August 23 – 26, 2024 Emails Rogelio (Roger) Nores and Geoff Payne**

**From:** geoff.payne.60 <███████████████>
**Sent:** lunes, 26 de agosto de 2024 06:31
**To:** Alan McEvoy <██████████>; Roger Nores ████████████████
**Cc:** Liam Payne <██████████████>; Ignacio Bard <██████████████>; Lawrence Engel
<████████████████████>
**Subject:** Re: Past 4 months

No suele recibir correos electrónicos de ████████████████. Por qué esto es importante

For clarification I'm referring to Roger's original email.


Also thank you for your call yesterday Roger. I have taken what you had to say on board.

Regards

Geoff.P

Sent from my Galaxy

-------- Original message --------

From: "geoff.payne.60" <████████████████>

Date: 26/08/2024 10:24 (GMT+00:00)

To: Alan McEvoy <█████████>, Roger Nores ████████████████

Cc: Liam Payne <██████████████>, Ignacio Bard <██████████████>, Lawrence Engel
<████████████████████>

Subject: Re: Past 4 months

Just to confirm. I retrieved this email from SPAM.

Regards

Geoff.P

Sent from my Galaxy

-------- Original message --------

From: Alan McEvoy <█████████████>

Date: 26/08/2024 10:00 (GMT+00:00)

1

RN/RNF/RNFD5004 emails August 23-26.2024

To: Roger Nores <███████████████████████>

Cc: "geoff.payne.60" <███████████████████████>, Liam Payne ███████████████████>, Ignacio Bard <███████████████>, Lawrence Engel ██████████████████████>

Subject: Re: Past 4 months

Thank you for your email Roger and apologies I missed your call on Friday evening.

I'm not sure any purpose would be served by a response from me at this stage.

 *'As discussed over the phone…'*

Just to be clear we didn't discuss anything over the phone as we didn't speak on Friday.

 Likewise, I'm copying Lawrence to keep him informed.

 Regards

 A

Alan McEvoy

Director LBM

From my iPhone

---

**From:** Roger Nores ████████████████████>
**Sent:** Friday, August 23, 2024 11:42 p.m.
**To:** Alan McEvoy ████████████████>
**Cc:** geoff.payne.60 <███████████████████████>; Liam Payne ██████████████████████>; Ignacio Bard <█████████████████>
**Subject:** Past 4 months

 Hey Alan,

 As discussed over the phone I wanted to send you a recap of the last 4 months.

 Liam stayed at my friend's ranch down in Palm beach and since the first day he arrived he was monitored and treated by professional doctors who specialize in addictions.

 He stayed fully clean without access to any hard drug during his whole stay.

2

RN/RNF/RNFD5004 emails August 23-26.2024

The plan was for him to work on the preparation for a music tour and stay healthy and busy with work.

A plan he successfully followed during his whole stay in the US.

I personally helped him close the Netflix building the band deal as instructed by him and he signed himself to CAA after going to their offices and meeting with their whole team multiple times.

I never received any salary inspite of having paid for a big part of his expenses during his stay including a private jet trip down in South America.

As you very well know I never sent an invoice for Liam to cover for my expenses either.

I don't need to get reimbursed for my out of pocket expenses as I helped him out as a friend.

Please note that now that he is back in the UK I decided to stop helping him as I don't live in Europe and frankly don't have the time anymore due to my business schedule.

I'm really concerned for his well-being while he is out there and I hope you can bring professional doctors to check on his health regularly as soon as possible as I did while he was out in the US.

I am going to stay fully out of the picture and disconnected from now on and I wish you all the best with Liam's health and career.

I also wanted to point out I received a call from Bledar today asking me to stop a payment coming out of Liam's JPMorgan personal account.

I wanted to make it very clear, Liam opened a personal account in JPMorgan by himself while he was in the US after meeting with JPMorgan representatives.

I don't have and I never had access, nor I'm authorized to even view his personal account and I am certainly not going to get involved with any of Liam's personal financial decisions.

I'm cc'ing Geoff and Liam as they can vouch for everything I am saying on this email.

Also cc'ing my lawyers from DLA Piper to keep them informed.

Thank you

Kind regards

Roger

RN/RNF/RNFD5004 emails August 23-26.2024

# <u>EXHIBIT J</u>

Defendant Geoff Payne 1st Sworn Declaration – October 22, 2024



**Ministerio Público de la Nación**

ANDRES E. MADREA
FISCAL

Ma. Florencia Lavagg
Secretaria

En la ciudad de Buenos Aires, a los veintidós días del mes de octubre de
dos mil veinticuatro, se presenta una persona previamente citada quien
este mismo acto lo hace POSF en compañía de la Lic. en psicología
María Sol Ferreira MN. 73082 del Cuerpo Único de Psicólogos de la
PCBA, y de su intérprete de confianza  Patricio Roitman -quien exhibe
DNI nro. 27.050.292- mediante el cual se le hace saber que se le va a
recibir declaración testimonial. Acto seguido, se le requirió el juramento
o promesa de decir verdad de todo cuanto supiere y le fuere preguntado,
de acuerdo con sus creencias, siendo instruida de las de las penas
correspondientes al delito de falsedad testimonial, para lo cual le fueron
leídas las disposiciones legales pertinentes del código penal, expresando
"LO JURO". Se le enuncian sus derechos previstos en los Arts. 79, 80 y
81 del Código Procesal Penal. Asimismo se le advierte de la facultad de
abstención prevista en el art. 243 del texto legal citado y el capítulo III
de la ley 27.372, para lo cual se le da lectura. Preguntada si tiene
vínculos con las partes intervinientes o algún interés particular en la
causa (art. 249 del mismo texto legal) contestó: "soy el papá de Liam".
Finalmente, dice llamarse: **Geoffrey Robert Payne, Pasaporte
británico nro. 536618957, de nacionalidad británica, nacido
el 28 de noviembre de 1960, de 63 años de edad, de estado
civil casado, jubilado, actualmente estoy hospedado en el
hotel Casa Lucia (arroyo 841 de esta Ciudad), teléfono de su
interprete                    1132443126,              email**
▬▬▬▬▬▬▬▬. Se deja constancia que las
preguntas y respuestas que se materializarán en el marco de esta
audiencia testimonial se realizarán por medio del nombrado intérprete
a pedido del declarante, en razón de que su lengua natal es el inglés
británico (idioma que la sumariante que esta a cargo de la redacción
también comprende) todo lo cual en este mismo acto el Sr. Fiscal
autoriza. Seguidamente, explicado el asunto, se lo invita a manifestar
cuanto conoce del mismo (art. 118 del C.P.P.N.), **refiere**: *"a Liam le
vencía su visa americana el 30 de septiembre de este año creo,
entonces en esa fecha aproximadamente eligió renovarla en
Argentina, yo estimo que porque Roger Nores -su amigo y luego
ampliaré al respecto- es residente en este país y porque además,*

entiendo que Liam aprovechó que uno de sus ex compañeros de la banda One Direction tocaba acá en Argentina. Este plan me lo contó Liam por teléfono y después también lo hablé con Nores. Tengo entendido por lo que Liam habló con Karen, su mamá y mi esposa, que la estadía era solamente por cinco días, después sé que se extendió pero no supe los motivos hasta que llegué a Argentina y me enteré que era por un tema de la VISA y los exámenes médicos que le exigían a Liam para renovarla. Quiero dejar en claro que Liam no tenía celular propio y era una decisión de él, en los últimos años cambió su celular numerosas veces. Él decidía estar desconectado como un método de protección para evitar las redes sociales y también para mantenerse alejado de la posibilidad de reincidir en sus adicciones. Esa decisión era personal de él y tenía todo el apoyo por parte del grupo familiar, en lo personal, yo estaba de acuerdo en que era realmente una forma de cuidarse para él. Por esa razón mi contacto telefónico con Liam no era directo, siempre era a través de terceros, particularmente, en su estadía última en Argentina fue a través de su novia Katlyne Cassidy (+4███████████) y de Roger Nores (+13███████████) quienes estaban a su cuidado por motivo de sus adicciones. A Katly por amor y Roger porque acompañaba y cuidaba a Liam en estos últimos meses y me reportaba a mí su estado". ***En este mismo acto el compareciente se compromete a aportar dentro de las próximas 48 horas las conversaciones mantenidas con Rogelio Nores y Katlyne Cassidy, además de las llamadas que efectúe con ellos durante su estadía en Argentina con Liam.*** "Lo mismo para mi grupo familiar (que está conformado por mi esposa, Karen, y mis dos hijas Ruth 33 y Nicola 36) que se contactaba con Liam de la misma manera, con las mismas personas que mencioné. A mí a veces el hecho de tener que hablar con mi hijo de esta manera, mediante otro, me hacía sentir mal, pero sabía que era lo mejor para él. Con Liam teníamos una relación muy fluida, nos veíamos todos lo meses generalmente en su casa, él vivía en Londres y yo vivo a dos horas de allí. La excusa para vernos era juntarnos con él y mi nieto, el hijo de Liam (Bear que tiene 7 años). Liam esta separado de la mamá de su hijo".-------------------------------------------------------------



*Ministerio Público de la Nación*

Ma. Florencia Lavaggi
Secretaria

ANDRES E. MADREA
FISCAL

**Preguntado por el Sr. Fiscal para que diga la forma en que tomó conocimiento del fallecimiento de su hijo Liam, respondió:** *"Yo tome conocimiento de la muerte de Liam por parte de Roger. Yo estaba en mi casa con mi mujer. Él me llamó a las 17.23 horas de acá, pero yo no vi la llamada hasta una hora después aproximadamente. En el medio me llamó una vez más y me mandó un mensaje para que lo llamara lo antes posible. Cuando vi todos esos llamados a las 18.18 horas de acá, le devolví el llamado. En el primer llamado le pregunté que había pasado y me respondió que tenía que venir para acá porque "sucedió un accidente", me decía "es verdad, es verdad" pero yo no entendía a que se refería. La llamada se cortó entonces lo llamé nuevamente, y Roger insistió en que tenía que yo que viajar para acá, pero no me confirmaba que era lo que había sucedido, le pregunté dos veces si Liam estaba muerto pero no lo único que me decía era que viniera para Argentina. Creo que no me lo quiso decir para no darme esa noticia estando yo allá, pero era obvio que iba a tomar conocimiento por los medios. Igualmente en ese momento yo me imaginé que algo malo le había pasado a Liam. Automáticamente me contacté con mi hijas y ellas ya estaban viendo en los medios lo que había sucedido y en ese momento rogábamos por esa noticia sea mentira. En el medio tengo llamadas perdidas de Roger que no contesté porque estaba hablando con mis hijas. Yo se las devolví luego pero él no me respondió, entiendo que era porque también estaba hablando con mis hijas. En ese momento decidí viajar a Argentina en el primer vuelo disponible. Sasha Jupp (que de ser necesario puedo aportar sus datos), que es la asistente personal de Liam en Londres, me organizó el viaje a Argentina con Paul -fue el antiguo tour manager de One Direction y jefe de seguridad, durante 14 años, muy cercano a Liam-, Jerry Cardona -parte el grupo de seguridad de One Direction- y Norberto Nava que es parte de una empresa de seguridad americana que se sumó al grupo. Yo llegué el viernes 18 a las 6.00 a Argentina. Con Roger no hablé mas ni de manera telefónica ni personalmente, solo me envío mensajes por WhatsApp con sus condolencias y diciéndome que me quería dar un abrazo y hablar conmigo personalmente pero yo sinceramente por el momento no*

*tengo energía para eso, estoy atravesando este duelo como puedo. También me envío mensajes una amiga o novia de él "Lula" manifestándome sus condolencias, no se como consiguió mi numero porque jamás se lo pasé, seguramente se lo dio Roger."* ------------------

**Preguntado por el Sr. Fiscal para que detalle el vinculo de sus hijas (hermanas de Liam) con Katlyne Cassidy, respondió:** *"Ruth era la mas cercana a la novia de Liam".*-----------------------------

**En base a lo narrado anteriormente, es preguntado por el Sr. Fiscal para que diga por qué imaginó que "algo malo" le había pasado a Liam y respondió:** *"en un primer momento por la forma de comunicación urgente que utilizó Roger al hablar conmigo, era distinto al trato habitual. Además habíamos luchado mucho por las adicciones de Liam y mi temor era que hubiera vuelto a ellas y particularmente tenia la sensación de que no lo cuidaban, mi miedo era que Liam con su personalidad cuando ocurrían estos episodios "se iba", no tenía el control con lo que hacía, no era Liam. No se como explicarlo. Liam era muy pensante cuando estaba sano."*----------------

**Preguntado por el Sr. Fiscal para que manifieste cuando fue la última vez que vio a Liam con vida, respondió:** *"La ultima vez que vi a Liam fue en Manchester, el 29 de agosto de este año, el día de su cumpleaños, en horas de la mañana. Estábamos juntos hospedados en un hotel en Manchester por cuestiones laborales de él que luego detallaré, yo lo estaba acompañando. Ese día, a la mañana, llegó mi mujer, nuestras hijas, y pasamos todo el día juntos y hasta la noche del día siguiente. También estaba el guardaespaldas que trabajó con Liam (lo tenía como artista por sus fans). Estuvimos juntos hasta la noche festejando en familia, aunque mis hijas se fueron más temprano. Con ganas de comenzar a tocar nuevamente, de comenzar nuevos proyectos."* ----------------------------------------------------------

**Preguntado por el Sr. Fiscal para que manifieste el estado físico y emocional de Liam en esa oportunidad, respondió:** *"él se veía bien. Yo estaba en Manchester hacía cinco días con Liam, paramos juntos en el mismo hotel. Desde el momento en que me jubilé, siempre que pude lo acompañé porque a Liam le servía ese sentimiento de familia, siempre que tuve la oportunidad y pude lo acompañé en su*



*Ministerio Público de la Nación*

ANDRES E. MADREA
FISCAL

Ma. Florencia Lavagni
Secretaria

*trabajo. En esa oportunidad lo vi bien, estable, limpio de cualquier droga o alcohol. Cuando yo me jubilé, Liam comenzó su carrera solista, entonces con mas razón siempre que podía lo acompañaba aunque sea solo por tres días".*-----------------------------------------------

**Preguntado por el Sr. Fiscal para que diga si Liam sufría de algún tipo de enfermedad o trastorno, respondió:** *"Liam sufría de consumo problemático de alcohol y drogas. Yo no tuve conocimiento directo de sus adicciones hasta el 24 de mayo el año 2015 que me lo comentó un guardaespaldas de él, en un evento. En esa época Liam viajaba mucho por trabajo y yo no tenía conocimiento pleno de su estado y situación, él siempre fue muy cerrado. Cuando me enteré ese mismo día lo confronté y empezamos como familia a estar mas cerca de él, me ocupaba en viajar más con él y acompañarlo, pero Liam siempre se ocupó de ocultarnos a mí y a toda la familia ese costado suyo y se mostraba bien delante nuestro. De hecho cada vez que él tenía una nueva recaída por sus adicciones tampoco me enteraba en ese mismo momento. Para mi era importante estar cerca de él y generar un vínculo de confianza aunque no siempre lo lograba. Incluso mi hija Ruth, quien tiene mayor confianza con él, siempre le preguntaba como estaba, generando un espacio donde él se pudiera abrir y contar lo que le pasaba, sabiendo las presiones a las cuales estaba expuesto por su trabajo, pero él tampoco le contaba demasiado. Nosotros somos una familia muy unida, pero Liam siempre se mostraba bien, se encargaba de estar bien enfrente nuestro para no preocuparnos. Yo al menos no estoy al tanto de otra patología de Liam, lo único que sé y tengo conocimiento es de sus adicciones al alcohol y drogas".*-------------------------------------------------

**Preguntado por el Sr. Fiscal para que informe si dicha patología se correspondía a un tratamiento psiquiátrico y/o psicológico, respondió:** *"Si. No se exactamente las fechas, pero en varios periodos Liam realizó tratamientos psiquiátricos y psicológicos por sus adicciones. Probablemente las primeras veces fueron por consejo médico, pero muchas veces fue por decisión propia de él. Él quería sanarse. Nosotros lo apoyamos siempre como grupo familiar y nos fue muy difícil y doloroso ver que él sufría este tipo de adicciones,*

*más cuando nadie de la familia es experto en eso, ni hay antecedentes de adicciones. Este año, entre enero y abril, no recuerdo exactamente la fecha exacta, Liam me llamó (no recuerdo desde que teléfono, pudo haber sido uno de Liam que tenía en ese momento o de su guardaespaldas, lo que si estoy seguro es que el guardaespaldas le dijo "avísale a tu papá" y él mismo) que estaba en el aeropuerto de Londres junto con su guardaespaldas para avisarme que estaba por tomarse un vuelo a Europa (prefiero no mencionar el destino exacto) para internarse voluntariamente y comenzar un tratamiento por el consumo problemático de droga y alcohol, era una decisión personal. Me dijo que yo quedaba a cargo de sus asuntos financieros. Yo en esa época lo estaba monitoreando, lo veía seguido y lo veía bien, me llamó la atención en ese momento, porque si yo lo hubiese visto mal hubiese accionado, pero igual como dije anteriormente, Liam se encargaba de mostrarse bien adelante mío y de mi familia para no preocuparnos. Este tratamiento duró dos semanas, yo creo que porque él no lo completó. Me llamó cuando estaba volviendo a su casa. Yo inmediatamente me fui a Londres antes que él llegara a su casa donde yo ya lo estaba esperando. Su novia también estaba en la casa. En esa oportunidad no lo vi del todo bien emocionalmente, ni anímicamente, pero si estaba receptivo para recibir ayuda, pasamos mucho tiempo juntos, yo en ese momento ya estaba pensando en que era muy necesario un programa para su recuperación, que luego hizo en mayo de este año en USA. El periodo en que él volvió de este corto tratamiento y hasta que comenzó su nuevo tratamiento en USA fue muy duro, y voy a intentar recapitular y contar lo mas que recuerde aunque emocionalmente para mi sea muy triste y difícil. Ese periodo de tiempo estuve viviendo con el varios días solos nosotros dos, su novia estaba de viaje, yo intenté hablar todo lo posible con Liam, caminábamos juntos, compartíamos momentos juntos y de esa forma intentaba ayudarlo aun sabiendo que yo no era un experto en el tema adicciones, hacia lo que podía en mi función de padre, estando nosotros dos solos, compartiendo tiempo en la casa de Liam. En esos días Liam no estaba bien, yo hablé con uno de sus guardaespaldas que*



*Ministerio Público de la Nación*

Ma. Florencia L____
Secretaria

ANDRES E. MADREA
FISCAL

*vino a vivir con nosotros. Estábamos los dos monitoreándolo todo el tiempo, porque estaba mal".*-----------------------------------

**Preguntado por el Sr. Fiscal para que describa a qué se refiere con que Liam "estaba mal", respondió:** *"no quiero extenderme en eso, él se enojaba con el mismo porque no podía curarse".*----------------

**El declarante continuó relatando:** *"Finalmente decidimos solicitar ayuda médica para que intervenga porque nosotros (yo y el guardaespaldas) ya no podíamos controlar la situación. Logramos mantenerlo, estabilizarlo, pero Liam no estaba mejorando. Estaba estable pero no mejoraba. En ese periodo Liam recibía llamadas de Roger, yo no sabía quién era (entiendo que su novia Kate le pasó el número porque no tenían a nadie más en común y evidentemente en ese momento Liam usaba un celular propio) él dice que nos habíamos visto antes en fiestas pero yo no lo reconocí. Yo en un principio no le respondía los llamados hasta que finalmente Liam le contestó el teléfono, lo puso en altavoz y todos escuchamos la conversación. Yo Liam y el guardaespaldas escuchamos que Roger le decía que sabia que su estado de salud no era bueno, y que como lo conocía hace mucho le ofrecía ayudarlo a cambio de nada. Le ofreció salir de Londres y hacer un buen tratamiento de recuperación en Miami. En ese momento Roger se mostró a entera disposición para Liam y en su cuidado, se ofreció a hacerse cargo de él y su recuperación. Esta llamada fue en horas de la noche, al día siguiente volamos a Miami los tres porque consideramos que ese cambio absoluto de ambiente iba a ser favorable para Liam. Roger nos fue a buscar al aeropuerto de Miami y nos fuimos todos a Wellington a una casa de campo que tiene canchas de polo, de un tal "Gon" amigo de Roger. Nos quedamos 10 semanas ahí con Liam, los cuatro. Durante ese tiempo formamos un equipo con Roger y el guardaespaldas para la recuperación de Liam, siempre monitoreado por psicólogos y psiquiatras, todos contactos de Roger por lo que yo ahora no tengo sus datos. La novia de Liam iba y venía, no se quedó las 10 semanas. Ese periodo para mi hijo fue muy positivo, estuvo muy bien, creo que estaba tomando algún tipo de medicación por este tema (desconozco cuales) limpio de drogas y alcohol. Los cuatro teníamos bien en claro que el propósito nuestro era*

el bienestar de Liam. En ese periodo también tuvimos varias reuniones con personajes del entretenimiento del mas alto nivel buscando ofertas laborales para Liam, todas concertadas por Roger, pero a pedido de Liam porque él quería trabajar. De hecho del 16 al 21 de mayo nos hicimos una escapada los cuatro (Liam, el guardaespaldas, Roger y yo) a Buenos Aires y a Uruguay para que Liam vea a Louis (ex compañero de One Direction) en algunos conciertos que tenía acá y se vaya familiarizando con la idea de volver a trabajar. Acá nos hospedamos en el Hotel Hyatt y fuimos unos días de paseo al campo de "Gon" el amigo de Roger que queda a 75 minutos de acá, no recuerdo exactamente donde. Liam allí estuvo jugando al polo, estaba muy bien. Regresamos directo a Wellington a la casa de campo y nos quedamos allí como dije, 10 semanas; Liam mientras estuvo en esa casa producía música. Incluso cerramos un show de TV que se luego se filmó en Manchester todo el mes de agosto de este año. El periodo de 10 semanas en la casa finalizó a mediados de julio, Liam estuvo limpio todo ese tiempo, eso lo puedo asegurar. Yo previo a ir a Manchester y acompañar a Liam en su trabajo, volé a mi casa para ver a mi familia. Mientras tanto, Liam se quedó en la casa de campo en USA junto con Roger y el guardaespaldas de siempre. Me dio la sensación de que era un lugar seguro para él, que estaba bien acompañado (el guardaespaldas es mi persona de confianza y Roger en ese momento y de manera voluntaria se ofreció hacerse cargo y responsabilizarse de Liam) y me pareció bien que se quedara hasta comenzar su trabajo en Manchester. La producción del show se retrasó y comenzó a mediados de agosto, el 15 aproximadamente, en esa fecha nos encontramos con Liam, el guardaespaldas y yo en Manchester. La primera idea era que Roger venga también, pero con este cambio de fecha no vino, no se donde estuvo en esa época, además tengo entendido que con Liam tenían arreglado que Roger no se iba a meter en las cuestiones artísticas de él según me comentó Liam. El trabajo de Manchester fue corto, en los días libres de Liam nos íbamos los tres a un hotel de campo para que este tranquilo. En la fiesta de finalización de grabación Liam tomo unas copas de alcohol pero bajo mi supervisión, fue todo muy tranquilo. En ningún momento ingirió ninguna droga ni



*Ministerio Público de la Nación*

ANDRES E. MADREA
FISCAL

Ma. Florencia Lavagg
Secretaria

*estuvo en un estado de ebriedad. La grabación culminó cerca de su*

*cumpleaños. Luego Liam se fue a Paris porque tenía un casamiento. Se*

*fue con el guardaespaldas, y allí lo esperaba su novia. Yo no quise*

*acompañarlos para no sumar mas gastos y aparte sabía que con ellos*

*dos él iba a estar bien cuidado. Siempre me mantuve en contacto con el*

*guardaespaldas para ver cómo estaba Liam, y me decían que él estaba*

*bien. Luego Liam y su novia en compañía del guardaespaldas se*

*fueron de vacaciones a una playa de Europa y cuando finalizaron las*

*vacaciones a mediados de septiembre, volvieron los tres a la casa de*

*campo en Wellington donde estaba esperándolos Roger. El*

*guardaespaldas se fue pero no sé por qué, se que Liam le dijo que se*

*fuera pero yo entiendo que fue porque Roger lo fue llevando a eso.*

*Entonces quedaron en la casa, Liam con su novia y Roger. Yo me*

*comuniqué con Liam a través del teléfono de su novia creo -fue la*

*última conversación telefónica que tuve con él- porque estaba muy*

*preocupado por él, porque había alejado de él al guardaespaldas que*

*era mi persona de confianza. Yo quería saber que era lo que estaba*

*pasando ahí, por qué le había dicho al guardaespaldas que tanto lo*

*había ayudado que se fuera. Le dije que desconfiaba de las intenciones*

*de Roger y Liam solamente me respondió que me quedara tranquilo.*

*Yo sabia que se le vencía la visa a Liam, después me enteré que había*

*decidido volar a Argentina para renovarla. En ese período yo le*

*preguntaba a Roger como estaba Liam y él me aseguraba que bien.*

*También me preocupé mucho por como había repercutido en él el tema*

*de las denuncias de público conocimiento que efectuó en su contra su*

*ex novia; la realidad es que no estuve con Liam pero entiendo que eso*

*lo afectó mucho a nivel emocional, aunque Roger y su novia me decían*

*que estaba bien. Ellos entiendo que tampoco deben haber podido*

*hablar mucho del tema con Liam porque el era una persona muy*

*cerrada con sus asuntos personales. Yo no pude viajar a Argentina*

*porque tenía chequeos médicos que hacerme que ya los había*

*postergado por la estadía en Wellington durante 10 semanas. El plan*

*de Liam era renovar la visa Americana en Argentina para volver a*

*Wellington y en noviembre ya me encontraría ahí con mi mujer (su*

*mamá). Después su estadía en Argentina se extendió por los motivos de la VISA".*----------------------------------------------------

**Preguntado por el Sr. Fiscal para que aporte los datos filiatorios y de contacto de los profesionales de la salud que estuvieron a cargo del ulterior tratamiento de Liam en USA y de aquellos que luego lo asistieron acá en Argentina como parte del procedimiento para renovar su visa norteamericana, respondió:** *"no, esos datos los tiene que tener Roger quien gestionó todo ese asunto".*----------------------------------

**En relación a la pregunta inmediata anterior, y más allá que Liam ha fallecido, por cortesía, es preguntado por el Sr. Fiscal para que diga si releva del secreto profesional de la psicóloga de Liam, respondió:** *"sí".*------------------------------------------

**Preguntado por el Sr. Fiscal para que describa como era la personalidad de Liam teniendo en cuenta su perfil altamente expuesto, respondió:** *"era una persona muy honesta, muy generoso, cariñoso, empático con sus fans, siempre estaba de buen humor, ayudaba a todo el mundo, donde el estaba se sentía una sensación de bienestar".* -------------------------------------------

**Preguntado por el Sr. Fiscal para que exponga si Liam sufrió intentos de quitarse la vida o autolesionarse, respondió:** *"yo no estoy al tanto de que él haya estado en esas circunstancias alguna vez en su vida. Por cuestiones de trabajo él se fue de casa de muy jovencito, a los 17 años, entonces es probable que yo muchas situaciones que él si haya vivido yo no las sepa, más teniendo en cuenta que él siempre se ocupaba por mostrarse bien frente a su familia para no preocuparnos. Pero nunca supe de manera directa o por quienes lo acompañaban de que hubiera sucedido algo así, ni que fuera motivo de conversación o dialogo con nadie".*----------------------

**Preguntado por el Sr. Fiscal para que detalle quiénes integraban el grupo familiar de Liam, respondió:** *"mi mujer, sus dos hermanas, su hijo, Cheryl (la mamá de Bear) y yo. Con todos tenía muy buena relación, pero tenía una relación más cercana con Ruth".*----------------------------------------------------------



Ma. Florencia Lavaggi
Secretaria

*Ministerio Público de la Nación*

ANDRES E. MADREA
FISCAL

**Preguntado por el Sr. Fiscal para que describa quiénes integraban el circulo de confianza de Liam, respondió:** *"en este último tiempo, su círculo de confianza era su novia, Roger y el guardaespaldas, además de nuestra familia, a quienes ya nombre".----*

**Preguntado por el Sr. Fiscal para que detalle la relación entre Liam y Rogelio Nores, respondió:** *"tengo entendido que ellos se conocieron hace 3 años, por amigos en común. Cuando Roger se enteró que Liam estaba mal por sus adicciones, como conté, se comunicó ofreciéndole ayuda a cambio de nada. Yo a Roger lo conocí en Miami, él dice que nos vimos en alguna fiesta anteriormente pero yo no lo recuerdo. Ellos dos tenían una relación de amistad, es verdad que Roger este año gestionó reuniones para que Liam ingresara en el mercado laboral nuevamente pero él decía que lo hacía para ayudarlo, no por algo a cambio ni con un contrato de por medio, buscaba sus relaciones nada más. Yo igualmente este último tiempo noté que Roger lo direccionaba a Liam para que se desarrollara más en los negocios que en su parte artística. Este cambio de dirección en lo laboral de Liam no era favorecedor para él, porque a él lo que le gustaba hacer y le hacía bien era hacer música. Liam sabía que yo creía que era errado dejara la música por las inversiones. Cuando yo lo conocí a Roger, él estaba enfocado en el bienestar de Liam y lo creí genuino; luego, Roger cambió su enfoque cuando intentó integrar a su novia al circulo de confianza que teníamos con Liam, su novia, el guardaespaldas y yo. No lo mencioné, pero un par de días apareció su novia en la casa de Wellington durante las 10 semanas que estuvimos en la casa de campo. Con el guardaespaldas observamos y empezamos a notar que Roger con su actitud le quitó importancia a la gravedad del problema de Liam (por ejemplo, algo menor que recuerdo es que hacía chistes con el tema frente a Liam). Yo lo que quiero dejar en claro es que Roger tenía total responsabilidad en el cuidado de Liam durante este último período cuando al menos yo no estaba, porque así él lo asumió cuando lo llamó por sus propios medios para brindarle ayuda en su tratamiento. De hecho fue el mismo Roger quien decidió acompañarlo a Liam en su última estadía en Buenos Aires como parte de todo este cuidado que el necesitaba. Cuidado del cual Roger estaba muy al*

tanto. El grupo de confianza y cuidado de Liam en un principio fuimos el guardaespaldas y yo, además de la novia de Liam, luego se sumó Roger y cuando yo me tuve que volver a mi casa y el guardaespaldas también, lo continuó Roger y la novia de Liam. Él estaba junto con Liam justamente para cuidarlo no por otro motivo, de hecho me reportaba regularmente su estado de salud. A Liam no se lo podía dejar solo y Roger lo sabía y cuando se rompió el formato de grupo de cuidado cuando la novia de Liam se fue, Roger le reservó una habitación a Liam para él solo y así fue como pasó lo que pasó. Porque Roger sabía que el objetivo del grupo era mantenerlo ocupado a Liam, no se lo podía dejar solo en la situación vulnerable en la que se encontraba, era incluso la recomendación que me había dado uno de los médicos en UK (no recuerdo sus datos) y esa era la base de la recuperación de Liam la cual era recordada siempre en el grupo de cuidado que incluía a Roger. Liam no podía estar solo y Roger era quien se había responsabilizado en ese cuidado, al menos en su estadía acá en Argentina."---------------------------------------------------------

**Preguntado por el Sr. Fiscal para que diga si tenía conocimiento de los cambios de hospedaje de Liam durante su ulterior estadía en Argentina, respondió:** "no, no estaba al tanto de los cambios ni de la existencia del hotel donde ocurrió el incidente".----------------------------------------------------------------

**Preguntado por el Sr. Fiscal para que diga describa su relación con Rogelio Nores, respondió:** "yo lo conocí cuando llegamos a Miami y mantuvimos esas semanas de convivencia para el recupero de Liam, tal como él mismo se había ofrecido. Cuando yo no estaba con Liam, y se quedaba con Roger quien se responsabilizaba de su cuidado, él era quien me reportaba su estado y a veces su guardaespaldas cuando estaba como artista".--------------------------

**Preguntado por el Sr. Fiscal para que describa el manejo de las finanzas de Liam, respondió:** "las finanzas de Liam las manejaba una persona de mi confianza, Alan McEvoy (si es necesario luego aportaré sus datos de contacto). Se que Roger intervino las finanzas de Liam pero eso es algo que estoy averiguando de manera interna con mi equipo de trabajo. Liam me había contado que el plan



*Ministerio Público de la Nación*

*era que Roger reemplace a Alan y de hecho no se concretó porque Liam falleció".----------------------------------------------------------*

**Preguntado por el Sr. Fiscal para que diga que marca era el reloj que utilizó últimamente Liam, respondió:** *"él que sé que estuvo utilizado en su estadía acá en Argentina era marca Rolex. Desconozco su número de serie.* **En este mismo acto aporta vía WhatsApp una foto de dicho reloj para mayor ilustración".----**

**En este mimos acto, POSF se le exhibe el bolso de mano secuestrado en el Hotel Casa sur y su contenido, oportunamente certificado en autos, ante lo cual el compareciente** refirió: *"reconozco que el bolso era propiedad de mi hijo, era su bolso de viaje. Jamás tuve acceso al mismo entonces no se si las cosas que hay adentro son de él, pero entiendo que sí, el usaba ese tipo de auriculares profesionales, sacapuntas usaba porque dibujaba, lo mismo para el cargador porque él tenia una computadora de esa misma marca, los medicamentos desconozco si eran de él. Igualmente, solicito se me haga entrega del bolso lo antes posible".-----*

**Preguntada por el Sr. Fiscal para que diga si desea agregar algo más, refirió:** *"lo único que quiero es ayudar en la investigación con todo lo que pueda hacer. Yo no tengo ninguna duda de que Liam quería vivir, no se me pasa por la cabeza que fuera posible la idea de que el haya querido lastimarse".-------------------------------------------*

Asimismo, a pedido del declarante y para mejor entendimiento, se procede a traducir esta declaración mediante el traductor ofrecido por la aplicación Word año 2021 del paquete Office cuya copia se le da a leer al compareciente y el traductor además lee en voz alta el acta en castellano para aclarar las cuestiones gramáticas que podrían surgir de la traducción automática, lo cual se deja en copia a continuación de la presente y como parte integral de la misma. No siendo para más se da por finalizado el acto, previa lectura y ratificación de su contenido, firmando la compareciente por ante mí el Fiscal de lo que doy fe.-

ANDRES E. MADREA
FISCAL



*Public Prosecutor's Office*

Ma. Florencia Lavage
Secretaria

ANDRES E. MADREA
FISCAL

In the city of Buenos Aires, on the twenty-second day of the month of October of two thousand and twenty-four, a previously mentioned person appeared, who did this same act POSF in the company of the Bachelor of Psychology María Sol Ferreira MN. 73082 of the Single Body of Psychologists of the PCBA, and his trusted interpreter Patricio Roitman -who exhibited DNI no. 27.050.292- by which he was made aware that he was leaving to receive witness statements. Immediately afterwards, she was required to swear an oath or promise to tell the truth of everything she knew and was asked, in accordance with her beliefs, being instructed of the penalties corresponding to the crime of false testimony, for which the pertinent legal provisions of the penal code were read to her, expressing "I SWEAR IT". The rights provided for in Articles 79, 80 and 81 of the Code of Criminal Procedure are set forth in him. He is also warned of the power of abstention provided for in article 243 of the aforementioned legal text and chapter III of Law 27,372, for which it is read. Asked if she has ties with the intervening parties or any particular interest in the case (art. 249 of the same legal text) she answered: "I am Liam's father." Finally, he says his name: **Geoffrey Robert Payne, British Passport No. 536618957, of British nationality, born on November 28, 1960, 63 years of age, of marital status, married, retired, I am currently staying at the Casa Lucia hotel (841 stream of this City), telephone of his interpreter 1132443126, email** ███████████████com. It is hereby stated that the questions and answers that will take place in the framework of this testimony hearing will be carried out by the appointed interpreter at the request of the deponent, because his native language is British English (a language that the investigator who is in charge of the drafting also understands), all of which the Prosecutor authorizes in this same act. Then, having explained the matter, he is invited to state what he knows about it (art. 118 of the C.P.P.N.), **he says:** *"Liam's American visa expired on September 30 of this year I think, so on that date approximately he chose to renew it in Argentina, I believe that because Roger Nores - his friend and I will expand on this later - is a resident in this country and because in addition, I understand that Liam took*

advantage of the fact that one of his former bandmates from the band One Direction played here in Argentina. Liam told me about this plan on the phone and later I also talked about it with Nores. I understand from what Liam spoke with Karen, his mom and my wife, that the stay was only for five days, then I know that it was extended but I did not know the reasons until I arrived in Argentina and I found out that it was due to a VISA issue and the medical exams that Liam was required to renew it. I want to make it clear that Liam did not have his own cell phone and it was his decision, in recent years he changed his cell phone numerous times. He decided to be disconnected as a method of protection to avoid social networks and also to stay away from the possibility of relapsing into his addictions. That decision was personal to him and he had all the support from the family group, personally, I agreed that it was really a way to take care of himself for him. For that reason my phone contact with Liam was not direct, it was always through third parties, particularly, in his last stay in Argentina it was through his girlfriend Katlyne Cassidy (+44⬛⬛⬛⬛⬛) and Roger Nores (+1⬛⬛⬛⬛⬛) who were in his care due to his addictions. To Katly for love and Roger because he accompanied and took care of Liam in these last months and reported his condition to me." ___In this same act, the complainant agrees to provide within the next 48 hours the conversations held with Rogelio Nores and Katlyne Cassidy, in addition to the calls he makes with them during his stay in Argentina with Liam.___ "The same for my family group (which is made up of my wife, Karen, and my two daughters Ruth 33 and Nicola 36) who contacted Liam in the same way, with the same people I mentioned. Sometimes the fact of having to talk to my son in this way, through another, made me feel bad, but I knew it was the best thing for him. Liam and I had a very fluid relationship, we saw each other every month usually at his house, he lived in London and I live two hours from there. The excuse to see each other was to get together with him and my grandson, Liam's son (Bear who is 7 years old). Liam is separated from his son's mother."------------
--------------------------------------------------------------------

Ma. Florencia Lavagg
Secretaria

*Public Prosecutor's Office*

**Asked by the Prosecutor to say how he became aware of the death of his son Liam, he replied:** *"I became aware of Liam's death from Roger. I was at home with my wife. He called me at 5:23 p.m. here, but I didn't see the call until about an hour later. In the middle he called me once again and sent me a message to call him as soon as possible. When I saw all those calls at 6:18 p.m. here, I called him back. In the first call I asked him what had happened and he replied that he had to come here because "an accident happened", he told me "it's true, it's true" but I didn't understand what he meant. The call was cut off so I called him again, and Roger insisted that I had to travel here, but he did not confirm what had happened, I asked him twice if Liam was dead but no, the only thing he told me was to come to Argentina. I think he didn't want to tell me so as not to give me that news while I was there, but it was obvious that he was going to learn about it through the media. Also at that moment I imagined that something bad had happened to Liam. I automatically contacted my daughters and they were already seeing in the media what had happened and at that moment we prayed that the news was a lie. In between I have missed calls from Roger that I didn't answer because I was talking to my daughters. I returned them to him later but he didn't answer me, I understand that it was because he was also talking to my daughters. At that moment I decided to travel to Argentina on the first available flight. Sasha Jupp (who if necessary I can provide her information), who is Liam's personal assistant in London, organized my trip to Argentina with Paul -he was the former tour manager of One Direction and head of security, for 14 years, very close to Liam-, Jerry Cardona -part of the security group of One Direction- and Norberto Nava who is part of an American security company that joined the group. I arrived on Friday the 18th at 6:00 a.m. in Argentina. I didn't talk to Roger anymore either on the phone or in person, he just sent me messages on WhatsApp with his condolences and telling me that he wanted to give me a hug and talk to me personally but honestly at the moment I don't have the energy for that, I'm going through this grief as best I can. A friend or girlfriend of his "Lula" also sent me messages expressing her condolences, I don't know*

*how he got my number because I never passed it to him, surely Roger gave it to him."* -----------------

**Asked by the Prosecutor to detail the bond of his daughters (Liam's sisters) with Katlyne Cassidy, he replied:** *"Ruth was the closest to Liam's girlfriend".*--------------------------

**Based on what was narrated above, he is asked by the Prosecutor to say why he imagined that "something bad" had happened to Liam and he answered:** *"at first because of the form of urgent communication that Roger used when talking to me, it was different from the usual treatment. We had also struggled a lot with Liam's addictions and my fear was that he had returned to them and I particularly had the feeling that they did not take care of him, my fear was that Liam with his personality when these episodes occurred "went away", he was not in control with what he did, he was not Liam. I don't know how to explain it. Liam was very thoughtful when he was healthy."* -----------------

**Asked by the Prosecutor to state when was the last time he saw Liam alive, he replied:** *"The last time I saw Liam was in Manchester, on August 29 of this year, on his birthday, in the morning hours. We were together staying in a hotel in Manchester for work reasons of his that I will detail later, I was accompanying him. That day, in the morning, my wife arrived, our daughters, and we spent the whole day together and until the night of the next day. There was also the bodyguard who worked with Liam (he had him as an artist by his fans). We were together until the evening celebrating as a family, although my daughters left earlier. Looking forward to starting to play again, to start new projects."* --------------------------------------

------------------------**Asked by Mr. Prosecutor to express Liam's physical and emotional state on that occasion, he replied:** "He looked good. I had been in Manchester for five days with Liam, we stopped together at the same hotel. From the moment I retired, whenever I could I accompanied him *because Liam was served by that feeling of family, whenever I had the opportunity and I could I accompanied him in his work. On that occasion I saw him well, stable, clean of any drugs or alcohol. When I retired, Liam began his solo*



*Ms. Florencia Lazog*
*Secretaria*

**Public Prosecutor's Office**

*career, so with more reason whenever I could I accompanied him even if it was only for three days".------------------------------------------------*

**Asked by the Prosecutor if Liam suffered from any type of disease or disorder, he replied:** *"Liam suffered from problematic alcohol and drug use. I did not have direct knowledge of his addictions until May 24, 2015, when a bodyguard of his told me about it, at an event. At that time Liam traveled a lot for work and I did not have full knowledge of his condition and situation, he was always very closed. When I found out that same day I confronted him and we began as a family to be closer to him, I was busy traveling more with him and accompanying him, but Liam always took care to hide that side of him from me and the whole family and he showed himself well in front of us. In fact, every time he had a new relapse due to his addictions, I didn't know about it at that very moment. For me it was important to be close to him and generate a bond of trust although he did not always succeed. Even my daughter Ruth, who has more confidence in him, always asked him how he was, generating a space where he could open up and tell what was happening to him, knowing the pressures to which he was exposed by his work, but he did not tell her too much either. We are a very close family, but Liam always showed himself well, he was in charge of being well in front of us so we didn't worry. At least I am not aware of Liam's other pathology, the only thing I know and have knowledge of is his addictions to alcohol and drugs---------------------------------------------------------------."*

**Asked by the Prosecutor to report whether this pathology corresponded to psychiatric and/or psychological treatment, he replied:** *"Yes. I don't know exactly the dates, but in several periods Liam underwent psychiatric and psychological treatments for his addictions. Probably the first times it was on medical advice, but many times it was by his own decision. He wanted to be healed. We always supported him as a family group and it was very difficult and painful for us to see that he suffered from this type of addiction, especially when no one in the family is an expert in that, nor is there a history of addictions. This year, between January and April, I don't remember exactly the exact date, Liam called me (I don't remember from which*

phone, it could have been one of Liam's that he had at that time or his bodyguard, what I am sure is that the bodyguard told him "let your dad know" and himself) that he was at the London airport with his bodyguard to let me know that he was about to take a flight to Europe (I prefer not to mention the exact destination) to voluntarily enter and begin treatment for problematic drug and alcohol use, was a personal decision. He told me that I was in charge of his financial affairs. At that time I was monitoring him, I saw him often and I saw him well, he caught my attention at that moment, because if I had seen him wrong I would have acted, but as I said before, Liam was in charge of showing himself well in front of me and my family so as not to worry us. This treatment lasted two weeks, I think because he did not complete it. He called me when he was returning home. I immediately left for London before he reached his house where I was already waiting for him. His girlfriend was also in the house. At that time I didn't see him well emotionally, or emotionally, but if he was receptive to receive help, we spent a lot of time together, at that time I was already thinking that a program for his recovery was very necessary, which he then did in May of this year in the USA. The period in which he returned from this short treatment and until he started his new treatment in the USA was very hard, and I will try to recap and tell as much as I remember although emotionally for me it is very sad and difficult. That period of time I was living with him for several days just the two of us, his girlfriend was traveling, I tried to talk as much as possible with Liam, we walked together, we shared moments together and in that way I tried to help him even knowing that I was not an expert on the subject of addictions, I did what I could in my role as a father,  the two of us being alone, sharing time at Liam's house. In those days Liam was not well, I spoke to one of his bodyguards who came to live with us. We were both monitoring him all the time, because he was in a bad way."----------------------------------------------- --

**Asked by the Prosecutor to describe what he means by Liam "being bad", he replied:** "I don't want to dwell on that, he was angry with himself because he couldn't be cured".----------------

Ma. Florencia Lavaggi
Secretaria

*Public Prosecutor's Office*

**The witness continued:** "*We finally decided to request medical help to intervene because we (me and the bodyguard) could no longer control the situation. We managed to keep him, stabilize him, but Liam wasn't getting better. He was stable but not improving. In that period Liam received calls from Roger, I didn't know who he was (I understand that his girlfriend Kate gave him the number because they had no one else in common and obviously at that time Liam used his own cell phone) he says that we had seen each other before at parties but I didn't recognize him. At first I didn't answer his calls until finally Liam answered the phone, put it on speakerphone and we all heard the conversation. I, Liam, and the bodyguard heard Roger tell him that he knew that his health was not good, and that since he had known him for a long time, he offered to help him in exchange for nothing. He offered to leave London and do a good recovery treatment in Miami. At that moment Roger was entirely available to Liam and in his care, he offered to take care of him and his recovery. This call was at night, the next day the three of us flew to Miami because we considered that this absolute change of environment was going to be favorable for Liam. Roger picked us up at the Miami airport and we all went to Wellington to a country house that has polo fields, owned by a certain "Gon" friend of Roger's. We stayed there for 10 weeks with Liam, the four of us. During that time we formed a team with Roger and the bodyguard for Liam's recovery, always monitored by psychologists and psychiatrists, all of Roger's contacts so I don't have their details now. Liam's girlfriend came and went, she didn't stay for 10 weeks. That period for my son was very positive, he was very good, I think he was taking some kind of medication for this issue (I don't know which ones) clean of drugs and alcohol. The four of us were very clear that our purpose was Liam's well-being. In that period we also had several meetings with high-level entertainment personalities looking for job offers for Liam, all arranged by Roger, but at Liam's request because he wanted to work. In fact, from May 16 to 21 the four of us (Liam, the bodyguard, Roger and me) went on a trip to Buenos Aires and Uruguay so that Liam could see Louis (former One Direction bandmate) in some concerts he had here and get familiar with the idea*

*of going back to work. Here we stayed at the Hyatt Hotel and went for a few days on a walk to the countryside of "Gon" Roger's friend who is 75 minutes from here, I don't remember exactly where. Liam was playing polo there, he was very good. We went straight back to Wellington to the cottage and stayed there as I said, 10 weeks; Liam while he was in that house produced music. We even closed a TV show that was then filmed in Manchester for the entire month of August this year. The 10-week period in the house ended in mid-July, Liam was clean all that time, I can assure you. Before going to Manchester and accompanying Liam at work, I flew home to see my family. Meanwhile, Liam stayed at the country house in the USA along with Roger and the usual bodyguard. I had the feeling that it was a safe place for him, that he was in good company (the bodyguard is my trusted person and Roger at that time and voluntarily offered to take charge and take responsibility for Liam) and I thought it was good that he stayed until he started his work in Manchester. The production of the show was delayed and began in mid-August, on the 15th approximately, on that date we met Liam, the bodyguard and me in Manchester.  The first idea was that Roger would come too, but with this change of date he did not come, I don't know where he was at that time, I also understand that with Liam they had arranged that Roger was not going to get involved in his artistic issues as Liam told me. Manchester's work was short, on Liam's days off the three of us would go to a country hotel to make him quiet. At the end of the recording party Liam had a few drinks of alcohol but under my supervision, it was all very calm. At no time did he ingest any drugs or was he in a state of drunkenness. The recording ended around his birthday. Then Liam went to Paris because he had a wedding. He left with the bodyguard, and his girlfriend was waiting for him there. I didn't want to accompany them so as not to add more expenses and I also knew that with the two of them he was going to be well taken care of. I always kept in touch with the bodyguard to see how Liam was doing, and they told me he was fine. Then Liam and his girlfriend in the company of the bodyguard went on vacation to a beach in Europe and when the vacation ended in mid-September, the three of them returned*

Ma. Florencia Lavagg
Secretaria

*Public Prosecutor's Office*

*to the country house in Wellington where Roger was waiting for them. The bodyguard left but I don't know why, I know Liam told him to leave but I understand that it was because Roger was taking him to that. Then they met at the house, Liam with his girlfriend and Roger. I communicated with Liam through his girlfriend's phone I think — it was the last phone conversation I had with him — because I was very worried about him, because I had taken the bodyguard away from him who was my trusted person. I wanted to know what was going on there, why he had told the bodyguard who had helped him so much to leave. I told him I wasn't suspicious of Roger's intentions and Liam just told me to stay calm. I knew that Liam's visa was expiring, then I found out that he had decided to fly to Argentina to renew it. At that time I asked Roger how Liam was doing and he assured me that he was fine. I was also very concerned about how the issue of the publicly known complaints made against him by his ex-girlfriend had affected him; the reality is that I was not with Liam but I understand that it affected him a lot on an emotional level, although Roger and his girlfriend told me that he was fine. They understand that they must not have been able to talk much about it with Liam either because he was a very closed person with his personal affairs. I couldn't travel to Argentina because I had medical check-ups to do that I had already postponed because of the stay in Wellington for 10 weeks. Liam's plan was to renew the American visa in Argentina to return to Wellington and in November I would meet my wife (his mother) there. Later his stay in Argentina was extended for the reasons of the VISA".------------*
---------------------------------------------

**Asked by the Prosecutor to provide the filiation and contact details of the health professionals who were in charge of Liam's subsequent treatment in the USA and those who later assisted him here in Argentina as part of the procedure to renew his US visa, he replied:** *"No, that data must be in Roger who managed the whole matter".*--------------------------------- **In relation to the immediately previous question, and beyond the fact that Liam has died, out of courtesy, he is asked by the Prosecutor to say if he relieves Liam's psychologist of**

**professional secrecy, he answered:** "*yes*".---------------------------
---------------------

**Asked by Mr. Prosecutor to describe what Liam's personality was like taking into account his highly exposed profile, he replied:** "*he was a very honest person, very generous, affectionate, empathetic with his fans, he was always in a good mood, he helped everyone, where he was he felt a sense of well-being.*" --------------------
-----------------------------------

**Asked by the Prosecutor to explain whether Liam suffered attempts to take his own life or self-harm, he replied:** "*I am not aware that he has ever been in those circumstances in his life. For work reasons he left home at a very young age, at 17 years old, so it is likely that I do not know many situations that he has experienced, especially considering that he always took care to show himself well in front of his family so as not to worry us. But I never knew directly or from those who accompanied him that something like this had happened, or that it was a reason for conversation or dialogue with anyone.*"----------------------

**Asked by the Prosecutor to detail who made up Liam's family group, he replied:** "*My wife, his two sisters, his son, Cheryl (Bear's mother) and me. I had a very good relationship with everyone, but I had a closer relationship with Ruth.*"---------------------------------------
--------------------------

**Asked by the Prosecutor to describe who made up Liam's circle of trust, he replied:** "*In recent times, his circle of trust was his girlfriend, Roger and the bodyguard, in addition to our family, whom I have already name----d.*"

**Asked by the Prosecutor to detail the relationship between Liam and Rogelio Nores, he replied:** "*I understand that they met 3 years ago, through mutual friends. When Roger found out that Liam was in a bad way because of his addictions, as I said, he reached out offering him help in exchange for nothing. I met Roger in Miami, he says that we saw each other at a party before but I don't remember. The two of them had a friendly relationship, it is true that Roger this year arranged meetings for Liam to enter the job market again but he*

Ma. Florencia Lavaggi
Secretaria

*Public Prosecutor's Office*

said that he did it to help him, not for something in return or with a contract in between, he was looking for his relationships nothing more. I also noticed that Roger directed Liam to develop more in business than in his artistic part. This change of direction in Liam's work was not favorable for him, because what he liked to do and did him good was to make music. Liam knew that I thought it was wrong for me to leave music for investments. When I met Roger, he was focused on Liam's well-being and I believed it to be genuine; then, Roger changed his focus when he tried to integrate his girlfriend into the circle of trust we had with Liam, his girlfriend, the bodyguard, and me. I didn't mention it, but a couple of days his girlfriend showed up at Wellington's house during the 10 weeks we were at the cottage. With the bodyguard we observed and began to notice that Roger with his attitude downplayed the seriousness of Liam's problem (for example, something minor that I remember is that he made jokes about the subject in front of Liam).  What I want to make clear is that Roger had full responsibility for Liam's care during this last period when at least I was not there, because that is how he assumed it when he called him by his own means to help him in his treatment. In fact, it was Roger himself who decided to accompany Liam on his last stay in Buenos Aires as part of all this care he needed. Care of which Roger was well aware. Liam's trust and care group at first were the bodyguard and I, in addition to Liam's girlfriend, then Roger joined and when I had to go back to my house and the bodyguard too, Roger and Liam's girlfriend continued. He was together with Liam precisely to take care of him for no other reason, in fact he regularly reported his state of health to me. Liam couldn't be left alone and Roger knew it and when the care group format broke when Liam's girlfriend left, Roger booked Liam a room for himself and that's how what happened happened. Because Roger knew that the objective of the group was to keep Liam busy, he could not be left alone in the vulnerable situation in which he was, it was even the recommendation that one of the doctors in the UK had given me (I don't remember his details) and that was the basis of Liam's recovery which was always remembered in the care group that included Roger. Liam could not be alone and Roger was the one who

had taken responsibility for that care, at least during his stay here in Argentina." --------------------------------------------------------------

**Asked by the Prosecutor to say if he was aware of Liam's changes of accommodation during his subsequent stay in Argentina, he replied:** "no, I was not aware of the changes or the existence of the hotel where the incident occurred".------------------------
----------------------------------------------

**Asked by the Prosecutor to describe his relationship with Rogelio Nores, he replied:** "I met him when we arrived in Miami and we maintained those weeks of coexistence for Liam's recovery, as he himself had offered. When I wasn't with Liam, and he stayed with Roger who was responsible for his care, he was the one who reported his condition to me and sometimes his bodyguard when he was an artist." ------------------------

**Asked by Mr. Prosecutor to describe the handling of Liam's finances, he replied:** "Liam's finances were handled by a person I trust, Alan McEvoy (if necessary I will provide his contact details later). I know that Roger intervened Liam's finances but that is something that I am finding out internally with my work team. Liam had told me that the plan was for Roger to replace Alan and in fact it didn't come to fruition because Liam passed away." --------------------
--------------------------------------------------

**Asked by the Prosecutor to say what brand was the watch that Liam used lately, he replied:** "The one that I know was used during his stay here in Argentina was a Rolex brand. I don't know your serial number. **In this same act he provides via WhatsApp a photo of said watch for further illustration**".----

**In this same act, POSF is shown the handbag seized from the Casa Sur Hotel and its contents, opportunely certified in the records, to which the complainant** said: "I recognize that the bag was my son's property, it was his travel bag. I never had access to it so I don't know if the things inside are his, but I understand that yes, he used that type of professional headphones, pencil sharpener he used because he drew, the same for the charger because he had a computer



**Public Prosecutor's Office**

*of the same brand, I don't know if the medicines were his. Likewise, I request that the bag be delivered to me as soon as possible."*-----

**Asked by the Prosecutor to say if she wants to add anything else, she said:** *"The only thing I want is to help in the investigation with everything I can do. I have no doubt that Liam wanted to live, it doesn't cross my mind that it was possible that he wanted to hurt himself."*--------------------------------------------

Likewise, at the request of the deponent and for better understanding, this statement is translated using the translator offered by the Word application year 2021 of the Office package, a copy of which is given to the person appearing and the translator also reads aloud the minutes in Spanish to clarify the grammatical issues that could arise from the machine translation. which is left in copy below and as an integral part of it. Not being for more, the act is considered to be terminated, after reading and ratifying its contents, the Prosecutor signing before me, of which I attest.

ANDRES E. MADREA
FISCAL

Ma. Florencia Lavage
Secretaria

# **<u>EXHIBIT K</u>**

Defendant Geoff Payne 2nd Sworn Declaration – October 25, 2024



**Certified Translation**



*In the Business of Helping*
*People since 2002.*

Buenos Aires, October 25, 2024.

[There are two signatures]

Mr. Prosecutor, in charge of the National Criminal and Correctional Prosecutor's Office Number 14, Dr. Madrea:

I, the undersigned Geoff Payne, Passport Number 53▆▆▆▆▆, father of the victim in this investigation, Liam Payne, am addressing you in order to bring to your attention an email received today from Mr. Bledi Vata to the mailbox of Mr. Paul Higgins, from the mailbox ▆▆▆▆@gmail.com, which was originally sent on 09/16/24 from the mailbox of Dr. Rachel Rohaidy from her mailbox ▆▆▆▆@hotmail.com, informing a conversation between the aforementioned Rohaidy and Mr. Rogelio Nores, where she indicates that she is writing that letter to him, since she did not have Liam's email, and literally states as follows: "UNDER THESE CIRCUMSTANCES, UNFORTUNATELY, I DO NOT FEEL COMFORTABLE WITH CONTINUING WITH LIAM'S PSYCHIATRIC CARE. THESE MEDICATIONS ARE DELICATE AND MIXING THEM WITH ALCOHOL CAN BE DEADLY. I DO NOT HAVE THE STAFF TO HELP LIAM DURING HIS CRISIS, NOR DO I HAVE TIME OF MY OWN TO HANDLE THE TWO HOURS IT SOMETIMES TAKES ME. I BELIEVE WITH ALL MY HEART THAT HE NEEDS ONE-ON-ONE CARE, WHICH I AM NOT IN A POSITION TO PROVIDE." After that, she finishes the note with a greeting.

In the same email, the doctor attached a letter addressed to Liam that reads: "DEAR MR. PAYNE, I HOPE THIS LETTER FINDS YOU WELL. I AM WRITING TO INFORM YOU THAT I WILL NOT BE AVAILABLE TO CONTINUE YOUR PSYCHIATRIC CARE. AFTER CAREFUL CONSIDERATION OF YOUR NEEDS, I BELIEVE THAT YOU NEED A HIGHER LEVEL OF CARE, WHICH I UNFORTUNATELY CANNOT PROVIDE YOU THROUGH MY PRACTICES.

THE IMPORTANT FACTORS TO CONSIDER ARE THE FOLLOWING:

1) MEDICATION ADHERENCE: YOU MUST TAKE THE MEDICATIONS EXACTLY AS PRESCRIBED. THIS MEANS ORALLY, AS INSTRUCTED, AND NOT IN ANY OTHER WAY, SUCH AS SNORTING IT. ALTERING THE METHOD OF ADMINISTRATION MAY BE DANGEROUS AND SIGNIFICANTLY REDUCE THE EFFECTIVENESS OF THE TREATMENT.

2) ALCOHOL CONSUMPTION: YOU SHOULD AVOID HEAVY CONSUMPTION OF ALCOHOL WHILE UNDER TREATMENT. ACCORDING TO THE NATIONAL HEALTH INSTITUTE, MODERATE DRINKING IS DEFINED AS ONE DRINK PER DAY FOR WOMEN, AND UP TO TWO DRINKS PER DAY FOR MEN. IT IS ESSENTIAL TO ADHERE TO THESE ORDERS TO PREVENT ANY NEGATIVE INTERACTION WITH YOUR MEDICATION AND TO SUPPORT YOUR OVERALL MENTAL HEALTH

3) THERAPY SESSIONS: IT IS VITAL THAT YOU TALK TO A THERAPIST ON A WEEKLY BASIS TO PROCESS YOUR DEPRESSION AND YOUR TRAUMA. REGULAR THERAPY SESSIONS WILL PROVIDE YOU WITH THE SUPPORT AND STRATEGIES NEEDED TO MANAGE THESE ISSUES EFFECTIVELY.

4) COMPLIANCE WITH MEDICATION AND DIAGNOSTIC TESTS: COMPLYING WITH YOUR MEDICATION REGIME IS CRUCIAL. ADDITIONALLY, YOU SHOULD REQUIRE NEUROPSYCHIATRIC TESTING FOR A COMPREHENSIVE EVALUATION OF YOUR DIAGNOSIS. GENETIC TESTING MAY ALSO BE BENEFICIAL IN GUIDING YOU IN MANAGING YOUR MEDICATION AND ENSURING THAT YOU ARE RECEIVING THE MOST EFFECTIVE TREATMENT.

5) PRIMARY CARE COORDINATION: ESTABLISHING CARE WITH A PRIMARY CARE THERAPIST IS KEY. REGULAR BLOOD TESTS, INCLUDING URINE ANALYSIS, ELECTROPHYSIOLOGY AND TOXICOLOGICAL SCANS, ARE NECESSARY TO MONITOR YOUR OVERALL HEALTH AND THE IMPACT OF MEDICATIONS.

IT IS IMPORTANT TO ME THAT YOU RECEIVE THE APPROPRIATE CARE AND SUPPORT NECESSARY FOR YOUR WELL-BEING. I RECOMMEND THAT YOU SEEK A SPECIALIST OR A FACILITY THAT CAN OFFER YOU THE INTENSIVE CARE AND RESOURCES YOU NEED AT ALL TIMES.

TO ASSIST WITH THIS TRANSITION, HERE IS A LIST OF THERAPISTS IN YOUR AREA WHO MAY BE ABLE TO HELP YOU WITH YOUR NEEDS



**Certified Translation**



*In the Business of Helping People since 2002.*

1)   ANGELA CONWAY 305-▒▒▒▒▒
2)   ANN EUSTACE MS LMHC ▒▒▒▒▒
3)   HANLEY CENTER REHAB
4)   CARON TREATMENT CENTER
5)   RIVERSIDE RECOVERY OF TAMPA

THANK YOU FOR YOUR UNDERSTANDING AND I WISH YOU THE BEST IN YOUR CONTINUING JOURNEY TOWARDS YOUR MENTAL HEALTH AND WELLBEING. SINCERELY, RACHEL ROHAIDY MD, PSYCHIATRIST."

It should be noted that Mr. Bledi Vata (▒▒▒@gmail.com) turns out to be the person who was Liam's bodyguard in London (Great Britain) and Florida (USA) from August 2023 to September 17, 2024. He provided his cell phone number: +447▒▒▒▒▒ That Mr. Vata was fired from his job as a bodyguard by Liam. The reason was that when psychiatrist Dr. Rohaidy resigned from her position, Liam went to see another psychiatrist with Rogelio Nores, and they both hid Liam's problems with alcohol and drugs in order for him to prescribe psychiatric medication and avoid giving him the care recommendations that Dr. Rohaidy had given him. That, due to this situation, Vata decided to visit the new psychiatrist alone and he informed him the real problems that Liam had. Because of this, Rogelio Nores spoke with Liam and manipulated him into firing him, which Liam did on September 17, 2024.

Likewise, Dr. Rachel Rohaidy (▒▒▒@hotmail.com) happens to be Liam's treating psychiatrist in Florida (USA) until September 16, 2024.

[There follow three pages in English]

I attach hereto the referred email, and declare that Mr. Patricio Roitman, Identity Document Number 27050292, acted as translator upon my request, and signed all the documents together with me.

For the above reasons, I hereby submit this document for the corresponding purposes.

[There is a signature.]                                     [There is a signature.]
G.R. Payne                                                          Patricio Roitman

[There is a stamp:] RECEIVED ON 10/28/2024 AT 10:00 AM. CERTIFIED - CRIMINAL AND CORRECTIONAL PROSECUTOR'S OFFICE NUMBER 14

[There is a signature and a stamp:] Ma. Florencia Lavaggi - Secretary

**CERTIFICATION: Translation from Spanish into English**

I, Diego D. Rodriguez, a professional translator with over 20 years of experience in the translation business, member number 231266 of the American Translators Association, President and Director of Tranlanguage Inc., a certified translation services company duly incorporated in the State of Florida, hereby certify the foregoing to be a translation made by a professional and qualified translator, fluent in the abovementioned languages and experienced in the translation of this type of documents. To the best of my knowledge and belief, this translator produced a true and accurate translation of the pertinent part of the photocopy of the source document, which is attached hereto. This certification does not cover the legitimacy of the source document nor the truthfulness of the information contained therein. In witness whereof, I set my hand and seal on January 13, 2025.

Translator Diego Rodriguez
American Translators Association
ATA member number 231266

Digitally signed by Diego D Rodriguez
DN: cn=Diego D Rodriguez,
o=Tranlanguage Inc., ou=Tranlanguage
Inc., email=info@tranlanguage.com, c=US
Adobe Acrobat DC version:
2015.006.30482

Buenos Aires, 25 de Octubre de 2024.-

Señor Fiscal, a cargo de la Fiscalía Nacional en lo Criminal y Correccional Nro. 14, Dr. Madrea:

Quien suscribe Geoff Payne, Pasaporte Nro. 5366⬛⬛⬛, padre del damnificado en la presente investigación Liam Payne, me dirijo a Ud. a los fines de poner en su conocimiento en relación a un email recibido el día de la fecha por parte del señor Bledi Vata a la casilla del señor Paul Higgins, desde la casilla ⬛⬛⬛⬛⬛⬛⬛⬛ el cual es enviado primeramente el 16/09/24 desde la casilla de la Dra. Rachel Rohaidy desde su casilla ⬛⬛⬛⬛⬛⬛⬛⬛, dando cuenta de una conversación entre la mentada Rohaidy y el señor Rogelio Nores, donde le indica que le escribe esa carta a él, por carecer del email de Liam, y textualmente indica "BAJO ESTAS CIRCUNSTANCIAS DESAFORTUNADAMENTE, NO ME SIENTO CÓMODA PARA CONTINUAR CON EL CUIDADO PSIQUIÁTRICO DE LIAM. ESTAS MEDICACIONES SON DELICADAS Y MEZCLARLAS CON ALCOHOL PUEDE SER MORTAL. YO NO CUENTO CON EL PERSONAL PARA AYUDAR A LIAM DURANTE SUS CRISIS, NI TAMPOCO TENGO TIEMPO PROPIO PARA MANEJAR LAS DOS HORAS QUE A VECES ME TOMA. YO CREO DE TODO CORAZÓN QUE ÉL NECESITA UN CUIDADO DE PERSONA A PERSONA, QUE YO NO ESTOY EN CONDICIONES DE PROVEER". Luego de ello finaliza la nota con un saludo.-

En el mismo correo adjunta la facultativa una carta dirigida a Liam que reza: "QUERIDO SEÑOR PAYNE, ESPERO QUE ESTA CARTA TE ENCUENTRE BIEN, TE ESCRIBO PARA INFORMARTE QUE NO ESTARÉ DISPONIBLE PARA CONTINUAR CON TU CUIDADO PSIQUIÁTRICO. DESPUÉS DE UNA CUIDADOSA CONSIDERACIÓN DE TUS NECESIDADES, YO CREO QUE NECESITAS UN NIVEL MAS ALTO DE CUIDADO, EL CUAL YO DESAFORTUNADAMENTE NO PUEDO PROVEERTE CON MIS PRÁCTICAS.

LOS FACTORES IMPORTANTES A CONSIDERA SON LOS SIGUIENTES:

1) ADHERENCIA A LA MEDICACIÓN: DEBES TOMAR LAS MEDICACIONES EXACTAMENTE COMO SON PRESCRIPTAS. ESTO SIGNIFICA DE MANERA ORAL, COMO SI INSTRUYÓ Y NO DE NINGUNA OTRA MANERA, COMO POR EJEMPLO ASPIRÁNDOLA. ALTERAR EL MÉTODO DE ADMINISTRACIÓN, PUEDE SER PELIGROSO Y REDUCIR SIGNIFICATIVAMENTE LA EFECTIVIDAD DEL TRATAMIENTO.

2) CONSUMO DE ALCOHOL: DEBES EVITAR CONSUMIR ALCOHOL DE FORMA PESADA MIENTRAS ESTAS EN TRATAMIENTO, DE ACUERDO AL INSTITUTO NACIONAL DE SALUD, BEBER MODERADAMENTE SE DEFINE COMO UN TRAGO POR DÍA PARA LAS MUJERES, Y HASTA DOS TRAGOS POR DÍA PARA LOS HOMBRES. ES ESENCIAL ADHERIR A ESTAS ÓRDENES PARA PREVENIR CUALQUIER INTERACCIÓN NEGATIVA CON TU MEDICACIÓN Y PARA APOYAR TU SALUD MENTAL GENERAL.-

3) SESIONES DE TERAPIA: ES VITAL QUE HABLES CON UN TERAPEUTA, CON UNA BASE SEMANAL PARA PROCESAR TU DEPRESIÓN Y TU TRAUMA. SESIONES DE TERAPIA

REGULARES TE PROVEERÁ EL SOPORTE Y LAS ESTRATEGIAS NECESARIAS PARA MANEJAR ESTOS TEMAS EFECTIVAMENTE.-

4) CUMPLIMIENTO CON LA MEDICACIÓN Y EXÁMENES DE DIAGNÓSTICO: CUMPLIR CON EL RÉGIMEN DE MEDICACIÓN ES CRUCIAL. ADICIONALMENTE DEBERÍAS REQUERIR EXÁMENES NEUROPSIQUIATRICOS PARA UNA EVALUACIÓN COMPRENSIVA DE TU DIAGNÓSTICO. UN EXAMEN GENÉTICO TAMBIÉN PUEDE SER BENEFICIOSO PARA GUIARTE EN EL MANEJO DE LA MEDICACIÓN Y ASEGURAR QUE ESTAS RECIBIENDO EL TRATAMIENTO MÁS EFECTIVO.

5) COORDINACIÓN DEL CUIDADO PRIMARIO: ESTABLECER UN CUIDADO  CON UN TERAPEUTA DE CUIDADO PRIMARIO, ES CLAVE. CONTROLES SANGUÍNEOS REGULARES, INCLUYENDO ANÁLISIS DE ORINA, ELECTROFISIOLOGÍA Y ESCANEOS TOXICOLÓGICOS, SON NECESARIOS PARA MONITOREAR TU SALUD GENERAL Y EL IMPACTO DE LAS MEDICACIONES.

ES IMPORTANTE PARA MÍ QUE RECIBAS EL CUIDADO Y SOPORTE APROPIADOS, NECESARIOS PARA TU BIENESTAR. YO RECOMIENDO QUE VOS BUSQUES UN ESPECIALISTA O UNA DEPENDENCIA QUE PUEDA OFRECERTE EL CUIDADO INTENSIVO Y LOS RECURSOS QUE TU NECESITAS TODO EL TIEMPO.

PARA ASISTIR CON ESTA TRANSICIÓN, AQUÍ HAY UNA LISTA DE TERAPEUTAS EN TU ÁREA, QUE PODRÍAN ASISTIRTE CON TUS NECESIDADES

1) ANGELA CONWAY ████████████
2) ANN EUSTACE MS LMHC ██████
3) HANLEY CENTER REHAB
4) CARON TREATMENT CENTER
5) RIVERSIDE RECOVERY OF TAMPA

GRACIAS POR TU COMPRENSIÓN Y TE DESO LO MEJOR EN TU CONTINUO VIAJE HACIA TU SALUD MENTAL Y BIENESTAR. SINCERAMENTE RACHEL ROHAIDY MD, PSIQUIATRA.-"

Cabe destacar que el señor Bledi Vata (██████████ resulta ser quien fue guardaespaldas de Liam en Londres (Gran Bretaña) y en Florida (USA) desde agosto del 2023 hasta el 17 de septiembre de 2024, aportando su celular: +447██████ Que el señor Vata fue echado de su trabajo como guardaespaldas por Liam, en razón de que al renunciar la psiquiatra Dra. Rohaidy a su cargo, Liam fue a ver a otro psiquiatra junto a Rogelio Nores, y ambos le ocultaron los problemas con el alcohol y las drogas que tenía Liam a fin de que le recete medicación psiquiátrica y evite darle las recomendaciones de cuidado que le había dado la Dra. Rohaidy; que en razón de esta situación, Vata decidió ir a ver al nuevo psiquiatra solo y le expuso los verdaderos problemas que tenía Liam, ante tal hecho Rogelio Nores habló con Liam y lo manipuló para que lo despida, cosa que Liam realizó el 17 de septiembre de 2024.-

Asimismo, que la Dra. Rachel Rohaidy (r██████████) resulta ser quien fue la médica psiquiatra tratante de Liam en Florida (USA) hasta el 16 septiembre del 2024.-

Dear Mr. Payne,

I hope this letter finds you well. I am writing to inform you that I will no longer be able to render psychiatric care to you. After careful consideration and assessment of your current needs, I believe that you require a higher level of care, which I, unfortunately, am unable to provide within my practice.

Important factors to consider are the following:

1. **Medication Adherence**: You must take your medications exactly as prescribed. This means taking the medication orally, as instructed, and not by any other means, such as snorting. Altering the method of administration can be dangerous and significantly reduce the effectiveness of your treatment.

2. **Alcohol Consumption**: You should avoid heavy drinking while on medication. According to the National Institutes of Health (NIH), moderate drinking is defined as up to one drink per day for women and up to two drinks per day for men. It is essential to adhere to these guidelines to prevent any negative interactions with your medication and to support your overall mental health.

3. **Therapy Sessions**: It is vital that you speak with a therapist on a weekly basis to process your depression and trauma. Regular therapy sessions will provide you with the support and coping strategies needed to manage these issues effectively.

4. **Medication Compliance and Diagnostic Testing**: Compliance with your medication regimen is crucial. Additionally, you will likely require neuropsychiatric testing for a comprehensive diagnostic evaluation. Gene testing may also be beneficial to guide medication management and ensure that you are receiving the most effective treatment.

5. **Primary Care Coordination**: Establishing care with a primary care physician is key. Regular blood work, including but not limited to urinalysis, electrophysiology, and toxicology screens, is necessary to monitor your overall health and the impact of your medications.

It is important to me that you receive the appropriate care and support necessary for your well-being. I recommend that you seek a specialist or a facility that can offer the intensive care and resources that you need at this time.

To assist with this transition, here is a list of physicians in you area that could possibly assist you with your needs:

1. Angela Conway, ▮▮▮▮▮▮▮
2. Ann Eustace, MS, LMHC ▮▮▮▮▮▮▮
3. Hanley Center Rehab
4. Caron treatment center
5. Riverside Recovery of Tampa

Thank you for your understanding, and I wish you the very best in your continued journey toward mental health and well-being.

Sincerely,

Rachel Rohaidy, MD
Psychiatry

Aportando adjunto al presente el correo electrónico en cuestión, y manifiesto que ofició como traductor a mi requerimiento el sr. Patricio Roitman, DNI 270502██, quien firma todos los documentos en conjunto conmigo.-

Por lo antes expuesto, elevo la presente a los fines que estime corresponder.-

G.R.Payne.

PATRICIO ROITMAN

POR RECIBIDO EN.28./.10./24..

A LAS...10⁰⁰......Hs. CONSTE.

FISCALIA CRIM. Y CORR. Nº44

Ma. Florencia Lavaggi
Secretaria

From: Bksd Vida <bvida55@gmail.com>
Date: 25 October 2024 at 15:47:26 GMT-3
To: Paul Higgins <paulphiggins@yahoo.com>
Subject: Fwd: Termination of care

------ Forwarded message ------
From: Rachel Rohauty M.D. <rrohautymd@hotmail.com>
Date: Tue, 17 Sept 2024, 02:53
Subject: Fwd: Termination of care
To: Bvida55@gmail.com <Bvida55@gmail.com>

Rachel Rohauty MD

Begin forwarded message:

From: "Rachel Rohauty M.D." <rrohautymd@hotmail.com>
Date: September 16, 2024 at 9:52:04 PM EDT
To: rose.rossi@willucmd6.com
Subject: Termination of care

Good evening Roger

I'm sending this letter to you as I do not have Liam's email address. Under the circumstances I unfortunately do not feel comfortable continuing psychiatric care to Liam. These medications are delicate and mixed with alcohol can be deadly. I do not have the staff to help Liam during times of crisis nor do I have here myself to give to him the 2 hrs it can sometimes take me.

I wholeheartedly believe he needs more attention one on one / personalized care, which I am just not able to provide.

Take care
Rachel Rohauty MD

1 archivo adjunto · Analizado por Gmail

Item payne.docx

( Responder ) ( Responder a todos ) ( Reenviar )

# <u>EXHIBIT L</u>

Screenshot of video call of July 30, 2024 between Liam and certain advisors about: (1) Liam moving to Florida; and (2) Liam moving his business operations and structure to Palm Beach County, Florida

**Exhibit L –**

**Screenshot of Video call on July 30, 2024 between Liam and certain advisors about (1) Liam moving to Florida and (2) Liam moving his business operations and structure to Palm Beach County, Florida**



# __EXHIBIT M__

Photo of Liam Payne and Niall Horan meeting together in
Buenos Aires, Argentina in October 2024

# Exhibit M –

**Photo of Liam Payne and Niall Horan meeting together in Buenos Aires, Argentina in October 2024.  [Note that in the Exhibit M Paul Higgins Sworn Declaration at page 9/10 Mr. Higgins falsely stated that Liam Payne did not meet together with Niall Horan in October 2024 in Buenos Aires, Argentina**

Liam Payne and Niall Horan meeting together in October 2024 in Buenos Aires, Argentina:



1. Below is an extract from bottom of page 9 and top of page 10 of the Exhibit M Paul Higgins October 23, 2024 Sworn Decoration which is in Spanish and English.

2. Mr. Higgins falsely stated that Liam Payne and Niall Horan did not meet in October 2024 in Buenos Aires, Argentina because  Niall  Horan refused to meet with Liam Payne because Liam was using drugs. Mr. Higgins statement is simply false.

**English Certified Translation:**

…that they were going to travel to Argentina to see Niall (Liam's ex-partner) and to renew his US visa. That seemed like a good plan to me because Niall is a very healthy person and I thought it was good for Liam to strengthen that relationship. I specifically asked Roger to look after Liam, that he could not consume alcohol or drugs, that he had to be looked after for his well-being, and also if the intention was for him to go back to work, because no one in the industry would work with him if he was unwell. Roger assured me at the time (September before traveling to Argentina) that Liam was clean, [that he was] not using alcohol or drugs. Roger asked me if I could please get him 15 tickets for Naill's concert. It seemed very strange to me because I realized that his intention to reunite Liam with Naill [sic] was not genuine, because otherwise you would not ask me for 15 tickets. That meeting did not occur because apparently, Naill [sic] refused to meet with Liam because he saw on social media that he was not well, he realized that he was using drugs. I watched those videos four days before Liam died, and I could tell by the way Liam moved that he was unwell.

**Spanish Original Version:**

que iban a viajar a Argentina para ver a Niall (ex compañero de Liam) y para renovar su visa Americana. Eso me parecio un buen plan porque Niall es una persona muy sana y me parecia que estaba bueno que Liam fortaleciera esa relacion. Yo expresamente le pedi a Roger que cuidara a Liam, que no podia consumir alcohol ni drogas, que habia que cuidarlo por su bienestar y tambien si la idea era que volviera a trabajar porque nadie de la industria iba a trabajar con el si estaba mal. Roger me aseguro en ese momento (septiembre previo a viajar a Argentina) que Liam estaba limpio, no consumia alcohol ni drogas. Roger me pidio por favor si le conseguia 15 tickets para el recital de Naill. A mi me parecio muy raro porque me di cuenta que su intencion de reunir a Liam con Naill, no era genuina, porque sino, no me pedis 15 tickets. Ese encuentro no existio porque aparentemente Naill rechazo a Liam porque veia en las redes sociales que el no estaba bien, se dio cuenta que estaba consumiendo. Yo cuatro dias antes de la muerte de Liam vi esos videos, y me di cuenta por la forma de moverse de Liam que estaba mal.

 

**Certified Translation**

*In the Business of Helping People since 2002.*

…that they were going to travel to Argentina to see Niall (Liam's ex-partner) and to renew his US visa. That seemed like a good plan to me because Niall is a very healthy person and I thought it was good for Liam to strengthen that relationship. I specifically asked Roger to look after Liam, that he could not consume alcohol or drugs, that he had to be looked after for his well-being, and also if the intention was for him to go back to work, because no one in the industry would work with him if he was unwell. Roger assured me at the time (September before traveling to Argentina) that Liam was clean, [that he was] not using alcohol or drugs. Roger asked me if I could please get him 15 tickets for Niall's concert. It seemed very strange to me because I realized that his intention to reunite Liam with Niall [sic] was not genuine, because otherwise you would not ask me for 15 tickets. That meeting did not occur because apparently, Niall [sic] refused to meet with Liam because he saw on social media that he was not well, he realized that he was using drugs. I watched those videos four days before Liam died, and I could tell by the way Liam moved that he was unwell.

---

**CERTIFICATION: Translation from Spanish into English**

I, Diego D. Rodriguez, a professional translator with over 20 years of experience in the translation business, member number 231266 of the American Translators Association, President and Director of Tranlanguage Inc., a certified translation services company duly incorporated in the State of Florida, hereby certify the foregoing to be a translation made by a professional and qualified translator, fluent in the abovementioned languages and experienced in the translation of this type of documents. To the best of my knowledge and belief, this translator produced a true and accurate translation of the pertinent part of the photocopy of the source document, which is attached hereto. This certification does not cover the legitimacy of the source document nor the truthfulness of the information contained therein. In witness whereof, I set my hand and seal on January 13, 2025.

---



…que iban a viajar a Argentina para ver a Niall (ex compañero de Liam) y para renovar su visa americana. Eso me pareció un buen plan porque Niall es una persona muy sana y me parecía que estaba bueno que Liam fortaleciera esa relación. Yo expresamente le pedí a Roger que cuidara a Liam, que no podía consumir alcohol ni drogas, que había que cuidarlo por su bienestar y también si la idea era que volviera a trabajar porque nadie de la industria iba a trabajar con él si estaba mal. Roger me aseguro en ese momento (septiembre previo a viajar a Argentina) que Liam estaba limpio, no consumía alcohol ni drogas. Roger me pidió por favor si le conseguía 15 tickets para el recital de Naill. A mí me pareció muy raro porque me di cuenta que su intención de reunir a Liam con Naill, no era genuina, porque sino, no me pedís 15 tickets. Ese encuentro no existió porque aparentemente Naill rechazo a Liam porque veía en las redes sociales que él no estaba bien, se dio cuenta que estaba consumiendo. Yo cuatro días antes de la muerte de Liam vi esos videos, y me di cuenta por la forma de moverse de Liam que estaba mal.

# <u>EXHIBIT N –</u>

January 10, 2025 email from English Counsel Bray & Krais acting as counsel for Defendant Geoff

**From:** Simon Goodbody <simong@brayandkrais.com>
**Sent:** Friday, January 10, 2025 6:18 PM
**To:** James Whisenand <jdw@w-tgroup.com>
**Cc:** Richard Bray <richard@brayandkrais.com>; Udo Onwere <udo@brayandkrais.com>; Catherine Rogers <catherine@brayandkrais.com>
**Subject:** Geoff Payne - Rogelio Nores

Dear Mr Whisenand

We are instructed by the Estate of Liam Payne.

Liam's father, Geoff Payne ("**GP**"), has provided us with a copy of your two letters to him dated 8 January 2025 (copies attached) and the various related enclosures.

Your correspondence purports to express condolence and sympathy for GP's loss, before seeking to articulate the basis for a claim in defamation against GP on behalf of Rogelio Nores in consequence of the evidence provided by GP to the Argentinian authorities in support of their investigation into the death of Liam Payne.

The statements of which your client complains were not enclosed with your correspondence (despite the suggestion that they were to appear as appendices to your second letter).  Nonetheless, you suggest that Mr Nores has suffered irreparable damage and monetary damages in excess of $10m, with daily damages "*in excess of $100,000*", and invite GP to withdraw substantial parts of the evidence which he has provided to the authorities.

We are deeply concerned by your client's actions.  Quite apart from the obviously distasteful nature of your client's decision to engage lawyers to send threatening and upsetting correspondence to GP at a time when he and his wider family are overwhelmed by the most profound grief, it seems to us that your client is seeking to interfere with a Police investigation by pressuring GP to change his evidence.  If that is right, and your client does not urgently reconsider his position, we will be compelled to bring his actions to the attention of the Argentinian authorities.

The Estate is also extremely concerned by the effect of your client's actions on Liam Payne's son, Bear Payne (the sole beneficiary of Liam Payne's Estate).  The suggestion that Mr Nores will "*donate the net financial proceeds paid for the benefit of Liam's son*" is pointless and of no comfort when compared to the irreparable damage that would be done to Bear if your client were to initiate a public claim against his grandfather when he is trying to process the loss of his father.  Mr Nores cannot pretend that he has Bear's best interests at heart.

The Estate could not take this matter more seriously.  It has therefore taken the decision to support GP in this matter.  GP denies, in the strongest possible terms, that he has defamed or otherwise caused any harm to your client (in the manner set out by your correspondence of 8 January 2025 or otherwise).  If compelled to do so, he will instruct counsel in Florida to deal with any claims which Mr Nores maintains.  The Estate will also take whatever steps are necessary to preserve the integrity of the Police investigation in Argentina.

In all the circumstances, we invite your client to voluntarily withdraw his claims such that the parties may draw a line under this regrettable episode now.  Please take instructions and let us

know his position by close of business on Monday 13 January 2025.  Absent an affirmative response from you at that time, we will pick this matter up with counsel in Argentina and Florida (the latter who will be engaged to respond substantively to the allegations which have been advanced by your correspondence to date).

We look forward to hearing from you. In the meantime, all our client's and GP's rights and remedies in this matter are, and will remain, fully and expressly reserved.

Yours faithfully

Bray & Krais

**Simon Goodbody**
**Partner**
Bray & Krais
Suites 9 & 10
Fulham Business Exchange
The Boulevard
Imperial Wharf
London SW6 2TL

**Tel:**  +44 (0)20 7384 3050
**Mob:** +44 (0)7799 895993
www.brayandkrais.com

# **EXHIBIT O –**

January 13, 2025 email from Plaintiff's Counsel to Defendant Geoff's Counsel

**From:** James Whisenand
**Sent:** Monday, January 13, 2025 1:37 PM
**To:** 'Simon Goodbody' <simong@brayandkrais.com>
**Subject:** RE: Geoff Payne - Rogelio Nores

Dear Mr. Goodbody.

Thank you for your note.

If you have any information documents or independent corroboration that proves the contents of the January 8, 2025 letter to Mr. Payne inaccurate in any respect, please forward the information and documents at your earliest convenience

Unless you have already done so, it would be most appreciated if you would please do a detailed and complete due diligence review of each paragraph of the Geoff Payne declarations of October 22 and 25, 2024. The purpose is to do  post sworn declaration signing deliberative due diligence to ascertain whether the statements in the 2 Geoff Payne sworn declarations are false in any respect, omit material information and documents which omission makes the declaration false and misleading, are self-incriminating to the author, are internally inconsistent, are not made on personal knowledge rather or made on rumor and hearsay and to establish any verifiable independent corroboration of each paragraph the sworn statements made.

If this important exercise has not been done, I respectfully urge you to do so. If it has been done and you believe the results support the veracity of the 2 sworn declarations, please forward the information and documents forthwith.

As stated in the January 8, 2025 letter, we believe that some important parts of each declaration are false and clear fiction. As published false and clear fiction, the statements are defamatory per se causing injury and damage to Mr. Nores and his reputation on a continuing daily basis.

As an example Geoff Payne omitted the August 23-26, 2024 email exchange with Mr. Nores and  the many people copied in which Mr. Nores made it crystal clear he was not involved in the care of Liam. If you have information and documents to the contrary please forward to me forthwith.

Furthermore, the "another psychiatrist" reference in Mr. Payne's 2nd Sworn Declaration is pure fiction. It is inconceivable that Mr. Payne has personal knowledge of this false assertion. It is inconceivable that Mr. Payne has any ability to have independent corroborative evidence. Liam and Roger Nores never met with any psychiatrist after September 16, 2024. It is complete fiction. If you have information and documents to the contrary please forward to me forthwith.

You as an attorney have a duty of care to ensure that any sworn declaration is truthful and accurate and a duty of care to correct any false sworn declarations. Please do so immediately.  The failure to conduct this due diligence and to allow the 2 false sworn declarations to be perpetuated raises serious issues.

This a tragic situation in all respects for all people.  We respectfully request your assistance in handling this matter correctly with a mutually agreed retraction or clarification which contains accurate facts supported by independent corroboration.

If you have any of the requested information to provide, please provide it forthwith.

Kind regards

James D. Whisenand
Whisenand & Turner, P.A.
240 Crandon Blvd. Suite250
Key Biscayne, Florida 33149
Tel. +1 305 375-8484
Fax +1 305 374- 2919
Mob +1-305-773-7518
www.w-tgroup.com